# DISTRICT COURT OF THE VIRGIN ISLANDS

## DIVISION OF ST. CROIX

| | |
|---|---|
| MING YANG, Individually and on Behalf of All Others Similarly Situated, | CASE No.: 12-CV-00054-WAL-GWC |
| Plaintiff, | CLASS ACTION |
| vs. | |
| TIBET PHARMACEUTICALS,INC, HONG YU, TAYLOR Z. GUO, SABRINA Y. REN, WENBO CHEN, YOUHANG PEN, SOLOMON CHEN, ANDERSON & STRUDWICK INCORPORATED, STERNE AGEE GROUP, INC., HAYDEN ZOU, and L. MCCARTHY DOWNS III | **JURY TRIAL DEMANDED** |
| Defendants. | |
| ROBIN JOACHIM DARTELL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | CASE No.: 12-CV-00089-WAL-GWC |
| Plaintiff, | CLASS ACTION |
| vs. | |
| TIBET PHARMACEUTICALS, INC, HONG YU, TAYLOR Z. GUO, SABRINA Y. REN, WENBO CHEN, YOUHANG PEN, SOLOMON CHEN, ANDERSON & STRUDWICK INCORPORATED, STERNE AGEE GROUP, INC., HAYDEN ZOU, L. MCCARTHY DOWNS III and, ACQUAVELLA, CHIARELLI, SHUSTER, BERKOWER & CO., LLP, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1

Lead Plaintiffs Obasi Investment Limited, Jingli Shao, Robin Dartell, Lixin Wu, and Jason Helton (collectively "Plaintiffs" or "The Obasi Group") and named plaintiffs John Black and Sean Carithers ("Named Plaintiffs") (collectively Lead Plaintiffs and Named Plaintiffs are "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, Chinese court filings, wire and press releases published by and regarding Tibet Pharmaceuticals, Inc. ("Tibet" or the "Company"), securities analysts' reports and advisories about the Company, review and analysis of PRC news reports, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased the common stock of Tibet in the Company's Initial Public Offering ("IPO") on January 24, 2011 or purchased Tibet stock thereafter in the stock market pursuant, and/or traceable to, the Company's Registration Statement and Prospectus issued in connection with the IPO during the period from January 24, 2011 to April 3, 2012 (the "Class

Period").  This Complaint seeks to recover damages to the Class members caused by defendants'
violations of federal securities laws under the Securities Act of 1933 (the "Securities Act").

2.      On January 24, 2011, Defendant Anderson & Strudwick served as Underwriter of
Tibet's IPO and sold $16.5 million of Tibet common stock to investors by means of a false and
misleading initial offering prospectus that misrepresented Tibet as a financially sound and profitable
company.  In truth, Tibet had defaulted on a $4.54 million loan secured by Tibet's operating assets.

3.      On September 10, 2010, a Chinese court entered judgment against Tibet for $4.54
million.  Tibet didn't pay the judgment.  On January 10, 2011, two weeks prior to the IPO, the court
entered an order permitting the bank to seize all of Tibet's operating assets.

4.      Thus, when A&S sold $16.5 million of Tibet stock to investors, Tibet had lost its
entire business.  A&S sold investors stock in a defunct company whose assets were being seized by
the bank and which was on the verge of bankruptcy.

5.      Eventually the value of Tibet dropped to zero and investors suffered a complete loss
of their investment.

6.      Plaintiffs believe that Anderson & Strudwick (through its successor Sterne Agee) still
maintains control over approximately $14.4 million of the $16.5 million it received from the sale of
Tibet stock in the IPO that is kept in an escrow account in a Hong Kong bank.

7.      Plaintiffs seek the return of these funds that are under Anderson & Strudwick's
control.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of
the Securities Act (15 U.S.C.  §§ 77k, 77l and 77(o)).

9.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v(a).

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(d) and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a).

11.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Lead Plaintiff Obasi Investment Limited purchased 334,000 shares of Tibet stock from March 12, 2012 to March 30, 2012, issued pursuant and traceable to the Registration Statement issued in connection with the IPO.

13.     Lead Plaintiff Jingli Shao purchased 64,500 shares of Tibet stock on February 28, 2012, and 85,300 shares on March 1, 2012, issued pursuant and traceable to the Registration Statement issued in connection with the IPO.

14.     Lead Plaintiff Robin Dartell purchased 156,590 shares of Tibet stock on March 16, 2012, issued pursuant and traceable to the Registration Statement issued in connection with the IPO.

15.     Lead Plaintiff Lixin Wu purchased 102,345 shares of Tibet stock from February 28, 2012 to March 5, 2012, issued pursuant and traceable to the Registration Statement issued in connection with the IPO.

4

16.    Lead Plaintiff Jason Helton purchased 70,000 shares of Tibet stock on February 28, 2012, and 7,000 shares on March 2, 2012, issued pursuant and traceable to the Registration Statement issued in connection with the IPO.

17.    Named Plaintiff John Black purchased 5,000 shares of Tibet stock at $5.50 per share directly from and through Anderson & Strudwick on January 24, 2011 in the IPO.

18.    Named Plaintiff Sean Carithers purchased 6,000 shares of Tibet stock at $5.50 per share directly from and through Anderson & Strudwick on January 24, 2011 in the IPO.  Thereafter, Mr. Carithers purchased 26,000 additional shares of Tibet stock during the Class Period.

19.    Each of the Lead Plaintiffs' certifications pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") listing their Tibet stock purchases and sales have been previously filed with the Court and are incorporated by reference herein.

20.    Named Plaintiffs' PSLRA certifications are attached hereto and incorporated by reference herein.

21.    Plaintiffs all purchased Tibet shares traceable to the IPO Registration Statement and Prospectus during the Class Period.  Each has suffered losses as a result.

22.    Plaintiffs' shares are traceable to the IPO Registration Statement and Prospectus because the IPO was the only offering conducted by Tibet.

23.    Defendant Tibet is a British Virgin Islands corporation that purportedly engages in the research, development, manufacturing, marketing and selling of modernized traditional Tibetan medicine in the People's Republic of China ("PRC" or "China").  Tibet is a holding company with two wholly owned subsidiaries: China Tibetan Pharmaceuticals Limited ("China Tibetan"), incorporated in Hong Kong, and Yibo Information Consulting (Shenzhen) Company Ltd. ("Yibo"),

incorporated in the PRC.  Neither China Tibetan nor Yibo conducts any revenue-generating operations.

24.    Tibet's sole operational entity is Yunnan Shangri-La Tibetan Pharmaceutical Group Limited ("Yunnan Tibetan" or "YSTP"), a company incorporated in the PRC.  Due to limitations imposed by PRC law, Tibet does not have direct equity ownership of Yunnan Tibetan.  Instead, Tibet's wholly owned PRC subsidiary Yibo has a series of contractual relationships with Yunnan Tibetan that provides with it with effective control over the operations of Yunnan Tibetan and the economic benefits derived therefrom.  All of Tibet's business is conducted through Yunnan Tibetan.

25.    The following is a diagram of Tibet's corporate structure, taken from Tibet's Prospectus:



26.     Defendant Taylor Z. Guo ("Guo") has served as Tibet's Chief Executive Officer and Director since 2010.  Prior to that he served as CEO of Yunnan Tibetan since mid-2009.  Guo signed the registration statement in connection with the IPO. Guo is a PRC citizen residing in the PRC.

27.     Defendant Hong Yu ("Yu") has been Tibet's Chairman of the Board of Directors since April, 2010 and served as Yunnan Tibetan's chairman and CEO from 2000 to 2009.  Yu signed the registration statement in connection with the IPO. Yu is a PRC citizen residing in the PRC.

28.     Defendant Sabrina Y. Ren ("Ren") has served as Tibet's Chief Financial Officer since 2010.  Ren signed the registration statement in connection with the IPO. Ren is a PRC citizen residing in the PRC.

29.     Defendant Wenbo Chen ("Chen") has served as a Tibet Director since April 2010. Chen signed the registration statement in connection with the IPO. Chen is a PRC citizen residing in the PRC.

30.     Defendant Youhang Peng ("Peng") has served as a Tibet Director since April 2010. Peng signed the registration statement in connection with the IPO.  Upon information and belief, Peng is a PRC citizen residing in the PRC.

31.     Defendant Solomon Chen ("S. Chen") has served as a Tibet Director since April 2010. S. Chen signed the registration statement in connection with the IPO. S. Chen is a PRC citizen residing in the PRC.

32.     Defendant Anderson & Strudwick, Incorporated, ("A&S"), a corporation headquartered in Virginia, was an underwriter of the IPO, selling three million shares of Tibet stock at $5.50 per share to Named Plaintiffs and other Class Members.

33.     Defendant Sterne Agee Group, Inc. ("Sterne Agee") is a financial holding company incorporated in Delaware and is headquartered in Alabama.  On or about December 2011 Sterne Agree acquired A&S and assumed all of the assets and liabilities of A&S.

34.     Sterne Agee is liable for the acts of A&S as a successor-in-interest.  Thus, "A&S" as used herein shall sometimes refer to both defendants A&S and Sterne Agee.

35.     Defendant L. McCarthy Downs III ("Downs") was A&S's designated observer to Tibet's Board of Directors in connection with the IPO.  He was also A&S' Managing Director and one of the lead investment bankers who orchestrated Tibet's IPO. According to the Prospectus, as an observer to the Board of Directors, Downs may "significantly influence the outcome of matters submitted to the Board of Directors."  Observers to the Board are compensated the same as other, independent Directors.

36.     Defendant Hayden Zou ("Zou") was A&S's designated observer to Tibet's Board of Directors in connection with the IPO.  Zou is currently the sole Director of China Tibetan, Tibet's Hong Kong subsidiary, and has total control over Tibet's IPO proceeds.   According to the Prospectus, as an observer to the Board of Directors, Zou may "significantly influence the outcome of matters submitted to the Board of Directors."  Observers to the Board are compensated the same as other, independent Directors.  Zou resides in the PRC.

37.     A&S, Sterne Agee, Downs, and Zou are sometimes referred to herein as the "Underwriter Defendants."

38.     Acquavella, Chiarelli, Shuster, Berkower & Co. LLP ("Acquavella" or "Auditor Defendant") is a certified public accountant and advisory firm headquartered in Iselin, New Jersey, and at all relevant times herein was Tibet's Independent Registered Public Accounting Firm.

8

39.     Acquavella provided an unqualified audit opinion in Tibet's registration statement and prospectus for the IPO.

40.     Guo, Yu, Ren, Chen, Peng, S. Chen, Downs and Zou are sometimes referred to herein as the "Individual Defendants."

## DEFENDANTS' VIOLATIONS OF THE SECURITIES LAWS

### *Tibet's Inaccurate Registration Statement and Prospectus*

41.     On December 16, 2010 Tibet filed an amended registration statement ("Registration Statement") and preliminary prospectus with the SEC in connection with the IPO.

42.     On December 28, 2010 the SEC declared the registration statement effective.

43.     On January 18, 2011 Tibet filed with the SEC the final version of the prospectus contained in the Registration Statement (the "Prospectus").

44.     A&S as Underwriter and placement agent for the IPO distributed the Prospectus to over two thousand investors and used the Prospectus to solicit and persuade these investors to purchase shares of Tibet stock in the IPO.  A&S contacted thousands of investors and solicited their purchase of Tibet stock in the IPO.

45.     The Prospectus was the main instrument that A&S used to convince Class members to purchase shares of Tibet stock in the IPO.

46.     On January 24, 2011, the IPO was completed for 3 million shares at $5.50/share.  The IPO raised $16.5 million total.  After expenses, net proceeds to Tibet from the offering totaled $14.42 million.

47.     Tibet's Registration Statement and Prospectus contained false statements of material fact and omitted to state material facts about Tibet and its financial condition.

9

48.     The Registration Statement and Prospectus overstated Tibet's assets, misrepresented Tibet's indebtedness, and failed to disclose a series of adverse court judgments for millions of dollars entered against Tibet and the freezing of the assets of Yunnan Tibetan, Tibet's sole operating entity.

49.     As a result, Tibet was presented to the U.S. capital markets as a profitable and growing company, when in truth, Tibet had defaulted on $4.54 million of loans and was on the verge of bankruptcy.

50.     The Registration Statement and Prospectus falsely state that as of 9/30/2010, Tibet had $27 million in assets, including $8.3 million in cash, and that as of 12/31/2009, Tibet had $17.9 million in assets, including $4 million in cash.  This is false and misleading because, as detailed below, Tibet was actually on the verge of bankruptcy at the time of the IPO, and in default on $4.54 million in secured loans from the Agricultural Bank of China.  These loans were secured by the assets of Yunnan Tibetan.

51.     The Registration Statement and Prospectus further state that Tibet owed $3.58 million on a long-term loan as of 12/31/2009, increasing to $3.65 million as of 9/30/2010, presumably due to accrued interest.  The Registration Statement and Prospectus indicate that the debt consisted of two unnamed bank loans, both not due until November 2011.  This is false and misleading because, as detailed below, it failed to disclose that Tibet was in default on three loans from the Agricultural Bank of China, totaling $4.54 million, and had a court judgment and enforcement order entered against it as a result.

*Tibet's Undisclosed Bank Loans Come to Light*

52.     On January 18, 2010, the Agricultural Bank of China filed a lawsuit ("Bank Suit") in the People's Intermediate Court in China's Yunnan Province against Yunnan Tibetan for defaulting

on three loans, all of which were secured by the assets of Yunnan Tibetan – Tibet's sole operating entity.

53.     The Bank Suit alleged that Yunnan Tibetan took out three loans from the Agricultural Bank of China from 1999 to 2003 totaling RMB 20,630,000, of which RMB 20,330,000 – essentially the entire amount – remained unpaid and were past due.  The following table details the loans and the amount unpaid (interest not included):

| Loan Date | Loan Amount | Balance Remaining |
|---|---|---|
| Dec 29, 1999 | RMB 2,700,000 | RMB 2,400,000 |
| Aug 15, 2003 | RMB 10,230,000 | RMB 10,230,000 |
| Oct 16, 2003 | RMB 7,700,000 | RMB 7,700,000 |
| Total | RMB 20,630,000 | RMB 20,330,000 |

54.     The Bank Suit demanded that Yunnan Tibetan repay the RMB 20,330,000 principal plus RMB 9,884,088 in accrued interest, for a total of RMB 30,214,088.  Under the average December, 2010 exchange rate of RMB 6.65 to $1 USD, the RMB 30,214,088 is equivalent to about $4.54 million USD.

55.     On September 10, 2010, the People's Intermediate Court entered a judgment against Yunnan Tibetan.  The judgment (attached as Exhibit 1) stated that Yunnan Tibetan was served and summoned by the court to appear for trial on July 20, 2010, but Yunnan Tibetan failed to appear and did not contest the Bank Suit.  This September 10, 2010 court judgment ordered Yunnan Tibetan to repay its $4.54 million debt to the Agricultural Bank of China within 60 days.

56.     Yunnan Tibetan did not pay its debt within 60 days of the court judgment (i.e. by November 9, 2010).  As a result, the People's Intermediate Court entered an enforcement order (attached as Exhibit 2) on January 10, 2011, freezing all of Yunnan Tibetan's assets:

In accordance with Articles 8, 44, 60, 196, 205, 206 of the Contract Law of the People's

11

Republic of China and the relevant implementation rules and regulations, we hereby order the freezing of all the assets of the Respondent, consisting of: 1) a parcel of land located at the west side of Niwang Road, Jiantang Town, Shangri-la County, Diqing Region (Land #: A-(11)-2-2, covering an area of 12369 square meters); 2) House and Construction on the land (Deed #: 53305000014 with construction area of 6,708.13 square meters); and 3) Machinery, process equipment, air-conditioning equipment, electrical equipment, boiler equipment, water supply, and drainage equipment.

57.     These drastic and adverse court actions all occurred while Tibet was still in the process of registering its securities with the SEC in connection with the IPO (i.e. filing and amending its Registration Statement and Prospectus).  Neither the Registration Statement, which did not become effective until December 28, 2010, nor the final Prospectus filed on January 18, 2011 disclosed any of this critical adverse information.

58.     On February 17, 2012, with the loans still not repaid, the Agricultural Bank of China proceeded to auction off the operating assets of Yunnan Tibetan.  The public auction of Yunnan Tibetan's assets was announced on a website operated by the Kunming Pan Asia Assets and Equity Exchange Center at www.fycqjy.com/cq/102733/102735/98706.html.

59.     Seeking to conceal the auction, the Company issued a press release via PR Newswire on February 27, 2012.  In this press release, Hong Yu, Chairman of Tibet's Board of Directors, dismissed announcements of the public auction as "untrue and incorrect."  Yu stated that the Company would conduct an investigation of this "mistaken report" and keep investors informed of the results of the investigation.

60.     There were no indications that any "investigation" was ever conducted, and no "results" were released.

61.     Kunming Pan Asia Assets and Equity Exchange Center's announcement of the auction of Yunnan Tibetan's assets was not a hoax.  The Supreme People's Court of China publishes

online a list of all current enforcement orders issued by all the lower courts in China.  The court order freezing Yunnan Tibetan's assets to satisfy a debt of RMB 30,214,088 appeared on that list.  A screenshot of the relevant page from the Supreme People's Court's website is attached as Exhibit 3.

62.    These court actions in China were not trivial ones that companies could simply ignore.  The court had decreed Yunnan Tibetan in default of bank loans and had put all of the company's operating assets up for auction to satisfy the Company's debt.  This was critically material information that any investor would want to know, and needed to know, before investing in Tibet.

63.    The asset and cash figures reported in the Registration Statement and Prospectus were false and misleading.  If Tibet really had $27 million in assets, including $8.3 million in cash, in 2010, and $17.9 million in assets, including $4 million in cash, in 2009, then Tibet would not have defaulted on its loans, and would not have had to suffer the ignominy of having its assets frozen and publicly auctioned.

64.    The false nature of the financial figures presented in the Registration Statement and Prospectus is further corroborated by a news report that appeared in China on April 19, 2012.  The news report was a feature on Zhang Yingyun, the CEO of Kunming Shangri-La Medicine Co., Ltd. ("Kunming Shangri-La").  Kunming Shangri-La is allegedly Tibet's largest customer.  According to the news report, Zhang Yingyuan was a former business partner of Hong Yu and one of the original founders of Yunnan Tibetan, along with Hong Yu.  Zhang Yingyuan was associated with Yunnan Tibetan for about ten years before leaving to Kunming Shangri-La.  The news report claimed that: "through [Zhang Yingyuang's] efforts, Yunnan Tibetan, which had been on the verge of bankruptcy,

13

was successfully pushed on to the stock market in the United States." The article can be found at:

news.kunming.cn/km-news/content/2012-04/19/content_2921449_2.htm

65.     The debt figures reported in the Registration Statement and Prospectus were false and

misleading. By January 2010, Tibet was in default of about $4.54 million in loans, as a result of

Tibet's failure to pay back three loans taken out between 1999 and 2003 from the Agricultural Bank

of China. The Registration Statement and Prospectus falsely and misleadingly reported that Tibet

was current on its outstanding indebtedness (i.e. not in default) and that it owed only $3.5 million as

of 12/31/2009, and $3.6 million as of 9/30/2010, and that this debt was comprised of two bank loans,

both not due until November 2011.

***Subsequent Events***

66.     On June 6, 2011, Defendant Guo inexplicably resigned as CEO of Tibet and Yunnan

Tibetan, agreeing not to receive any severance payments. He later resigned as a director on January

12, 2012.

67.     On September 6, 2011, the Company's auditor Acquavella, Chiarelli, Shuster,

Berkower & Co., LLP, abruptly resigned, without explanation.

68.     On April 3, 2012, the NASDAQ halted trading in Tibet's stock for "additional

information requested."

69.     Having failed to provide the "additional information requested," the Company's stock

was delisted from the NASDAQ, and began trading over the counter on the Pink Sheets, on April 27,

2012.

70.     As a result, on the first day of trading on April 27, 2012, Tibet stock fell from $1.29/share to $.35/share, losing 72% of its value.  As of February 11, 2013, Tibet stock is trading at $0.01/share.

71.     Plaintiffs are now holding Tibet stock that is completely worthless.

**The IPO Proceeds are now in Hong Kong and controlled by Hayden Zou**

72.     For international hybrids structured in the way of Tibet, net proceeds from IPOs are first deposited in an escrow account setup by the underwriters.  Next, the money is transferred to a Hong Kong bank account owned by the company's Hong Kong subsidiary.  Finally, the Hong Kong subsidiary makes an application with PRC State Administration of Foreign Exchange (SAFE) to remit the proceeds to the company's PRC subsidiary.

73.     Hence in the case of Tibet, the net proceeds from the IPO, totaling $14.42 million, were initially deposited by Defendant A&S into an escrow account in Virginia's SunTrust Bank.

74.     The net proceeds were subsequently transferred to China Tibetan, Tibet's Hong Kong subsidiary, and deposited in China Tibetan's HSBC account in Hong Kong.

75.     This is corroborated by Tibet's Form 10-Q for the period ending March 31, 2011, which states: "As of March 31, 2011, the Company had received the proceeds of the offering, had not yet applied it to any use, and is holding the proceeds in a bank account pending their use."

76.     Tibet's latest Form 10-Q, for the period ending September 30, 2011, similarly states: "As of September 30, 2011, the Company had received the proceeds of the offering, had not yet applied it to any use, and is holding the proceeds in a bank account pending their use."

77.     The net proceeds have not yet been transferred to Tibet's PRC subsidiary.   Any

15

foreign company wishing to inject capital in its PRC subsidiary must apply with the SAFE and

go through a formal process governed by PRC law.  This is also explained in Tibet's Prospectus:

> We will not be able to use the proceeds of the offering in China until we complete certain remittance procedures in China, which in the ordinary course may take approximately six months from the close of an offering. To remit the proceeds of the offering, we must open a special foreign exchange account after submitting to SAFE certain documents, remit the offering proceeds into that account, and finally apply for settlement of the foreign exchange by submitting to SAFE certain application forms, identity documents, payment orders to a designated person, and a tax certificate.

A report published by China Equity Research states that inquiries made to the State

Administration of Foreign Exchange (SAFE) showed no record of any application forms filed by

Yibo, Tibet's PRC subsidiary, for transferring foreign capital into China.

78.     In the same report, China Equity Research noted that a search of Yibo's records

with the Shenzhen Administration of Industry and Commerce (SAIC) still showed a registered

capital of only about $15,000 USD as of May 2012.

79.     Hence all, or substantially all, of the net proceeds from the IPO is still deposited in

China Tibetan's HSBC bank account in Hong Kong.

80.     The sole Director of China Tibetan is Defendant Hayden Zou, A&S' designated

observer to Tibet's Board of Directors.

81.     As sole director and controller of China Tibetan, Hayden Zou is the only person

with the authority to approve any transfers of the IPO proceeds out of China Tibetan's bank

account.

82.     Therefore, Hayden Zou has full control over the IPO net proceeds at this time.

83.     Hayden Zou is the agent of A&S.  Therefore, A&S has full control over the IPO

net proceeds at this time.

## THE UNDERWRITERS ARE LIABLE

84.     Section 11 of the Exchange Act provides that underwriters are liable for any false

statements of material facts or the omission to state a material fact in a registration statement. [15

U.S.C. § 77k(a)(5)].

85.     Section 12 of the Exchange Act provides that any person who "offers or sells a

security [...] by means of a prospectus or oral communication, which includes an untrue

statement of a material fact" or omission of a material fact is liable.  [15 U.S.C. § 77l(a)(2).]

86.     The underwriters offered or sold Tibet's securities.  The Prospectus indicated that

Anderson & Strudwick was engaged by Tibet as the Underwriter and Placement Agent to

conduct the IPO on a "best efforts, minimum/maximum" basis.

87.     It is commonly understood in the underwriting industry that the underwriter

"prepare[s] disclosure and conduct[s] marketing" of the prospectus and registration statement.[1]

Underwriters "assist the issuer in providing an offering document to investors that discloses all

material information relevant to the offering."[2]

88.     It is unchallenged that as gatekeepers, underwriters must *independently* verify all

material facts in the registration statement.  To conduct a proper due diligence, underwriters must

take an *adverse* role to the issuer during the diligence process.  In other words, underwriters are

required to play "devil's advocate" to the issuer to ensure that the Registration Statement and

Prospectus accurately reflect the financial and business condition of the issuer.

89.     Both Section 11 and Section 12 provide that underwriters are liable for damages

---

[1] Goldman Sachs, Report of the Business Standards Committee, January 2011, at 13.
[2] *Id.*

resulting from materially false misstatements contained in a prospectus or registration statement.

90.     The amount and nature of an issuer's debts, whether the issuer was embroiled in lawsuits, and the issuer's total assets are all material facts requiring inquiry <u>and</u> independent verification by underwriters.

91.     A proper due diligence here would have required the underwriter to, *inter alia*, inquire and independently verify the amount, nature, and due dates of Tibet's loans, and perform a litigation check to see whether the Company was facing any lawsuits and/or judgments.

92.     William Purcell, an investment banker of over 45 years and an expert witness in more than 100 investment banking related litigation matters, reviewed the Registration Statement and Prospectus and the complaint in this action, and concluded as follows:

> 1)     As an investment banker for more than 45 years, it is my opinion that the investment bank, Anderson & Strudwick, Incorporated ("Anderson"), now owned by the financial holding company and investment banking firm of Sterne Agree Group, Inc., was reckless and negligent, or willfully blind, in undertaking its duty to perform a reasonable due diligence investigation in acting as the placement agent and underwriter during January 2011 in regard to the initial public offering of 3 million shares of common stock (i.e., $16.5 million) of Tibet Pharmaceuticals, Inc. ("Tibet" or the "Company") to investors.
>
> 2)     Anderson's due diligence investigation of Tibet, if in fact any actual due diligence was performed, failed to uncover, among other things, the extremely important if not critical fact that Tibet as of the January 2011 IPO financing

18

date was in default in regard to its outstanding debt with the Agricultural Bank of China - - and that as of September, 2011 a Court judgment had already been entered in China in regard to the default. Any reasonable due diligence investigation would have uncovered this very important fact.

3)    During my career as an investment banker, I have performed due diligence investigations for in excess of 100 financings, both equity and debt financings for both large and medium-sized companies. In addition, during my career I have been an expert witness in over 100 litigation cases, a number of which have involved due diligence issues. I have also advised the Securities & Exchange Commission (the "SEC"), the Internal Revenue Service (the "IRS"), and the Department of Justice (the "DOJ") in regard to certain financial and investment banking issues.

4)    To begin, it is absolutely well understood in the investment banking industry and in the financial community generally, and confirmed in numerous court opinions, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

5)    It is also well understood within the investment banking and financial communities that an investment bank's role and duty as a placement agent or underwriter is to ensure that all material information is included in the offering documents (in this case the registration statement and prospectus, collectively the "Prospectus", for the January 2011 financing for Tibet) and that no

19

material information is omitted that is needed to make the information

provided therein not misleading.

6)      In fact, in the area of selling securities to investors and performing a

reasonable due diligence investigation, investment banks are often referred to

as "gatekeepers". The placement agent or underwriter (i.e., the investment

bank) controls what information is in the Prospectus and it controls the

dissemination of that information to potential investors. Indeed, there is much

literature that supports the premise of investment banks being "gatekeepers".

As an example of an investment bank referring to its duty to perform due

diligence and referring to itself as a "gatekeeper", if one refers to the website

of the prestigious investment bank Goldman Sachs, including a document

called Report of the Business Standards Committee dated January 2011,

Goldman Sachs describes its role as an underwriter or placement agent as

follows: it "prepares the disclosure" in the Prospectus, and will "conduct

appropriate and thorough due diligence on the issuer" and will "endeavor to

ensure there is no material misstatement/omission in the disclosure". Goldman

Sachs also acknowledges its role as a "gatekeeper", i.e., it is stated: "An

underwriter [or placement agent] of financial instruments works with the

issuer in connection with offering financial instruments to investors. In this

context, the securities laws effectively impose a gatekeeper role on Goldman

Sachs: as an underwriter [or placement agent] the firm is expected to assist the

issuer in providing a Prospectus to investors that discloses all material

information that is relevant to the offering." (emphasis added) (Refer to pages 13 and 14 of the Report of the Business Standards Committee.)

7)     The initial public offering of $16.5 million of Tibet common shares to investors was in substance and effect an underwriting.  Although Anderson referred to itself as a placement agent in the Registration Statement and Prospectus, as opposed to calling itself an underwriter, this distinction is only relevant as to its obligation to Tibet to use its "best efforts" to sell the securities to investors as compared to a "firm commitment" to Tibet to buy (own) the securities and then resell the securities to investors. The Tibet financing was an initial public offering of securities to investors, for which Anderson sponsored the offering, solicited the purchasers, distributed the prospectuses to 2,200 investors, and acted as an underwriter in the offering.  It was not a private placement.

8)     In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that in enacting Section 11 of the Securities Act: "Congress recognized that underwriters [investment banks] occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering [financing]. Congress believed that subjecting underwriters [investment banks] to the liability provisions [of the Act] would provide the necessary incentive to ensure their careful investigation of the offering." (emphasis added) (Reference is made to the Regulation of Securities Offerings, SEC Release No 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998.)

The above quoted statement by the SEC was also referred to in Federal Judge (Southern District of New York) Denise Cote's important December 2004 *WorldCom* opinion - - which in effect included a treatise on the history and importance of due diligence in selling securities to investors. Indeed, without an investment bank having performed a reasonable due diligence investigation of an issuer, it would not be possible to make full disclosure in the Prospectus.

9)      In conclusion, because investment banks such as Anderson have ultimate control over the contents and dissemination of the disclosure document, i.e., the Prospectus, an investment bank must make full disclosure or not sponsor the financing if full disclosure is not to be provided. If other participants in a financing refuse to provide/disclose important information, an investment bank should withdraw from the financing. When an investment bank allows its name to appear on the cover of a Prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the Prospectus being used for the stock offering is accurate and not misleading. This is a fundamental and basic expectation of investors - - and investors rely on this expectation when purchasing securities. As Federal Judge Denise Cote stated in her 2004 *WorldCom* opinion: "…, and if unsatisfied, they [the investment banks] must demand disclosure, withdraw from the underwriting process [the financing] or bear the risk of liability." (emphasis added)

10)      Although the term "due diligence" does not appear in any statute or rule, it

22

is well accepted and understood in the investment banking and financial communities that a reasonable due diligence investigation refers to an affirmative duty to verify the accuracy of disclosure concerning securities offerings and that it is expected that a thorough investigation will take place as part of virtually every issuance of securities.

11)    The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied. The due diligence process is not just a "ho-hum" exercise of accepting a company's/management's views or its auditors opinion at face value. The due diligence process is just the opposite. The investment bank should act as a "devil's advocate" by digging and probing within a company. The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

12)    As Professor Robert J. Haft states in his text: The underwriter [investment bank] should look upon due diligence primarily as an attempt to find "red flags" which indicate potential danger. To assist in this search, the underwriter [investment bank] should not hesitate to incur reasonable costs to utilize experts [and attorneys] whenever it feels that neither the corporate finance department nor the firm at large has the expertise necessary to analyze a fundamentally important aspect of a company's business.

23

13)     With respect to the importance of performing a reasonable due diligence investigation in regard to an issuer's financial condition, which investigation would clearly include such things as the appropriate checking for any judgments and/or tax liens against the Company and any off-balance sheet obligations of the Company, it is accepted practice within the investment banking community that the statements by the issuer about its own financial condition are not accepted by the investment bank at face value without adequately questioning the company's auditors and its accounting and financial officers, as well as independently verifying information with third parties.

14)     While the due diligence responsibility is not just that of investment banks, securities regulations and industry practice make it the primary responsibility of investment banks. To quote from Federal Judge Denise Cote's December 2004 *WorldCom* opinion: "No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter [investment bank] … Underwriters [investment banks] function as 'the first line of defense' with respect to material misrepresentations." (emphasis added) Also, as stated previously, the SEC has stated that: "Congress recognized that underwriters [investment banks] occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering." (emphasis added)

15)     In my opinion as an experienced investment banker, it is clear that

24

Anderson did not conduct anything close to a reasonable due diligence investigation in regard to the sale of $16.5 million of Tibet's common stock to investors during January 2011. In 2012, after Plaintiffs' investigation, it became evident that Tibet as of September 2010 ( four months before the date of its initial public offering of common stock) was in fact in default in regard to three loans from the Agricultural Bank of China. Also, it became evident that judgments had actually been entered in Chinese court as of September 2010 as a result of the defaults - - and that Tibet's assets (including its cash) were thus significantly overstated in the Prospectus. Indeed, two weeks before the IPO, the Chinese court issued an order allowing the seizure and sale of all of Tibet's operating assets to satisfy the court judgment.  Given such facts, it appears clear that Anderson did not perform a reasonable due diligence investigation of Tibet - - and indeed was negligent and reckless in its expected duty to investors.

16)     The Tibet Prospectus indicated that the Company was in excellent health, with excellent growth and future prospects. Total sales for the year ended December 31, 2009 were shown as more than 47% above the total sales for 2008 and net income for 2009 was shown as more than 55% above that for 2008. For the nine months ended September 30, 2010, both total sales ($23.9 million) and net income ($10.1 million) were equal to or slightly above that for the full year 2009.

17)     The Company's cash position as of September 30, 2010 was indicated to

be $8.36 million and the net cash inflow (i.e., increase in cash) for the nine months ended September 30, 2010 was shown as $4.28 million. Refer to page 51 of the Prospectus.

18)    The Company's total debt was secured debt (secured by a pledge of certain of the Company's machinery equipment and buildings) and was shown to be $3,645,810 in total amount. The debt was shown as consisting of two loans, with both loans being due in November 2011 (14 months from September 30, 2010). The interest rate on the debt was 5.05% per annum. Refer to pages F-2 and F-12 (Note 3) of the Prospectus. Based on the discoveries during 2012, it appears that the disclosure in the Prospectus about two loans was inaccurate. The default judgments disclosed in the Chinese courts indicated that three loans were in default. Also, the Prospectus did not even disclose to investors to whom the so-called two loans were owed to. The three loans in default, based on Court records, were due to the Agricultural Bank of China.

19)    If the Company really had $8.3 million of cash as of September 30, 2010 and was generating increased cash of more than $4 million per year, how could it possibly be in default on its $3.6 million of indebtedness based on the information in the Prospectus? Given that it was discovered during 2012 that the Company was sued by the Agricultural Bank of China for defaulting on three of its loans as of, or prior to January 18, 2010 (a full year prior to the Initial Public Offering). The Company's financial statements as set forth in the Prospectus were clearly false and misleading.

20)     Given that: (a) Tibet was a medium-sized company whose operating assets were 100% in China, a known very risky business and political environment, (b) that Anderson had no previous business relationship with the Company (i.e., Tibet was a new client), (c) that the Company's auditing firm was a small and little known accounting firm (i.e., Acquavella, Chiarelli, Shuster, Berkower & Co. located primarily in Iselin, New Jersey, with an office also located in New York City), and (d) that the last audit of the Company's financial statements was as of December 31, 2009 (a full 13 months prior to the initial public offering in January 2011), Anderson should have clearly been on full alert to perform a very thorough due diligence investigation of the Company.

21)     Any reasonable due diligence investigation by an investment bank should include extensive and thorough interviews with both a company's chief financial officer and its auditor - - separately, and not together, or in addition to being together. All areas of concern that an auditor may have about the company and/or its accounting decisions should be discussed - - with follow-up questioning if deemed necessary.

22)     For the underwriter to fail to question Tibet's chief financial officer and its auditor as to whether Tibet had disclosed all outstanding bank loans in its financial statements and whether Tibet's debt was in default is a due diligence failure of the highest magnitude.  Similarly, Anderson's failing to inquire to Tibet's Chief Financial Officer, and its auditor as to whether there existed any

27

outstanding court judgments and/or tax liens in China in regard to the

Company is almost beyond imagination. Even if the CFO and auditor do not

disclose any loan defaults, based on my experience, an underwriter or

placement agent of a medium sized foreign-based issuer should independently

contact the bank lender and inquire as to whether or not Tibet is current in its

loan payments.

23)     Moreover, it is an absolute requirement for due diligence in a stock

offering that the underwriter conduct a public records search to ensure that

there are no undisclosed lawsuits, judgments or liens concerning the company.

Had Anderson done a search of the local provincial court records and other

public records in Yunnan Province, it would have uncovered the Bank Suit

and the PRC court judgment and enforcement order.

24)     Anderson's due diligence investigation may have been so inadequate that

it may not have even checked Tibet's filings with its provincial government

regulator in China (known as the State Administration for Industry and

Commerce "SAIC"). It is generally well known within the financial

community which deals with China and Chinese companies that China has

approximately 30 separate governmental provinces, and that each province has

its own SAIC office - - to which companies in that province must, by law, file

their annual financial statements and other information, such as any changes in

equity ownership and/or capital structure. Just as investment banks in the U.S.

check all of the company's SEC filings as part of a reasonable due diligence

investigation, so should an investment bank of a Chinese company check all of the filings made to its provincial SAIC office. This basic procedure could fairly be called Due Diligence 101. If such filings had been reviewed, the default situation – and other inconsistencies in Tibet's financial statements - may have been uncovered.

25)     Equally egregious in its due diligence investigation, Anderson allowed the Company's initial public offering to take place with nine months of unaudited financial statements. Indeed, in my opinion, relying on nine months of unaudited financial statements (i.e., 75% of the year) for a company like Tibet, rather than waiting for a full audit, was itself reckless behavior by Anderson. Anderson probably only had to wait a maximum of 2-3 additional months in order to have a full and complete 2010 audit. Waiting for a full audit would be prudent behavior for most mid-sized U.S. companies, but particularly prudent for a mid-size Chinese company selling securities publicly in the U.S. for the first time. There was no need to rush, except perhaps for Anderson's desire to quickly earn commissions. Indeed, just the opposite would be proper behavior, i.e. take your time to do a full due diligence investigation and allow the auditor, who was also presumably relying on a Chinese auditor, to do a proper job and also to allow the investment bank to ask proper due diligence questions.

26)     The proof of how unreasonable or reckless the due diligence investigation of Tibet was will be confirmed after discovery in this matter has been

29

completed.  Among other things, it will be confirmed whether or not Anderson

has a detailed due diligence memorandum in its file, outlining precisely what

it did in terms of due diligence.  It is a standard procedure in the investment

banking industry to have a detailed due diligence memorandum in the files.

93.       The underwriters here failed to conduct a proper due diligence.  If they did, they

would have discovered, among others, that: (1) Tibet was in default of millions of dollars in

loans from the Agricultural Bank of China, (2) consequently a court judgment had been entered

against Tibet for defaulting on the loans, and (3) Tibet's operating assets had been frozen as a

result.

## THE AUDITOR IS LIABLE

94.       In the Registration Statement, Acquavella certified that "We conducted our audits

in accordance with the standards of the Public Company Accounting Oversight Board (United

States).  Those standards require that we plan and perform the audit to obtain reasonable

assurance about whether the financial statements are free of material misstatement. [...] We

believe that our audits provide a reasonable basis for our opinion. [Paragraph Break] In our

opinion, the financial statements referred to above present fairly, in all material aspects, the

consolidated financial position of Tibet Pharmaceuticals, Inc..."  This certification was signed by

Acquavella on July 19, 2010.

95.       Acquavella consented to have this opinion used in the Registration Statement.

96.       An audit is not just a rubber stamp.  GAAS requires that "sufficient competent

evidential matter is to be obtained through inspection, observation, inquiries, and confirmations

to afford a reasonable basis for an opinion regarding the financial statements under audit." AU

326.01.

97.     Auditing Standard No. 15 ¶ 10 provides that "[w]hen using information produced by the company as audit evidence, the auditor should [...] [t]est the accuracy and completeness of this information."  An auditor cannot take at face value, and blindly accept as truth, audit evidence proffered by the company.  Instead, an auditor is required to exercise professional skepticism throughout the audit process.

98.     Professional skepticism means that an audit be performed with "a questioning mind and a critical assessment of audit evidence." AU 230.07.  Moreover, the auditor is mandated to conduct audits "with a mindset that recognizes the possibility that a material misstatement due to fraud could be present[.]"  AU 316.13.

99.     To comply with audit standards, Acquavella was required to obtain sufficient competent evidential matter relevant to all litigation, claims, and assessments against Tibet.  In meeting this standard, Acquavella must make inquiries to the Company, followed by a letter of audit inquiry to the Company's outside counsel.  AU 337.

100.    AU 337.08 provides that "A letter of audit inquiry to the client's lawyer is the auditor's primary means of obtaining corroboration of the information furnished by management concerning litigation, claims, and assessments."   Had Acquavella confirmed the existence of the loans or defaults on the loans with Tibet's outside counsel as required by audit standards, it would have discovered the defaulted loans and the Bank Suit.

101.    Acquavella was also required to confirm details of Tibet's loans with lenders, either through confirmation letters to each lender or via other adequate alternative procedure. AU 330.  Had Acquavella followed required audit procedures and confirmed with Tibet's

31

lenders, it would have discovered the defaulted loans.

102.    To confirm Tibet's available cash, Acquavella needed to send confirmations to Tibet's banks and obtain bank statements.

103.    Upon information and belief, Acquavella failed to obtain sufficient evidential matter to support their audit opinion regarding the financial statements.  Acquavella's failure to comply with GAAP and GAAS was of the highest magnitude.  Since Tibet was in default of millions of loans, a competent audit would have uncovered evidence that Tibet was in severe debt and had loans that were already past due.  A competent audit would also have uncovered that Tibet did not have the sizeable assets and millions in available cash that it claimed to possess.  Moreover, a simple search of public records and regulatory filings would have revealed the Agricultural Bank of China loans and the liens placed on Yunnan Tibetan's assets.

104.    Acquavella's failure to carry out standard audit procedures, and verify basic but crucial information, renders its audit as good as no audit at all.

105.    Even though the Registration Statement and Prospectus only included audited financial statements through December 31, 2009[3], Acquavella was still required to inquire about material subsequent events, and to adjust/reissue their audit opinion if necessary.  AU 560. During the period after Acquavella's last audit of Tibet's financial statements but before the SEC declared Tibet's Registration Statement and Prospectus effective, a series of adverse material subsequent events occurred, including the Bank Suit, the court judgment, and the enforcement order.  Had Acquavella done a proper audit, these subsequent events would not have been hidden

---

3 The Registration Statement and Prospectus also included nine months of unaudited financial statements from Acquavella, covering the period ending September 30, 2010.

from investors.

106.     Acquavella failed to make adequate inquiry to the Company and to the

Company's counsel regarding subsequent events as required by audit standards.  As a result,

Acquavella failed to reissue its audit opinion and disclose the defaulted loans and Bank Suit in

Tibet's financial statements -  even after Tibet had defaulted on millions of loans, had a court

judgment entered against it, and had its assets frozen and auctioned off.

107.     Acquavella served as Tibet's auditor for fiscal 2010.  During the course of its

fiscal 2010 audit of Tibet in late 2010 and January 2011, Acquavella should have made the same

inquiries of lenders, outside counsel and public records search.  Had it done so, it would have

discovered the defaulted loans and Bank Suit.  Upon discovery, it was required to withdraw its

audit opinion from the Registration Statement and Prospectus.

108.     Acquavella had two opportunities to follow required audit procedures.  It

neglected to follow audit procedures during both audits.  Had it followed proper audit procedures

it would have discovered the defaulted loans and Bank Suit and the losses to Plaintiffs in the IPO

and aftermarket would have been prevented.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

109.     Plaintiffs bring this action as a class action on behalf of themselves and on behalf of

all purchasers of Tibet's securities issued pursuant to and/or traceable to the Company's IPO,

including purchasers of Tibet stock from January 24, 2011 to April 3, 2012, pursuant to Federal

Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class.   Excluded from the Class are

defendants, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest

110.    The members of the Class are so numerous that joinder of all members is impracticable. Three (3) million Tibet shares were sold in the IPO.  The precise number of Class members is unknown to Plaintiffs at this time but it is believed to be in the thousands.  Members of the Class may be identified from records maintained by Tibet or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

111.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

112.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

113.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)  whether the provisions of the Securities Act were violated by defendants' acts as alleged herein;

(b)  whether documents, including the  Registration Statement and Prospectus, press releases, and public statements issued by defendants to the investing public committed and/or misrepresented material facts about the Company and its business; and

(c) the extent to which members of the Class have sustained damages, and the proper measure of damages.

114.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PROOF OF RELIANCE IS UNNECESSARY

115.    Neither Plaintiffs nor the Class need prove reliance.  Section 11(a) of the Securities Act specifically provides that plaintiffs need not show reliance "if the issuer has not made available an earnings statement covering a period of at least twelve months beginning after the effective date of the registration statement."  15 U.S.C. §77k(a).  In this case, this would be Tibet's annual report for the year ending December 31, 2011, on Form 10-K.  This annual report was never released.  Therefore, proof of reliance is unnecessary.

116.    Reliance is not an element of a claim arising under Section 12 of the Securities Act, 15 U.S.C. §77l.  Therefore, Plaintiffs need not prove reliance as to their Section 12 claims.

## FIRST CLAIM

### Violation of Section 11 of the Securities Act against All Defendants

117.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is not based on and does not sound in fraud.

35

118.    This claim is brought by Plaintiffs on their own behalf and on behalf of other members of the Class who acquired Tibet shares pursuant to or traceable to the Company's IPO. Each Class Member acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Registration Statement and Prospectus.   Tibet is the issuer of the securities through the Registration Statement and Prospectus.   The Individual Defendants are signatories of the Registration Statement and Prospectus.

119.    Underwriter Defendants owed to the holders of the securities obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein. As such, defendants are liable to the Class.

120.    Acquavella was Tibet's certified public accountant at the time of the IPO, audited the Consolidated Financial Statements contained in the registration statement and prospectus, and issued a report included in the Registration Statement and Prospectus, the veracity of said report being based on the authority of Acquavella as experts in accounting and auditing.

121.    Acquavella's report included in the Registration Statement and Prospectus was false because it stated that Tibet's Consolidated Financial Statements accurately represented the Company's operations and cashflow when in fact they did not.

122.     Acquavella stated that its audits of Tibet were conducted in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB") when in fact they were not.

123.     All Defendants owed to the purchasers of the stock obtained through the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

124.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

125.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reason of the conduct alleged herein, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

126.     Tibet is the issuer of the stock sold via the Registration Statement and Prospectus.  As issuer of stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

127.     At the times they obtained their shares of Tibet, Plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

128.     This claim is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement and Prospectus that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement and Prospectus.

129.     By virtue of the foregoing, plaintiffs and the other members of the class are entitled to damages under Section 11 as measured by the provisions of the Section 11(e), from the defendants and each of them, jointly and severally.

## SECOND CLAIM

### Violations of Section 12(a)(2) of the Securities Act
### Against Tibet, A&S and Sterne Agee

130.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is not based on and does not sound in fraud.  This claim is asserted against Tibet, A&S, and Sterne Agee ("Second Claim Defendants").

131.     Named Plaintiffs purchased Tibet shares directly through A&S in the IPO and have standing to bring this claim.

132.     Second Claim Defendants were sellers, offerors and/or solicitors of sales of the shares offered pursuant to the Registration Statement.  The Registration Statement contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

133.     Tibet, A&S, and Sterne Agee solicited Named Plaintiffs and other class members to purchase shares in the IPO.  Tibet, A&S, and Sterne Agee each actively solicited and sold the Tibet shares to purchasers in the IPO for financial gain and to server their own financial interests.  A&S

and Sterne Agee earned underwriting fees of about $1,155,000 for its role as underwriter and placement agent in selling Tibet shares in the IPO.  Tibet received the proceeds of the IPO of about $14.42 million.

134.    Plaintiffs and the other Class members who purchased or otherwise acquired shares pursuant or traceable to the materially untrue and misleading Registration Statement did not know or, in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

135.    The Second Claim Defendants owed to Plaintiffs and the other Class members who purchased or otherwise acquired shares pursuant or traceable to the materially false and misleading Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, to ensure such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading. The Second Claim Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading. By virtue of the conduct alleged herein, the Second Claim Defendants violated § 12(a)(2) of the Securities Act.

136.    This claim is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement and Prospectus that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement and Prospectus.

**THIRD CLAIM**

39

**Violations of Section 15 of the Securities Act**
**Against the Individual Defendants**

137.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is not based on and does not sound in fraud.

138.    This claim is asserted against the Individual Defendants, each of whom was a control person of Tibet during the relevant time period.

139.    The Individual Defendants were control persons of Tibet by virtue of, among other things, their positions as senior officers and directors of the Company, and they were in positions to control and did control, the false and misleading statements and omissions contained in the Registration Statement and Prospectus.

140.    None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects.  Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

141.    This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after Tibet shares was sold to the Class in connection with the IPO.

142.    By reason of the misconduct alleged herein, for which Tibet is primarily liable, as set forth above, the Individual Defendants are jointly and severally liable with and to the same extent as Tibet pursuant to Section 15 of the Securities Act.

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

40

(a)      Determining that this action is a proper class action, designating plaintiffs as

Lead Plaintiffs and certifying plaintiffs as class representatives under Rule 23 of

the Federal Rules of Civil Procedure and designating plaintiffs' counsel as Lead

Counsel;

(b)      Entering a worldwide injunction freezing Tibet's assets;

(c)      Entering an injunction freezing the Hong Kong bank account in which the

IPO proceeds are currently held under the control of Stern Agee and Hayden Zou.

(c)       Awarding damages in favor of plaintiffs and the other Class members

against all defendants, jointly and severally, together with interest thereon;

(d)      Awarding plaintiffs and the Class all equitable and injunctive relief, including

all appropriate rescission or rescissory damages;

(e)      Awarding plaintiffs and the Class reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

(f)       Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: May 1, 2013                    Respectfully submitted,


                                      */s/ Joel H. Holt*
                                      Joel H. Holt
                                      LAW OFFICES OF JOEL HOLT
                                      2132 Company Street, Suite 2
                                      St. Croix, VI 00820
                                      Tel: 340-773-8709
                                      Fax: 340-773-8677
                                      holtvi@aol.com

41

and

Laurence M. Rosen
Phillip Kim
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 34th Floor
New York, New York 10016
Tel: 212-686-1060
Fax: 212-202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com

Counsel for Plaintiffs