Robert J. Brener, Esq. (RB-3764))
A. Neil Hartzell, Esq. (*admitted pro hac vice*)
**LECLAIRRYAN, A PROFESSIONAL CORPORATION**
One Riverfront Plaza
1037 Raymond Boulevard, Sixteenth Floor
Newark, New Jersey 07102
(973) 491-3600
Robert.Brener@leclairryan.com
Attorneys for Defendant L. McCarthy Downs III

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MING YANG, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 14-cv-3538-FSH-MAH |
| **Plaintiff,** | |
| -against- | |
| TIBET PHARMACEUTICALS, INC. HONG YU, TAYLOR Z. GUO, SABRINA Y. REN, WENBO CHEN, YOUHANG PENG, SOLOMON CHEN, ANDERSON & STRUDWICK INCORPORATED, STERNE AGEE GROUP, INC., HAYDEN ZOU, and L. MCCARTHY DOWNS III | |
| **Defendants.** | |
| ROBIN JOACHIM DARTELL, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 14-cv-3620 |
| **Plaintiff,** | |
| -against- | **DECLARATION OF L. MCCARTHY DOWNS, III IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| TIBET PHARMACEUTICALS, INC. HONG YU, TAYLOR Z. GUO, SABRINA Y. REN, WENBO CHEN, YOUHANG PENG, SOLOMON CHEN, ANDERSON & STRUDWICK INCORPORATED, STERNE AGEE GROUP, INC., HAYDEN ZOU, L. MCCARTHY DOWNS III, and ACQUAVELLA, CHIARELLI, SHUSTER, BERKOWER & CO., LLP, | |
| **Defendants.** | |

L. McCarthy Downs, III ("Downs"), of full age, hereby declares as follows:

1. I was employed by Anderson & Strudwick, Inc. ("A&S" or "the Firm") from 1990 until 2011.

2. At all relevant times, I was employed as one of at least 7 individuals who had the title of Managing Director of A&S.

3. In this role, I was one of many employees in investment banking operations at A&S who reported directly to the Chief Executive Officer of the Firm.

4. I did not serve as the head of A&S's investment banking operations.

5. At all relevant times, which included the initial public offering ("IPO") of Tibet Pharmaceuticals, Inc. ("Tibet" or "the Company"), I was merely an employee of A&S.

6. During this period of time, I did not serve as an officer, director, or fiduciary of A&S.

7. At all relevant times, I only followed the direction and orders of my employer, A&S, and A&S's officers and directors.

8. My role was to identify prospective companies for issuances and bring the potential offerings to the A&S Commitment Committee (the "Commitment Committee") for the Committee's approval.

9. The A&S Commitment Committee decided whether to proceed with any issuances overseen and marketed by A&S.

10. I was not a permanent member of the Commitment Committee at the time of the Tibet IPO nor did I vote on any matter that I presented to the Committee.

11. If the Commitment Committee approved the transaction, it would direct me to enter into an engagement letter with the prospective client, retain counsel, and A&S would begin the due diligence effort.

12. Upon completion of the due diligence effort, as part of my duties as an employee of A&S I would coordinate the sale and closing of the offering with other departments in A&S by filing the necessary documents with government agencies, self-regulatory organizations, and the listing exchanges.

13. A&S first reviewed information and documents concerning Tibet in connection with a potential IPO in late 2009, including company generated financial statements and other business descriptive materials.

14. The decision to underwrite the Tibet IPO issuance was made by A&S alone.

15. Participation in the Tibet IPO involved practically all employees of A&S.

16. As an employee, I followed the directions of the Company's officers and directors in undertaking the underwriting process for the Tibet IPO.

17. The Commitment Committee approved the Company's decision to underwrite the Tibet IPO.

18. At A&S's direction, George Nolde, the former Chief Executive Officer of A&S, and I traveled to China to visit with Tibet, including Taylor Guo, Tibet's Chief Executive Officer, in January of 2010.

19. We visited a factory that Tibet stated was part of the company for which the IPO was being issued.

20. I observed that the company was engaged in the operation of producing pharmaceuticals, and took various photos. True and accurate copies of certain of those photos are attached as <u>Exhibit A</u> to this Declaration.

21. From my observations, it appeared as though Tibet was operating a viable business for the production of pharmaceuticals.

22. I also witnessed Tibet employees assembling packages, processing raw materials, and creating a product for distribution.

23. Tibet engaged Acquavella, Chiarelli, Shuster, Berkower & Co., LLP ("Acquavella") as the auditor to prepare financial statements for the Registration Statement and Prospectus. Acquavella was registered with the Public Company Accounting Oversight Board ("PCAOB"), the corporation created by federal statute to oversee the audits of public companies and other issuers in order to protect the interests of investors. A true and accurate copy of a list of registered firms with the PCAOB in 2010 —including Acquavella—is attached to this Declaration as Exhibit B.

24. A&S hired the law firm of Kaufman & Canoles in Richmond, Virginia to act as placement agent counsel in connection with the Tibet IPO.

25. Upon my return to the United States and after I consulted with A&S's senior management, I notified Kaufman & Canoles that A&S wanted them to proceed with the formal investigation and continued due diligence of Tibet Pharmaceuticals in preparation for the IPO.

26. Kaufman & Canoles performed the majority of due diligence on Tibet under this engagement.

27. Two partners from the law firm Kaufman & Canoles visited Tibet some time after January of 2010. Upon information and belief, the attorneys were Bradley Haneberg and Anthony Basch. Both Mr. Haneberg and Mr. Basch were members of Kaufman & Canoles' China practice area team, and were experienced in assisting Chinese companies that are listed on U.S. markets with their securities law obligations. Mr. Basch also spoke Mandarin.

28. Members from the auditor, Acquavella, were also present at the time of Kaufman & Canoles' visit to Tibet Pharmaceuticals.

29. Tibet Pharmaceuticals hired local counsel in China, the DeHeng Law Firm, to represent Tibet in connection with the IPO issuance and provide independent investigation of the statements Tibet made in the Prospectus. The DeHeng Law Firm is one of the largest law firms in China, and it currently employs over 1,000 attorneys.

30. Tibet Pharmaceuticals hired local counsel in Hong Kong, the firm of Iu, Lai & Li, to represent Tibet in connection with the IPO issuance and provide independent investigation of the statements Tibet made in the Prospectus as it regarded Tibet subsidiaries and operations in Hong Kong.

31. In connection with A&S's due diligence into Tibet in preparation for issuance of the IPO, A&S relied upon the work and opinions of these four entities—Kaufman & Canoles, Acquavella, DeHeng Law Firm, and Iu, Lai & Li—as they all had personnel among their staffs that spoke and read Chinese, which A&S did not.

32. A&S relied upon these opinion letters dated January 20, 2011, and January 24, 2011, issued by the three law firms while undertaking its due diligence of Tibet. True and accurate copies of these opinion letters are attached hereto as Exhibits C through E.

33. A&S was aware during its due diligence that Tibet had an outstanding bank loan from the Agricultural Bank of China due in November 2011, in the amount of 24,420,000 Renminbi ("RMB"), the official currency of the People's Republic of China. A&S was also aware that the bank loan was secured by a pledge of certain of Tibet's machinery equipment and buildings.

34. A&S also relied upon the audited financial statements and the opinion letter issued by Acquavella that were incorporated into the Registration Statement and Prospectus, along with the comfort letter dated January 21, 2011, also rendered to A&S by Acquavella.

Paragraph 9 of the comfort letter states that Acquavella specifically recognized that the comfort letter was being recognized as part of A&S' due diligence. A true and accurate copy of the comfort letter drafted by Acquavella is attached as <u>Exhibit F</u>.

35. In conversations with Acquavella in early 2011, Acquavella represented to me at A&S that in the course of its investigation, it had determined Tibet had repaid the bank debt on or before November 30, 2010.

36. In conversations with Kaufman & Canoles in late 2010, Kaufman & Canoles represented to me and A&S that in the course of its investigation, it had determined that Tibet had repaid the bank debt some time in November 2010.

37. At no point did Kaufman & Canoles, Acquavella, or representatives of the local law firms in China and Hong Kong represent that Tibet had any additional unpaid bank debts, any court judgments related to unpaid debts, or other concerns regarding Tibet's assets and liabilities.

38. Kaufman & Canoles stated in its opinion letter:

> To our knowledge, there are no legal or governmental proceedings pending or threatened against the Company that are of a character required to be disclosed in the Registration Statement or the Prospectus by the Act or the Rules and Regulations, other than those which are described in the Registration Statement or the Prospectus.

<u>Exhibit C</u>, p. 3.

39. Deheng Law Offices, the law firm Tibet hired in China to represent it in connection with the IPO, stated in its opinion letter:

> None of [Tibet or its subsidiaries of affiliates] has taken any action nor has had any steps taken, nor has legal or administrative proceedings been commenced or threatened for the winding up, dissolution, or liquidation of [Tibet or its subsidiaries of affiliates].
> . .

6

> [Tibet or its subsidiaries of affiliates] are not in default under or in breach of any term or condition of any agreement or instrument of which such counsel has actual knowledge after due inquiry to which any of [Tibet or its subsidiaries of affiliates] is a party or by which any of their properties, investments or assets are bound, except as disclosed in the Registration Statement.
>
> . . .
>
> There is not pending or threatened, any action, suit, or proceeding before or by any court, government authority, arbitrational body or agency to which [Tibet or its subsidiaries of affiliates] is or may be a party, or to which any of the investments, properties or assets of any of [Tibet or its subsidiaries of affiliates] is or may be subject which is not disclosed in the Registration Statement that, if adversely determined, would materially affect the ability of [Tibet or its subsidiaries of affiliates] to carry out and implement the business described in the Registration Statement.

Exhibit D, p. 3.

40. Iu, Lau and Li, the Hong Kong law firm Tibet hired to represent it in connection with the IPO, stated in its opinion letter regarding its examination of both Tibet and its Hong Kong subsidiary:

> (ii) . . . [N]or has any steps taken, nor has legal or administrative proceedings been commenced in Hong Kong for the winding up, dissolution, or liquidation of [the subsidiary. . .
>
> (iii) . . . [The subsidiary], in carrying on the aforesaid business, is not in violation of Hong Kong laws or regulations or any order, decree, or regulation of any governmental body or agency in Hong Kong having jurisdiction over it or over any of its properties or assets. There is no action, suit or proceeding to which [the subsidiary] is a party before the High Court and District Court of Hong Kong as at 19 January 2011.

Exh. E.

41. These law firms hired by Tibet Pharmaceuticals in PRC did not disclose to Kaufman & Canoles or A&S in any written or oral communication that they had any information concerning the possibility that Tibet's assets may have been frozen.

42. As an employee of A&S, I did not discover any information in the course of my work for the Tibet IPO that led me to otherwise believe that the information contained in the Prospectus, including both the audited and unaudited financial statements Acquavella prepared, and the opinion letters issued by Acquavella and the three law firms, was incorrect.

43. As a final step before permitting the IPO to close in early January 2011, as an A&S employee I placed four separate phone calls before the IPO closing in January of 2011, to: (1) Hayden Zou[1]; (2) Guo, CEO of Tibet; (3) Acquavella; and (4) Kaufman & Canoles.

44. I asked of Zou whether any issues had come to Zou's attention that A&S should know about, and Zou assured me that all was in order and Tibet was ready to proceed with the IPO.

45. I also asked Guo if any issues had come to his attention as the CEO of Tibet Pharmaceuticals about which A&S should know, and whether someone traveling to Tibet would find everything in order. Guo confirmed he did not know of any issues, and that everything was in order.

46. I further asked Guo whether he needed to make any additional statements or amend any information in the Prospectus; Guo said he did not.

47. In my call with Acquavella, it informed me that Tibet had properly answered all Acquavella's questions and met the audit requirements for Acquavella to issue its audit letter and provide the comfort letter to A&S.

48. I then asked Acquavella whether the bank debt had actually been paid off in November 2010, as was my understanding at that time.

49. Acquavella informed me that it understood the debt had been paid off in November 2010, but it had not yet verified it.

---

[1] Defendant Mr. Zou introduced A&S to Tibet and accompanied A&S during A&S' trip to Tibet before the IPO.

50. Acquavella further informed me that such verification would take place in conjunction with the audit for the year ending December 31, 2010.

51. Tibet Pharmaceuticals and Acquavella further confirmed full payoff of the bank debt in the Company's Annual Report and Audit Report issued for the year ending December 31, 2010. Page F-16 of the 10-K states: "The Company paid the [bank] debt in November 2010." A true and accurate copy of the 2010 Annual Report and Audit Report 10-K is attached as <u>Exhibit G</u> to this Declaration.

52. I also spoke with Attorney Brad Haneberg of Kaufman & Canoles, who assured me that Kaufman & Canoles had done proper due diligence on Tibet and that "everything was in order."

53. Attorney Haneberg also told A&S that Kaufman & Canoles conducted additional extensive due diligence into Tibet because Kaufman & Canoles was preparing a 10b-5 legal opinion letter concerning its review of the statements made in the Prospectus.

54. Simultaneously to the closing of the offering, Kaufman & Canoles provided a Rule 10b-5 opinion letter as issuer's counsel in which Kaufman & Canoles stated that the prospectus was accurate and it contained no misrepresentations.

55. I did not sign in any capacity the Registration Statement that Tibet filed with the SEC in connection with the proposed IPO.

56. I did not sign in any capacity the Prospectus concerning the Tibet proposed IPO. A true and accurate copy of the Prospectus is attached as <u>Exhibit H</u> to this Declaration.

57. On the closing call, I confirmed with Kaufman & Canoles and A&S's subsequent placement agent counsel, Anslow & Jaclin, that all information and documentation was in order and that the Prospectus properly reflected Tibet and the IPO.

58. In connection with A&S's underwriting of the Tibet IPO, A&S nominated me as a non-voting observer ("Board Observer") to Tibet's Board of Directors to be effective upon completion of the IPO.

59. This meant that as a Board Observer, I would have the opportunity to be heard -- but not to vote -- at meetings of the Tibet Board after the close of the IPO transaction, and specifically not before the closing of the offering.

60. As a Board Observer, I did not have a right to vote in a Board meeting or otherwise veto, approve or deny any action by the Tibet Board nor did I have a right to call any meetings of the Board or participate in any committees of the Board.

61. I did not perform any duties or have any responsibilities in my role as Board Observer.

62. I never participated in any Board activities or otherwise influenced the Tibet Board of Directors.

63. The Board of Directors of Tibet never notified me of or invited me to any Board or other meetings of Tibet.

64. As a Board Observer, I did not have any official capacity on the Tibet Board.

65. I never received compensation from Tibet for my role as Board Observer.

66. I never received any correspondence from Tibet concerning Board activities.

67. I never attended any Board or other meetings with Tibet.

68. I did not assume my role as Board Observer until after the Tibet IPO issuance closed.

69. A&S did not consider me a Board Observer until after the Tibet IPO issuance had closed, as is memorialized in an A&S Outside Business Request form in connection with my role. A true and accurate copy of this document is attached as <u>Exhibit I</u> to this Declaration.

70. After the closing of the IPO, I made multiple requests to A&S to travel to China to attempt to meet with the Tibet Board. A&S denied each request on the advice of counsel.

71. Damon Joyner, the CEO of A&S, ordered me to cease all communications with Tibet sometime around April 2011.

72. As A&S was the appointing authority, I resigned as a Board Observer on August 18, 2011.

73. In my resignation letter to Damon Joyner with a copy to the Chief Compliance Officer of A&S, I encouraged A&S to communicate my resignation to Tibet or to others, because some purchasers of the IPO issuance may have relied upon the fact that an A&S employee was a Board Observer and would therefore need to know this information. For reasons unknown, A&S did not communicate my resignation to Tibet. A true and accurate copy of my letter of resignation is attached as <u>Exhibit J</u> to this Declaration.

I certify and declare that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
L. McCarthy Downs, III

DATED: June 24 2016

11

## CERTIFICATE OF SERVICE

  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified in the Notice of Electronic Filing (NEF) on June 30, 2016.

              /s/ Robert J. Brener
              Robert J. Brener, Esq.