# Exhibit 5

Page 1

DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

_____

MING YANG, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

 vs.                       Case No.:  12-CV-00054-WAL-GWC

TIBET PHARMACEUTICALS, INC., HONG YU,
TAYLOR Z. GUO, SABRINA Y. REN, WENBO CHEN,
YOUHANG PEN, SOLOMON CHEN, ANDERSON & STRUDWICK,
INC., STERNE AGEE GROUP, INC., HAYDEN ZOU, and
L. MCCARTHY DOWNS, III

Defendants.
_____

ROBIN JOACHIM DARTELL, Individually and on
Behalf of All Others Similarly Situated,
                    Plaintiff,
vs.                       Case No.:  12-CV-00089-WAL-GWC
TIBET PHARMACEUTICALS, INC., HONG YU,
TAYLOR Z. GUO, SABRINA Y. REN, WENBO CHEN,
YOUHANG PEN, SOLOMON CHEN, ANDERSON & STRUDWICK,
INC., STERNE AGEE GROUP, INC., HAYDEN ZOU, and
L. MCCARTHY DOWNS, III, and ACQUAVELLA,
CHIARELLI, SHUSTER, BERKOWER & CO., LLP

Defendants.
_____

DEPOSITION OF LEWIS MCCARTHY DOWNS, III
April 13, 2016
9:31 a.m.
Taken at:
LECLAIR RYAN
919 East Main Street, 24th Floor
Richmond, Virginia  23219
REPORTED BY:  Lisa M. Blair, RMR



Page 37

1          A.      Yes, ma'am.

2          Q.      Okay.  And do you recall again when

3     exactly you discussed -- you first discussed Tibet

4     with Hayden?

5          A.      November or December of 2009.

6               MS. FUKS:  I'm going to introduce this as

7     Exhibit 3.

8                    (Downs Exhibit Number 3 was marked for

9     identification)

10         Q.      This is a copy of Plaintiffs'

11    Consolidated Amended Class Action Complaint.

12               Mr. Downs, I trust you've seen this

13    document?

14         A.      I've seen this document, yes, ma'am.

15         Q.      And can you take a look, if you will, at

16    Paragraph 26, which is on page 7.

17         A.      Uh-huh.

18         Q.      And it says Taylor Guo --

19               MR. HARTZELL:  I'm sorry, which page are you

20    looking at?

21               MS. FUKS:  Page 7.

22         Q.      And so Taylor Guo has served as Tibet's

23    chief executive officer since 2010.

24               Did you ever meet Taylor Guo?

25         A.      I did.



Page 38

```
 1        Q.      Okay.  When was the first time you met
 2   him?
 3        A.      The first time I met him was on a trip to
 4   China in January of 2011.
 5        Q.      Okay.  And how many times did you meet
 6   him?
 7        A.      Well, that trip lasted a couple of days,
 8   and I was -- I don't recall if there was another
 9   meeting with him or not, but I don't think so.  I
10   think that was the only meeting that I had with
11   Mr. Guo.
12        Q.      Had you spoken to him before meeting him?
13        A.      No, I had not.
14        Q.      And when is the last time you spoke with
15   him?
16        A.      I know -- I don't -- I'm sure that I
17   spoke to him sometime in -- I can absolutely state
18   that I spoke to him on January 24th, 2011 during the
19   closing call of the transaction, but I don't recall if
20   I spoke to him after that.  I think I did, but I'm not
21   certain.
22        Q.      So do you know if you spoke to him after
23   this lawsuit was filed?
24        A.      I have not spoken to him after this
25   lawsuit was filed.
```



Page 39

1          Q.      Have you attempted to contact him since
2     this lawsuit was filed?
3          A.      No, I have not attempted to contact him.
4          Q.      Do you think he knows what happened to
5     the proceeds from the IPO?
6              MR. HARTZELL:  Objection.
7          A.      What do you mean, what happened to him?
8          Q.      Well, the IPO proceeds were -- which
9     we'll get to later -- they were transferred to a bank
10    account in Hong Kong; is that correct?
11         A.      Yes, ma'am.
12         Q.      And nobody in this case seems to be sure
13    where they have gone.  They may be missing or stolen.
14    Do you think he would be --
15         A.      Mr. --
16             MR. HARTZELL:  Wait a minute.  She doesn't
17    have a question.  She's making comments.  Wait until
18    she asks the question, listen, and then answer.
19         Q.      Given his role in Tibet, do you think he
20    would be in a position to know what happened to the
21    money in the IPO account?
22         A.      Given his role at Tibet, he signed the
23    cross receipt acknowledging receipt of the funds into
24    that bank account on behalf of Tibet.  What happened
25    after that, I don't know.



Page 57

1   on the audit --

2        A.      Anderson & Strudwick relied on counsel

3   and the experiences that we had had -- that Anderson &

4   Strudwick had had in working on other offerings.  They

5   relied on the comfort letter that was provided to us

6   by the auditor.  They relied on the opinions of the

7   Hong Kong counsel, the China counsel, and Kaufman and

8   Canoles.  They relied on the accuracy and completeness

9   of the prospectus.  They relied on the on-site visit

10  that Mr. Nolde and I did early on.  They relied on the

11  information that was provided to us by Kaufman and

12  Canoles in the completion of the due diligence.  They

13  relied on the due diligence that was specifically

14  requested by NASDAQ before they would approve the

15  listing.  They -- I mean, there was a lot of pieces to

16  the puzzle that had to come together for Anderson &

17  Strudwick to make the decision to move ahead and price

18  the deal and market the deal and close the deal.

19       Q.      So you said Anderson relied on the

20  accuracy of the prospectus, but everything in the

21  prospectus is representations by management more or

22  less.  How could Anderson rely on the accuracy of the

23  prospectus?

24       A.      The prospectus was drafted and put

25  together by Kaufman and Canoles with input from



Page 58

1    management.  And Kaufman and Canoles rendered a 10b-5

2    opinion to Anderson & Strudwick stating that the

3    prospectus was accurate and nothing in it was

4    misleading or false.

5         Q.    So on --

6         A.    And the financial statements were

7    prepared by the auditor.

8         Q.    So would Kaufman and and Canoles

9    regularly send you documents about Tibet that they

10   found?

11        A.    They provided us -- they provided

12   Anderson & Strudwick with documents relative to their

13   due diligence, and relative to their effort on behalf

14   of Anderson & Strudwick in their capacity as placement

15   agent counsel.

16        Q.    Why did Kaufman and Canoles resign as

17   placement agent counsel?

18        A.    FINRA -- who was responsible for looking

19   at the transaction in addition to the SEC -- FINRA on

20   behalf of -- doing it to look at compensation of the

21   underwriter, of Anderson & Strudwick, FINRA objected

22   to certain fees that Kaufman and Canoles was making

23   not only for serving as placement agent counsel, but

24   also serving as counsel to the issuer as far as the

25   SEC in British Virgin Island matters.  And FINRA said



1    that the compensation that they were -- that it was --

2    it was -- that the fees that they were receiving in

3    those capacities were not in line with their duties as

4    serving as placement agent counsel, in that they were

5    excessive, and that they -- that they said that

6    Kaufman and Canoles could not receive that level of

7    fees if they were serving as placement agent counsel.

8              So Kaufman and Canoles, in November of

9    2010, chose to resign as placement agent counsel, and

10   different placement agent counsel was obtained.

11        Q.    And who was the different placement agent

12   counsel?

13        A.    Anslow and Jaclin, based in New Jersey.

14        Q.    And what happened to all of Kaufman and

15   Canoles's due diligence for the Tibet IPO?

16        A.    A lot of it had already been transmitted

17   to Anderson & Strudwick, and it's been included in the

18   materials that have been provided to you.  Presumably

19   some of it was retained by Kaufman and Canoles.  But

20   in conjunction with their resignation, that's when we

21   insisted that they provide the 10b-5 opinion, which

22   had not been provided in prior IPOs.

23        Q.    So they provided a 10b-5 opinion before

24   the offering closed?

25        A.    Simultaneously with the closing of the



Page 75

1   Agritech.  I was an observer on Home Owners Choice
2   Insurance Company, which is based in Tampa.  I was --
3   way back -- I mean, back like in eFuture's case, I was
4   an actual Board member.  But I think for liability
5   reasons somewhere along the way the firm decided that
6   they would rather have its employees serve as
7   observers and not as Board members.  So in some cases
8   I was an actual Board member.  And I know that there
9   were others, but I just don't recall right now.  I
10  tended -- in most cases, the conditions were met,
11  which led to our resignation.
12         Q.    And Anderson also decided to designate
13  Hayden Zou as an observer?
14         A.    Hayden being the individual that
15  introduced the transaction to Anderson & Strudwick,
16  Anderson & Strudwick felt like that he was in the best
17  position to assist in the duties of being a Board
18  observer.
19         Q.    What did you do in your capacity as an
20  observer to Tibet's Board?
21         A.    Nothing.
22         Q.    And what was envisioned that you would do
23  as an observer?
24         A.    It was envisioned -- at the time that I
25  was to become a Board observer, it was envisioned that



1    where it had come public at 5 and-a-half, the fact

2    that Anderson & Strudwick within that period between

3    the closing of the Tibet transaction and April of 2011

4    had decided to not pursue any more China activities

5    because of the fact that the -- that the offerings --

6    that the China offerings were not doing well in

7    general -- not only for the ones that Anderson &

8    Strudwick had done, but the ones other firms were

9    doing as well -- it was felt that it was not a market

10   that the firm wanted to be in, and they didn't want

11   me -- they directed me -- Anderson & Strudwick

12   directed me to not go over there and make that trip --

13          Q.     So --

14          A.     -- in April.

15          Q.     And it said in the prospectus that you

16   had the ability to influence matters that were

17   submitted to Tibet's Board.  Did you influence any

18   matters submitted to Tibet's Board?

19          A.     I was not permitted by my firm to go back

20   to China to participate in any Board activities; and

21   thus, I was not able to influence the Board.

22          Q.     But what about from the closing?

23          A.     That was the quiet period then.  There

24   was very little -- normally, that 90-day period

25   following the closing of a transaction, very little



Page 78

1    would have been done by the Board in any event.  And I

2    was not -- I had not been notified of a Board meeting

3    during that period of time by the management.

4         Q.     Who were you in contact with at

5    management that would have notified you of meetings?

6         A.     I was in contact with Hayden Zou, who

7    still had an ongoing interest in Tibet; and I was in

8    contact with Brad Haneberg, who was representing the

9    company as issuer's counsel.  And I would have been in

10   contact with Taylor Guo, but not in person, but

11   perhaps by telephone or e-mail.

12        Q.     Do you know if Tibet had any Board

13   meetings?

14        A.     I do not know.

15        Q.     So who decided you should be reimbursed

16   $12,000 a year annually for your service?

17        A.     This was just something that -- I mean,

18   the involvement of an employee of Anderson & Strudwick

19   in matters relating to these other companies did

20   require an involvement of time, and did pull the

21   employee away from other duties at Anderson &

22   Strudwick that he might have been doing otherwise.

23   And under -- and under FINRA rules, we were advised

24   that the compensation that would be payable to an

25   observer had to be no more than that which was paid to



Page 79

1    the independent directors.  And so that's -- and
2    that's what -- that's where it was set.
3        Q.     So you would -- it was decided you would
4    be compensated the same as an independent director?
5        A.     Yes, ma'am.
6        Q.     So were you concerned that your role as
7    an observer could subject you to the same liability as
8    a director?
9            MR. HARTZELL:  Objection.
10       A.     I was not concerned that the role as an
11   observer, given that I did not sign any registration
12   statements, given that I did not have any official
13   capacity on the Board, given that I was not a voting
14   member of the Board, that I had no say in calling the
15   meetings, that I had no say in attending committee
16   meetings or participating in committee meetings, l was
17   not concerned that my liability was significant, and I
18   did not believe that my liability was that significant
19   as an observer.
20       Q.     Were you concerned that your name was in
21   the prospectus as an observer?
22           MR. HARTZELL:  What time period?
23           MS. FUKS:  From the time the prospectus went
24   out from the time of the IPO.
25       A.     At the time that the prospectus went out



Page 80

1    and the time of the IPO, I think the -- I was not

2    concerned that my name was in the prospectus, because

3    I did not believe my liability to be that significant

4    as an observer, as a non-voting Board observer.

5         Q.    So what does it mean that you -- the

6    observers can significantly influence the outcome of

7    matters submitted to the Board?

8         A.    It means that they have an opportunity to

9    be heard at the Board meeting.

10        Q.    Did you have a veto right?

11        A.    Absolutely not.  I had no right to vote

12   or approve or deny.

13        MS. FUKS:  This is Exhibit 8.

14             (Downs Exhibit Number 8 was marked for

15   identification)

16        Q.    And this is an e-mail dated August 18th,

17   2011 from you to Damon Joyner.  Subject:  Board

18   observer to Tibet Pharmaceuticals.

19        A.    Yes, ma'am.

20        Q.    So in the second paragraph it says, To

21   date, I have not attended any meetings of the Board of

22   Directors of the company, nor have I received any

23   correspondence from the company relating to Board

24   activities.  Also, I have not received any

25   compensation in connection with serving as a Board



Page 103

1       A.      And then I verified them with Taylor.

2       Q.      Do you know who had authority to withdraw

3   funds from this HSBC Hong Kong account?

4       A.      I do not.

5       Q.      Do you know what happened to the money in

6   this HSBC Hong Kong account?

7       A.      I do not.

8       Q.      Do you know if it was stolen?

9       A.      I have no reason to believe that it was

10  stolen.

11      Q.      So what do you believe happened to it?

12          MR. HARTZELL:  I don't want you to guess or

13  speculate, Mr. Downs.  If you know -- if you can

14  answer the question without guessing or speculating,

15  then you should do so.

16      A.      What I know is that the company, through

17  its financial statements, reported having the proceeds

18  available to it in the financial statements that came

19  out in March for the quarter ending March 30th of

20  2011, June of 2011, and September 2011.  But I don't

21  know -- and I know that they reported it as having the

22  money available, but I don't know what happened to it

23  after that.

24      Q.      Did you have any communications with the

25  SEC about the IPO money?



Page 111

1    in particular that I spoke to at least once or twice

2    was that:  Yes, I had visited the company; yes, that I

3    felt that the company was sound and real; and yes,

4    that I didn't believe that the company was a fraud.

5         Q.     Do you know if, in fact, an auction of

6    Tibet's assets took place?

7         A.     I don't know.

8         Q.     Do you believe that it did, sitting here

9    now?

10             MR. HARTZELL:  Objection.

11        A.     I don't know what happened to the company

12   at this point in time.

13        Q.     How was the court judgment against Tibet

14   not detected if appropriate due diligence was done?

15             MR. HARTZELL:  Objection.

16        A.     I believe that it should have been

17   detected.

18        Q.     So whose fault do you think it is that it

19   wasn't detected?

20             MR. HARTZELL:  Objection.  You're asking the

21   witness for an opinion question.  He's here as a fact

22   witness.

23             MS. FUKS:  I can ask him for an opinion.

24        Q.     Whose job was it to make sure there was

25   no judgment against a company that you were doing an



Page 112

1   underwriting for?

2        A.      I believe that it should have been picked

3   up by one of -- one or all of three different

4   organizations.

5        Q.      And those are?

6        A.      I believe that Brad Haneberg should have

7   picked it up.  I believe that DeHeng law firm should

8   have picked it up.  I believe that the auditor should

9   have picked it up.

10            MS. FUKS:  This is Exhibit 13.

11                (Downs Exhibit Number 13 was marked for

12   identification)

13        Q.      This is an e-mail from you sent Thursday

14   January 20th, 2011 at 9:41 a.m., Bates marked D002310

15   gener@acsbco.com.  And it says, subject:  Tried to

16   call on Tibet Pharma, no voicemail.  Would you please

17   give me a call regarding Tibet Pharmaceuticals?

18   Thanks, Mac.

19                Whose e-mail address is this?

20        A.      I don't recall whose e-mail address this

21   is, other than the fact that it was somebody or a

22   general mailbox associated with the auditing firm.

23        Q.      And why did you want somebody at the

24   auditing firm to give you a call about Tibet on this

25   day?



Page 121

1      A.      I don't know.

2      Q.      Do you know who would know?

3      A.      Hong Yu.

4      Q.      Do you know if Hayden Zou is in touch

5  with Hong Yu?

6      A.      I do not know.

7      Q.      Have you ever spoken with Hayden Zou's

8  lawyers?

9      A.      No.

10      Q.      Do you know if Hayden Zou has control

11  over Tibet's bank accounts?

12      A.      I would be very surprised if he did.  I

13  do not know.

14      Q.      Do you believe that Hayden Zou knows

15  where the IPO funds are?

16      A.      No.

17      Q.      Would you say that Hayden Zou functioned

18  more as an officer/director of Tibet than just an

19  observer?

20          MR. HARTZELL:  Objection.

21      A.      I don't believe that Hayden functioned as

22  an officer or a director of Tibet.  I believe that

23  Hayden functioned as a consultant to Tibet.

24      Q.      Do you know if Hayden Zou has assets to

25  pay for any judgment that's entered in the case?



Page 122

```
1          A.     I have no knowledge of Hayden Zou's
2    financial situation.
3          Q.     So what would you tell investors who are
4    looking for answers as to how this happened?
5               MR. HARTZELL:  Objection.
6          A.     What would I tell -- would you rephrase
7    the question?
8          Q.     What would you tell investors who lost
9    their money in Tibet, and they're looking for answers
10   as to how this happened?
11              MR. HARTZELL:  Tell them about what?
12              MS. FUKS:  Tell them how a company that was
13   underwritten by Anderson & Strudwick that went public
14   just completely disappeared.
15              MR. HARTZELL:  Objection.
16         A.     Well, I don't have any -- I don't have
17   any good answers for them.  I mean, I know that this
18   was sold as -- by Anderson & Strudwick and by the
19   other participating broker dealers as a very risky,
20   highly risky investment, that clients should not --
21   and it was very clearly stated that clients should not
22   invest more in it than they were prepared to lose,
23   that they -- that there were 30-some pages of risk
24   factors presented in the prospectus, that the ability
25   to obtain a judgment against a Chinese company was
```

