**SHER TREMONTE LLP**
Scott Cargill, Esq. (No. 007991999)
80 Broad Street, 13th Floor
New York, New York 10004
*Attorneys for Defendant Hayden Zou*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBIN JOACHIM DARTELL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>vs.<br><br>TIBET PHARMACEUTICALS, INC, HONG YU, TAYLOR Z. GUO, SABRINA Y. REN, WENBO CHEN, YOUHANG PEN, SOLOMON CHEN, ANDERSON & STRUDWICK INCORPORATED, STERNE AGEE GROUP, INC., HAYDEN ZOU, L. MCCARTHY DOWNS III and ACQUAVELLA, CHIARELLI, SHUSTER, BERKOWER & CO., LLP,<br><br>Defendants. | Civil Action No.: 14-CV-03620 (JMV) (JBC) |

## DEFENDANT HAYDEN ZOU'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT HAYDEN ZOU'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 AND PLAINTIFFS' <u>SUPPLEMENTAL STATEMENT OF DISPUTED MATERIAL FACTS</u>

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the District of New Jersey, Defendant Hayden Zou ("Zou"), by his attorneys, Sher Tremonte LLP, hereby reply, respond and object to Plaintiff's Response to Defendant Hayden Zou's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 and Plaintiffs' Supplemental Statement of Disputed Material Facts.

1

**Zou's Statement No. 1**: Remains undisputed.[1]

**Zou's Statement No. 2**: Remains undisputed.

**Zou's Statement No. 3**: Remains undisputed.

**Zou's Statement No. 4**: Tibet "owns all of the outstanding capital stock" of China Tibetan and thus, exercises complete control over the subsidiary. June 30, 2016 Cargill Decl. **Exhibit 1** [Prospectus] at PDF009, PDF036, PDF043.

> **Plaintiffs' Response**: *Undisputed to the extent that Tibet owns all of the outstanding capital stock of China Tibetan but disputed to the extent that the statement asserts that Tibet exercises "complete control" over China Tibetan. Zou exercises complete control over China Tibetan because: 1) Zou incorporated China Tibetan, 2) Zou's name is listed on the China Tibetan HSBC Hong Kong bank account; 3) Zou attests that he was able to obtain the China Tibetan account records directly from HSBC, which demonstrates his control over China Tibetan; and 4) Zou is the sole Director of China Tibetan. Transcript of Deposition of Hayden Zou ("Zou Deposition"), attached as Ex. 1 to the Declaration of Laurence M. Rosen in Support of Plaintiffs' Opposition to Defendant Hayden Zou's Motion for Summary Judgment ("Rosen Decl."), 21:11-15; 73:23-74:18; 75:7-14; 76:18-77:3.*

> **Zou's Reply:**  Remains undisputed.  The cited evidence fails to establish that Tibet did

not exercise complete control over China Tibetan.  Indeed, elsewhere Plaintiffs concede that

China Tibetan has no assets, conducts no operations, was only formed to facilitate the IPO and

has all of its capital stock owned by Tibet. *See* Pl's Response to Zou's 56.1(a) Statement at Nos.

3-5 (emphasis added).  Plaintiffs concede that China Tibetan was "controlled by Tibet" and that

Tibet's CEO and CFO had complete control over China Tibetan's funds. *Id.* at No. 44 n.5.

Further, Plaintiffs fail to produce any evidence demonstrating a single activity conducted by

China Tibetan, let alone one that shows it operated independently of Tibet.  Thus, Plaintiffs have

failed to dispute the asserted fact by citing to relevant evidence.  In addition, Tibet's Prospectus

---

[1]      In the interest of judicial economy, statements that are undisputed by Plaintiffs are not reproduced herein.

expressly provides that it is Tibet that exercises complete control of China Tibetan, and through China Tibetan, exclusively controls Tibet's operating entity (YSTP). Plaintiffs' cited evidence fails to establish anything to the contrary.  *See* June 30, 2016 Cargill Decl. Exhibit 1 [Prospectus] at PDF004, PDF011 (noting "We conduct business through our operational entity, YSTP, located in Yunnan Province, China. **We control** YSTP'S operations through a series of contractual arrangements"; "***we control YSTP by virtue of our ownership of all of the equity of [China Tibetan]***"; and "[a]s a result of these Control Agreements . . . ***we are considered the primary beneficiary of YSTP***.") (emphasis added).

**Zou's Statement No. 5**: Remains undisputed.

**Zou's Statement No. 6**: Remains undisputed.

**Zou's Statement No. 7**: Remains undisputed.

**Zou's Statement No. 8**: Remains undisputed.

**Zou's Statement No. 9**: Remains undisputed.

**Zou's Statement No. 10**: Remains undisputed.

**Zou's Statement No. 11**: Remains undisputed.

**Zou's Statement No. 12**: Remains undisputed.

**Zou's Statement No. 13**: Remains undisputed.

**Zou's Statement No. 14**: Remains undisputed.

**Zou's Statement No. 15**: Remains undisputed.

**Zou's Statement No. 16**: Remains undisputed.

**Zou's Statement No. 17**: Remains undisputed.

**Zou's Statement No. 18**: Remains undisputed.

**Zou's Statement No. 19**: Remains undisputed.

**Zou's Statement No. 20**: Remains undisputed.

**Zou's Statement No. 21**: Remains undisputed.

**Zou's Statement No. 22**: Remains undisputed.

**Zou's Statement No. 23**: Remains undisputed.

**Zou's Statement No. 24**: Remains undisputed.

**Zou's Statement No. 25**: Remains undisputed.

**Zou's Statement No. 26**: Remains undisputed.

**Zou's Statement No. 27**: Remains undisputed.

**Zou's Statement No. 28**: Remains undisputed.

**Zou's Statement No. 29**: Remains undisputed.

**Zou's Statement No. 30**: Remains undisputed.

**Zou's Statement No. 31**: Remains undisputed.

**Zou's Statement No. 32**: Remains undisputed.

**Zou's Statement No. 33**: Remains undisputed.

**Zou's Statement No. 34**: Remains undisputed.

**Zou's Statement No. 35**: Remains undisputed.

**Zou's Statement No. 36**: Remains undisputed.

**Zou's Statement No. 37**: Remains undisputed.

**Zou's Statement No. 38**: Remains undisputed.

**Zou's Statement No. 39**: Remains undisputed.

**Zou's Statement No. 40**: Remains undisputed.

**Zou's Statement No. 41**: Remains undisputed.

**Zou's Statement No. 42**: Remains undisputed.

**Zou's Statement No. 40**: Remains undisputed.

**Zou's Statement No. 41**: Documents produced in discovery, including a memorandum from A&S providing wiring instructions to SunTrust Bank (the escrow agent for the IPO proceeds) establishes that the proceeds were not transferred into the China Tibetan bank account. *See* June 30, 2016 Cargill Decl. **Exhibit 3** [A&S Memorandum].

> **Plaintiffs' Response:** *Disputed. The wiring instructions merely state that the IPO proceeds were scheduled to be transferred into Tibet's HSBC Hong Kong bank account, and do not affirmatively state or confirm "that the proceeds were not transferred into the China Tibetan bank account" or that the proceeds were transferred to Tibet's HSBC Hong Kong bank account. Rosen Decl., Ex. 20.*

> **Zou's Reply:** Remains undisputed.  Although Plaintiffs cleverly (but disingenuously) suggest that the cited documents only show that the IPO proceeds "were scheduled to be transferred to into Tibet's HSBC Hong Kong bank account" but do not "affirmatively state or confirm" that they were transferred into the account, they fail to cite any evidence establishing the IPO funds were delivered elsewhere.  Accordingly, Plaintiffs conclusory denials are insufficient raise to the level of creating a genuine issue of material fact.  *See Hodges v. Mankey,* No. 15-3988, 2016 WL 3090326, at *1 (3d Cir. June 2, 2016) (to dispute a material fact "non-moving party ***must point to specific factual evidence*** to show a genuine dispute over a material fact") (emphasis added).  Moreover, the documentary evidence in the form of wire transfer records subpoenaed directly from HSBC Bank by Plaintiffs during discovery and produced by HSBC Bank conclusively and "affirmatively" establish that on January 24, 2011, the IPO proceeds were transferred directly into *Tibet's* HSBC Hong Kong bank account ending in ***108-8***38.  *See* September 30, 2016 Cargill Decl. Exhibit 1 (emphasis added); s*ee* Cargill Decl. **Exhibit 3** [A&S Memorandum] (reporting Tibet's HSBC Hong Kong bank account number ending in 108-838).

**Zou's Statement No. 42**: Remains undisputed.

**Zou's Statement No. 43**: Remains undisputed.

**Zou's Statement No. 44**: Remains undisputed.

**Zou's Statement No. 45**: Remains undisputed.

**Zou's Statement No. 46**: Remains undisputed.

**Zou's Statement No. 47**: Remains undisputed.

**Zou's Statement No. 48**: Remains undisputed.

**Zou's Statement No. 49**: Since the Court's ruling on Zou's motion to dismiss, discovery has confirmed the IPO proceeds were never deposited into the China Tibetan bank account, Zou never had an opportunity to influence the Board because no items were given to the Zou for consideration or input (indeed, there is no evidence the Board even ever met) and Zou was not compensated by Tibet for his role as "observer" of the Board (or for any other reason). *See* Cargill Decl. **Exhibit 3** [A&S Memorandum], **Exhibits 13-14** [China Tibetan HSBC Bank Account Statements], **Exhibit 15** [Zou Depo. Tr.] at 31-32, 36, 38, 41.

> **Plaintiffs' Response:** *Disputed. First, the wiring instructions for the IPO proceeds merely state that the proceeds were scheduled to be transferred into Tibet's HSBC Hong Kong bank account, and do not affirmatively state or confirm that "the IPO proceeds were never deposited into the China Tibetan bank account" or that the proceeds were transferred to Tibet's HSBC Hong Kong bank account. Rosen Decl., Ex. 20.*
>
> *Second, Zou did have the authority and opportunity to influence the Board and control the actions of Tibet. Rosen Decl., Ex. 3 (page 35) (Board Observers "may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval.") (emphasis added).*
>
> *Third, Zou as a Board Observer received the same amount of compensation from Tibet as the other Tibet independent directors. Rosen Decl., Ex. 3 ("We will also pay observers the same amount as our independent directors receive.") Zou also received the same amount from Tibet for reimbursement for his expenses in attending Board meetings as the other Tibet independent directors. Id. ("We have agreed to reimburse the observers for their expenses for attending our Board meetings, subject to a maximum reimbursement of*

*$6,000 per meeting and $12,000 annually, which amount is not more than the reimbursement payable to our directors.")*

*Fourth, on January 26, 2011, two days after the IPO proceeds were transferred, the China Tibetan HSBC Hong Kong bank account received a deposit in the amount of $4.1 million. Thus given the close proximity in time to the transfer of the IPO proceeds on January 24, 2011, the reasonable inference is that the $4.1 million deposit was from the IPO proceeds. Therefore, it is inconclusive as to whether the IPO proceeds were ever deposited in the China Tibetan bank account. Zou Deposition, 77:14-17; Rosen Decl., Ex. 7.*

**Zou's Reply:** Remains undisputed. Concerning Plaintiffs' **First point**, see Zou's Reply to Statement No. 41 above.

Concerning Plaintiffs' **Second point**, elsewhere Plaintiffs explicitly concede that "Zou never attended a Board meeting, the Board never submitted any item to Zou for his consideration or input and in fact, there is no evidence that the Board ever actually met", *see* Pl's Response to Zou's 56.1(a) Statement at No.54, and thus Plaintiffs are estopped from taking a contrary position.  Further, Plaintiffs pointing in a conclusory fashion to the language in the Prospectus stating that Board raise a dispute the stated facts.  *See Hodges v. Mankey,* No. 15-3988, 2016 WL 3090326, at *1 (3d Cir. June 2, 2016) (to dispute a material fact "non-moving party ***must point to specific factual evidence*** to show a genuine dispute over a material fact") (emphasis added).

Concerning Plaintiffs' **Third point**, Plaintiffs point in a conclusory fashion to the language in the Prospectus Documents stating Board observers *could be paid* in the same manner as a director.  This statement does not dispute the uncontroverted evidence in the record that Zou was never actually paid by Tibet and Plaintiffs have put forth no evidence to establish otherwise. *See* June 30, 2016 Cargill Decl. Exhibit 15 [Zou Depo. Tr.] at 41; *see Hodges v. Mankey,* No. 15-3988, 2016 WL 3090326, at *1 (3d Cir. June 2, 2016) (to dispute a material fact "non-moving party ***must point to specific factual evidence*** to show a genuine dispute over a material fact") (emphasis added).

7

Concerning Plaintiffs' **Fourth point**, the referenced transfer is irrelevant and immaterial to Zou's summary judgment motion.  Plaintiffs' conclusory response represents that the nature of the cited transfer is "inconclusive" and provides no evidence to establish its nature. *See Hodges v. Mankey,* No. 15-3988, 2016 WL 3090326, at *1 (3d Cir. June 2, 2016) (to dispute a material fact "non-moving party ***must point to specific factual evidence*** to show a genuine dispute over a material fact") (emphasis added).  Moreover, the unrefuted documentary evidence clearly establishes that months after the transaction occurred, in the 10-Q financial filings signed by Tibet's CEO and Chairman, Tibet represented that the IPO proceeds were "net cash" on Tibet's balance sheets and that Tibet had control of the IPO funds.  *See* Pl's Response to Zou's 56.1(a) Statement at n.5.  Indeed, both the June and September 2011 10-Q reports affirmatively state that Tibet had not yet applied the IPO proceeds "to any use" and that Tibet "is holding the [IPO] proceeds in a bank account pending their use." *See id.*  Zou did not sign these filed reports nor is he referenced in them.  *See id.*  Further, Plaintiffs' claims concern purported misrepresentations in Tibet's Offering documents, Plaintiffs have not alleged, nor is there any evidence to support, common law conversion claims.

**Zou's Statement No. 50**: Mr. Down A&S's other designated "observer" Board also was not aware of any meetings conducted by the Board of Directors and, like Zou, was not called on by the Board to weigh in on any action or decision taken by the Board. *See* June 30, 2016 Cargill Decl. **Exhibit 5** [Downs Depo. Tr.] at 75, 78-79, 80.

> **Plaintiffs' Response**: *Disputed. Downs reached out to the Tibet Board of Directors and Guo in early April of 2011 and recommended to them that they adopt a stock repurchase plan consisting of a two-pronged approach that consisted of an extension of the lockups of the insiders of Tibet, and a stock repurchase plan that was to be funded by the net income of Tibet on a quarterly basis. Transcript of Deposition of L. McCarthy Downs ("Downs Deposition"), attached as Ex. 4 to the Rosen Decl., 51:19-22, 82:3-83:16. In response to Downs' suggestion, Tibet and Guo agreed to, and ultimately implemented the repurchase plan. Id.*

*Downs communicated and corresponded with Tibet during his time as a Board Observer and advanced potential ways that Tibet might be able to better present itself to the U.S. markets and to the investing public. Id., 81:11-17.*

**Zou's Reply**: Remains undisputed.  The cited evidence fails to establish that Downs was aware of any meetings conducted by the Board of Directors or was called on by the Board to weigh in on any official Board action or decision and thus, does not dispute the stated facts.  The undisputed evidence shows that Downs has represented that to the best of his knowledge that: (i) the Tibet Board of Directors never met; (ii) Tibet's Board of Directors never notified him or invited him to attend any meetings; and (iii) he never attended any Board meetings of Tibet. *See* Declaration of Laurence M. Rosen in Support of Plaintiffs' Opposition to Defendant L. McCarthy Downs, III's Motion for Summary Judgment (Docket # 226) at Exhibit 5 [Downs' Answers to Plaintiffs' First Set of Interrogatories] at Answer No. 17 (Docket ## 208-4 at Ex. B); Declaration of L. McCarthy Downs, III dated June 29, 2016, ¶¶ 63 & 67 (Docket ## 209-1 at Ex. B).

**Zou's Statement No. 51**:

Zou's involvement in the IPO was confined to the following:

    a.   Introducing A&S to Tibet's executives who were interested in taking Tibet public; *see* Cargill Declaration **Exhibit 5** [Downs Depo. Tr.] at 75; and

    b.   Assisting Tibet in setting up its corporate structure by preparing documents to help from Tibet's Hong Kong and British Virgin Island subsidiaries; *see* Cargill Declaration **Exhibit 15** [Zou Depo. Tr.] at 18-19; and

    c.   Acting as a liaison between Tibet, A&S and other service providers by

providing documents to Tibet executives, obtaining signatures on certain documents from Tibet executives and relaying Tibet's position on certain issues. *See id.* at 30, 57-58.

**Plaintiffs' Response**: *Disputed. Zou did not have a "limited role" in Tibet's IPO. In addition to all of the above, Zou:*

- *was engaged in the whole process of assisting Tibet to go public. Downs Deposition, 51:19-22.*
- *assisted in the preparation of Tibet's IPO prospectus. Downs Deposition, 118:19-119:16.*
- *tendered information and documents concerning Tibet to A&S in late 2009, including company generated financial statements and other business descriptive materials and was thereafter directed by A&S to have Tibet's auditor begin their efforts to prepare the financial statements mandated by the SEC in connection with the potential Tibet IPO. Downs Deposition, 36:2-6; 119:19-120:6; L. McCarthy Downs III's Answers to Plaintiffs' First Set of Interrogatories ("Downs Answers") attached as Ex. 5 to the Rosen Decl., Answer No. 14.*
- *provided Downs with wire transfer instructions for the IPO proceeds. Downs Deposition, 102:10-24. was appointed as a Board Observer on Tibet's Board in connection with Tibet's IPO. Rosen Decl., Ex. 3 (the Prospectus); Downs Deposition, 74:2-8; 75:12-18.*
- *duties, responsibilities, and rights as a Board Observer included attending Board meetings in person or on the telephone, being a participant in the general Board meetings, which included listening in, offering advice if solicited or warranted, and being heard. Downs Deposition, 75:22-76:10.*

**Zou's Reply:** Remains undisputed.

**Zou's Statement No. 52**: Remains undisputed. The cited evidence does not refute that Zou's limited involvement in the IPO was confined to the listed items.

Concerning Plaintiffs' **First bullet point**, the cited testimony that Zou was "*engaged in the whole process*" of the IPO is vague, ambiguous and conclusory and thus, insufficiently specific to dispute Zou's statement.  *See Am. Plaza, LLC v. Marbo Cross Shop, LLC,* No. CIV085963 (FSH), 2010 WL 455349, at *3 (D.N.J. Feb. 3, 2010) ("non-moving party must set out ***specific facts*** showing a genuine issue for trial using affidavits or as otherwise provided in Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1")

Concerning Plaintiffs' **Second bullet point**, the cited testimony that Zou "*assisted in the preparation of Tibet's IPO prospectus*" is not material to summary judgment, as the well-established Section 11 case law makes clear even high-level company officials who have a direct role in preparing the registration statements are not to be held liable if they are not company directors or signatories to the registration statements.  *See, e.g., See, e.g., Employees' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.,* 804 F. Supp. 2d 141, 157 (S.D.N.Y. 2011) (fact that defendants "participated in drafting and disseminating the Offering Documents . . . sponsored the . . . offerings . . . and [that one defendant] is the parent company [of primary violator] . . . are statutorily irrelevant" under Section 11); *Armstrong v. Am. Pallet Leasing Inc.,* 678 F. Supp. 2d 827, 865 (N.D. Iowa 2009) (Dismissing Section 11 claims against individual defendants where there were no allegations that any of the defendants "signed any registration statement, was a person who was a director of . . . the issuer at the time of the filing . . . a person who, with his consent, is named in the registration statement as being or about to become a director, or was an underwriter") (internal quotations omitted); *In re Williams Sec. Litig.,* 339 F. Supp. 2d 1242, 1269 (N.D. Okla. 2003) (dismissing Section 11 claim against individual defendant where "he did not sign, nor is alleged to have signed, any registration statement containing any allegedly false or misleading statement"); *In re Elscint, Ltd. Sec. Litig.,* 674 F. Supp. 374, 385 (D. Mass. 1987) ("allegation that [individual defendant] was a high ranking officer in [plaintiff company] is not sufficient to state a Section 11 claim . . . an officer is not liable unless he was also a director, was named in the registration as about to become a director, or signed the registration statement"); *Somerville v. Major Expl., Inc.,* 102 F.R.D. 500, 502 (S.D.N.Y. 1984) (dismissing Section 11 claim against "Vice President for investor relations" that "had shared responsibilities for certain omissions or misstatements in the annual reports"

and was actually involved in circulating a press release which provided "much of the substance for plaintiff's fraud claims" where "he did not sign, nor is alleged to have signed, any registration statement containing any allegedly false or misleading statement"); *McFarland v. Memorex Corp.,* 493 F. Supp. 631, 642 (N.D. Cal. 1980) (while directors and registration statement signatories bear potential liability under Section 11 "the same does not hold true for officers . . .nonsigning officers cannot be held liable under Section 11."). Further, concerning the vague and ambiguous assertion that "Zou assisted in the preparation of Tibet's IPO prospectus" Plaintiffs have asserted the exact opposite when it suites them— Plaintiffs cannot have it both ways. *See* Statement of Disputed Fact 51 below (asserting "Zou did not review the Tibet IPO prospectus prior to its filing").

Concerning Plaintiffs' **<u>Third bullet point</u>**, the contents is undisputed but irrelevant and is consistent with Zou's limited role in Tibet as described above.

Concerning Plaintiffs' **<u>Fourth bullet point</u>**, the contents is undisputed but irrelevant and is consistent with Zou's limited role in Tibet as described above.

Concerning Plaintiffs' **<u>Fifth bullet point</u>**, the cited evidence does not establish that the matters set forth in this paragraph were Zou's "duties, responsibilities, and rights as a Board Observer" at best, it states Downs' speculative opinion as to what *he* "envisioned [he] would do as an observer." However, Downs vigorously objects to Plaintiffs' mischaracterization of his testimony. S*ee* Downs' responses to Plaintiffs' Supplemental Statement of Disputed Material Facts Response No. 43.

**<u>Zou's Statement No. 53</u>**: Zou does not (nor has he ever) have any voting power or veto power in connection with any item submitted to the Board for review. *See* June 30, 2016 Cargill Decl.

**Exhibit 1** [Prospectus] at PDF040, PDF092, **Exhibit 5** [Downs Depo. Tr.] at 80, **Exhibit 15**

[Zou Depo. Tr.] at 31-32, 36-37.

> **Plaintiffs' Response**: *Undisputed to the extent that Board Observers did not have a right to vote in a Board meeting. However, Plaintiffs dispute that Board Observers did not have the right to veto, approve or deny any action by the Tibet Board. Since Board Observers "may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval", (Rosen Decl., Ex. 3) (emphasis added), Board Observers had the power and authority to significantly impact matters submitted to the Tibet Board for approval, including the power and authority to veto, approve or deny actions taken by the Board.*

> **Zou's Reply**: Remains undisputed.  Plaintiffs pointing in a conclusory fashion to the

language in the Prospectus stating that Board observers "*may*" influence the outcome of matters

before Tibet's Board fails to dispute the stated facts.  *See Hodges v. Mankey,* No. 15-3988, 2016

WL 3090326, at *1 (3d Cir. June 2, 2016) (to dispute a material fact "non-moving party ***must***

***point to specific factual evidence*** to show a genuine dispute over a material fact") (emphasis

added).

**Zou's Statement No. 54**: Remains undisputed.

**Zou's Statement No. 55**: Remains undisputed.

**Zou's Statement No. 56**: Further, Zou was never compensated by Tibet for his role as

"observer" or in any other capacity. *Id.* at 41.

> **Plaintiffs' Response**: *Zou received the same compensation for his role as Board Observer as the other Tibet independent directors. Rosen Decl., Ex. 3 ("We will also pay observers the same amount as our independent directors receive.") Board Observers also received the same amount from Tibet for reimbursement for their expenses in attending Board meetings as the other Tibet independent directors. Id. ("We have agreed to reimburse the observers for their expenses for attending our Board meetings, subject to a maximum reimbursement of $6,000 per meeting and $12,000 annually, which amount is not more than the reimbursement payable to our directors.")*

> **Zou's Reply:** Remains undisputed.  Because Plaintiffs fail to state whether they dispute

this fact it is deemed admitted.  *See* New Jersey Local Rule 56.1 (*"any material fact not disputed*

shall be deemed undisputed for purposes of the summary judgment motion").  Further, Plaintiffs'

reference in a conclusory fashion to the language in the Prospectus Documents stating Board

observers *could be paid* in the same manner as a director does not dispute the uncontroverted

evidence in the record that Zou was never actually paid by Tibet.  Plaintiffs have put forth no

evidence to establish otherwise. *See* June 30, 2016 Cargill Decl. Exhibit 15 [Zou Depo. Tr.] at

41; *see Hodges v. Mankey,* No. 15-3988, 2016 WL 3090326, at *1 (3d Cir. June 2, 2016) (to

dispute a material fact "non-moving party ***must point to specific factual evidence*** to show a

genuine dispute over a material fact") (emphasis added).

**Zou's Statement No. 57**: Zou was not part of Tibet's management, had no role in the day-to-day

operations of Tibet, did not make or have the authority to make decisions on behalf of Tibet. *See*

June 30, 2016 Cargill Decl. **Exhibit 1** [Prospectus] at PDF009, PDF036, PDF043, **Exhibit 6** [S-

1 excerpts] and **Exhibit 7** [S-1 Amendments excerpts], **Exhibit 9** [Final Registration Statement

excerpts], **Exhibit 5** [Downs Depo. Tr.] at 121-122, **Exhibit 15** [Zou Depo. Tr.] at 31-32, 36, 38.

> **Plaintiffs' Response**: *Disputed. Zou's authority as a Board observer included attending Board meetings in person or on the telephone, being a participant in the general Board meetings, which included listening in, offering advice if solicited or warranted, and being heard. Downs Deposition, 75:22- 76:10. Zou had the authority and opportunity to influence the Board and control the actions of Tibet. Rosen Decl., Ex. 3 (Board Observers "may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval.") (emphasis added). Moreover, Zou received the same compensation for his role as Board Observer as the other Tibet independent directors. Rosen Decl., Ex. 3 ("We will also pay observers the same amount as our independent directors receive.") Board Observers also received the same amount from Tibet for reimbursement for their expenses in attending Board meetings as the other Tibet independent directors. Id. ("We have agreed to reimburse the observers for their expenses for attending our Board meetings, subject to a maximum reimbursement of $6,000 per meeting and $12,000 annually, which amount is not more than the reimbursement payable to our directors.")*

      **Zou's Reply**: Remains undisputed for the reasons stated in Zou's Reply to Statement No. 56 above and Zou's Reply to Plaintiffs' fourth bullet point in Response to Statement No. 52 above.

      **Zou's Statement No. 58**: Zou was not asked to nor did he draft the Offering Documents. Indeed, Zou had no responsibility for verifying the accuracy of the contents of the Offering Documents - such tasks were properly the responsibility of Tibet's executives and directors and the professionals hired by Tibet, including auditors, accountants, and lawyers. *See* June 30, 2016 Cargill Decl. **Exhibit 15** [Zou Depo. Tr.] at 38, 41, 85; **Exhibit 5** [Downs Depo. Tr.] at 57-58, 111-112.

      **Plaintiffs' Response**: *Disputed. This fact is a conclusion of law and thus cannot be presented in a form that would be admissible in evidence. This fact— that "Zou had no responsibility for verifying the accuracy of the contents of the Offering Documents - such tasks were properly the responsibility of Tibet's executives and directors and the professionals hired by Tibet, including auditors, accountants, and lawyers"—is Zou's legal conclusion of a legal question; whether Zou had a duty and responsibility to verify the accuracy of the contents of the Offering Documents, and thus whether Zou may be held liable as a Section 11 defendant. See Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc., 623 F.Supp.2d 518, 533 (D. Del. 2009) ("An affiant states a legal conclusion by applying the law to the facts.")*

*This fact concludes that Zou "had no responsibility for verifying the accuracy of the contents of the Offering Documents" based on Zou's and Downs' deposition testimony of their reliance upon the accountant, auditor, and lawyers hired in connection with Tibet's IPO. Since this fact effectively concludes that Zou is not a Section 11 defendant, it is a legally conclusive statement and thus cannot be presented in a form that would be admissible in evidence. See Knopick v. Downey, No. 1:09-CV-1287, 2013 WL 1882983, at \*14 (M.D. Pa., May 6, 2013) ("legally conclusive statements are not helpful to the jury, and thus, inadmissible at trial or at summary judgment"); see also LR. 56.1 ("Each statement of material facts shall be a separate document (not part of a brief) and shall not contain legal argument or conclusions of law.")(emphasis added).*

*In any event, Zou was engaged in the entire process of assisting Tibet to go public, and Zou assisted in the preparation of Tibet's IPO prospectus. Downs Deposition, 51:19-22; 118:19-119:16.*

**Zou's Reply**:  The statement "Zou was not asked to nor did he draft the Offering Documents" is a statement of fact, not a conclusion of law, requiring a response from Plaintiffs. Because Plaintiffs fail to dispute this fact it is deemed admitted.  *See* New Jersey Local Rule 56.1 (*"*any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion").

**Zou's Statement No. 59**: Remains undisputed.

**Zou's Statement No. 60**:  Contrary to Plaintiffs' alleged theory of this case that Zou was responsible for the alleged misstatements or material omissions in the Offering Documents, Zou invested his own money in Tibet, nearly $200,000, and acquired pre-IPO shares of Tibet. *See* June 30, 2016 Cargill Decl. **Exhibit 15** [Zou Depo. Tr.] at 39.

> **Plaintiffs' Response**: *Undisputed that Zou invested money in Tibet, however, Plaintiffs dispute that this fact runs contrary to Plaintiffs' theory of the case, and again submit that Zou is making a legal argument which has no place in a summary judgment statement of material facts. See LR. 56.1 ("Each statement of material facts shall be a separate document (not part of a brief) **and shall not contain legal argument or conclusions of law**.") (emphasis added). The fact that Zou invested money in Tibet does not alone negate Plaintiffs' theory of the case, and regardless, this is legal argument which is not appropriate within a statement of material facts attached to a summary judgment motion. Id.*

**Zou's Reply:** Remains undisputed. Plaintiffs admit "Zou invested his own money in Tibet, nearly $200,000, and acquired pre-IPO shares of Tibet."

**Zou's Statement No. 61**: As an early investor, Zou conducted his own diligence by visiting Tibet's factories and facilities and talking with its CEO Mr. Guo on several occasions. *See id.* at 23-25.

> **Plaintiffs' Response**: *Disputed. Zou concedes that he did not conduct any due diligence in connection with the Tibet IPO. Zou Deposition, 31:4-6. Zou did not review the Tibet IPO prospectus prior to its filing. Id., 30:25- 31:3; 35:25-36:4. Zou is not aware if anybody checked the court websites in China to see if there were any actions pending against Tibet. Id., 85:17-22. Moreover, Zou only met with Mr. Guo less than five (5) times, and rarely spoke with him. Id., 24:18-25:4.*

16

**Zou's Reply**: Remains undisputed.  The evidence cited by Plaintiffs fails to establish that Zou did not "visit[ ] Tibet's factories and facilities and talk[ ] with its CEO Mr. Guo on several occasions."  To the extent Plaintiffs' response concerns the construction of the term "due diligence" and whether Zou's conduct satisfies a "due diligence" defense, Plaintiffs' response represents a legal conclusion and should be disregarded.  *See* New Jersey Local Rule 56.1 (each statement of material fact *"*shall not contain legal argument or conclusions of law").

**Zou' Statement No. 62**: Remains undisputed.

**Zou' Statement No. 63**:  Remains undisputed.

**Zou's Statement No. 64**: Remains undisputed.

**Zou's Statement No. 65**: According to the prospectus, "affiliates" of Tibet that held restricted shares for at least six month would be entitled to sell their pre-IPO common shares that did not exceed 1% of the then outstanding common shares and non-affiliates were permitted to sell their pre-IPO common shares held or at least six month "without regard to any manner of sale, notice provisions or volume limitations." *Id.* at PDF102.

> **Plaintiffs' Response**: *Disputed. The Prospectus stated that the restricted shares could be sold subject to the restrictions and limitations of Rule 144*
>
> > *144 of the Securities Act:*
> > *Upon the completion of the offering, we will have outstanding 14,812,500 common shares, assuming the closing of the maximum offering. Of these common shares, the 3,000,000 common shares sold in this offering will be freely tradable without restriction under the Securities Act, except that any shares purchased by our "affiliates," as that term is defined in Rule 144 of the Securities Act, may generally only be sold in compliance with the limitations of Rule 144 described below. The remaining approximately 11,812,500 common shares outstanding will be restricted shares held by existing shareholders that could be sold pursuant to Rule 144. We have not agreed to register these restricted shares. We have not issued any warrants to purchase our common shares or other securities convertible into our common shares.*
> >
> > *Rule 144*

17

> *In general, under Rule 144 as currently in effect, beginning 90 days after the effective date of the registration statement of which this prospectus is a part, a person (or persons whose shares are aggregated) who is deemed to be an affiliate of our company at the time of sale, or at any time during the preceding three months, and who has beneficially owned restricted shares for at least six months, would be entitled to sell within any three-month period a number of our common shares that does not exceed the greater of 1% of the then outstanding common shares or the average weekly trading volume of common shares during the four calendar weeks preceding such sale. Sales under Rule 144 are subject to certain manner of sale provisions, notice requirements and the availability of current public information about our company. In addition, sales by our affiliates may be subject to the terms of lock-up agreements. See "Shares Eligible for Future Sale – Lock-Up Agreements." A person who has not been our affiliate at any time during the three months preceding a sale, and who has beneficially owned his or her common shares for at least six months, would be entitled under Rule 144 to sell such shares without regard to any manner of sale, notice provisions or volume limitations described above. Any such sales must comply with the public information provision of Rule 144 until our common shares have been held for one year. Rosen Decl., Ex. 3 (pages 95 and 96) (emphasis added).*

**Zou's Reply**: Remains undisputed.  The very language cited above by Plaintiffs establishes the facts asserted.

**Zou's Statement No. 66**: Thus, by August 2, 2011, after the second lock-up period expired, and at least six months from the IPO had passed, millions of pre-IPO common shares became eligible for sale on the open market.  *See id.* at PDF097.

> **Plaintiffs' Response**: *Disputed. This fact is a conclusion of law and thus cannot be presented in a form that would be admissible in evidence. This fact— that "by August 2, 2011, after the second lock-up period expired, and at least six months from the IPO had passed, millions of pre-IPO common shares became eligible for sale on the open market"—is Zou's legal conclusion of a legal question; whether under Rule 144 the shareholders of millions of pre-IPO Tibet common shares were legally permitted to sell those shares on the open market. See Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc., 623 F.Supp.2d 518, 533 (D. Del. 2009) ("An affiant states a legal conclusion by applying the law to the facts.") This fact concludes that the "millions of pre-IPO common shares became [legally] eligible for sale on the open market." Therefore since this fact is a legally conclusive statement it cannot be presented in a form that would be admissible in evidence. See Knopick v. Downey, No. 1:09-CV-1287, 2013 WL 1882983, at \*14 (M.D. Pa., May 6, 2013) ("legally conclusive statements are not helpful to the jury, and thus, inadmissible at trial or at summary judgment"); see also LR. 56.1 ("Each statement of material facts shall be a separate document (not part of a brief) and shall not contain legal argument or conclusions of law.") (emphasis added).*

> *In any event, Zou does not cite any Form 4 or Form 144 evidencing the sale of any pre-IPO Tibet common shares to support the assertion that millions of restricted Tibet stock were eligible for sale or actually were sold into the public markets.*

**Zou's Reply**:  Remains undisputed.  Plaintiffs' attempt to recast the above statement as a "conclusion of law" fails, as does Plaintiffs' attempts to shift the burden of establishing standing on Defendants— it is Plaintiffs' burden to establish standing, which they have failed to do.  *See ACLU-NJ v. Twp. of Wall,* 246 F.3d 258, 261 (3d Cir. 2001) (internal citations omitted) ("Plaintiffs bear the burden of proving standing" and must carry that burden "with the manner and degree of evidence required at successive stages of the litigation.").  Further, as the Prospectus makes clear, and as Plaintiffs do not dispute, the first lock up period for Tibet restricted shares expired on April 24, 2011. The second lock up period expired on August 2, 2011.  *See* June 30, 2016 Cargill Decl. **Exhibit 1** [Prospectus] at PDF012 (Of the pre-existing 11,812,500 common shares, the lock-up period for 9,058,125 restricted shares ended on April 24, 2011 and the lock-up period for millions of additional pre-IPO shares ended on August 2, 2011).

**<u>Zou's Statement No. 67</u>**: Remains undisputed.

**<u>Zou's Statement No. 68</u>**: Remains undisputed.

**<u>Zou's Statement No. 69</u>**: Remains undisputed.

**<u>Zou's Statement No. 70</u>**: Remains undisputed.

**<u>Zou's Statement No. 71</u>**: The settlement and Notice of Pendency was approved by the bankruptcy court on October 20, 2015. *See* Cargill Declaration **Exhibit 19** [Order Approving Compromise and Settlement]. Thus, Plaintiffs have admitted that as of April 3, 2012 at least 7.081 million shares of Tibet were outstanding in the open market.

**Plaintiffs' Response**: *Disputed. The definition of the term "outstanding shares" encompasses both restricted and non-restricted shares.7[2] Zou wrongly conflates "outstanding shares" with "outstanding shares available for trading in the market" (also known as "floating stock"[3]). Thus the outstanding 7.081 million[4] shares of Tibet represents both the restricted (pre-IPO restricted shares and subsequent restricted share issuances) and non-restricted shares of Tibet (IPO shares). The fact that shares are "outstanding" does not mean that they are actually trading in the market or are available for sale to the investing public. Therefore, as of April 3, 2012, 7.081 million shares of Tibet were not available for sale to the investing public nor have Plaintiffs admitted to this fact.*

**Zou's Reply:** Remains undisputed. Plaintiffs do not dispute that "[o]f the pre-existing 11,812,500 common shares, the lock-up period for 9,058,125 restricted shares ended on April 24, 2011 and the lock-up period for millions of additional pre-IPO shares ended on August 2, 2011," *see* Pl's Response to Zou's 56.1(a) Statement at No. 66.  Thus, as of August 2, 2011, by the clear terms of the Prospectus, Tibet's previously restricted pre-IPO shares became eligible for sale on the open market.

---

[2]   A business dictionary defines "outstanding shares" as "a company's stock currently held by all its shareholders, including share blocks held by institutional investors and restricted shares owned by the company's officers and insiders." http://www.investopedia.com/terms/o/outstandingshares.

[3]   A business dictionary defines "floating stock" as "the number of shares available for trading of a particular stock. Floating stock is calculated by subtracting closely-held shares and restricted stock from a firm's total outstanding shares." http://www.investopedia.com/terms/f/floating-stock.asp#ixzz4H3F3coDZ.

[4]   The Notice of Pendency referenced in Fact 71 above was subsequently amended to correct for the fact that the incorrect number of shares was stated. The corrected notice states that 14,845,834 shares of Tibet stock were outstanding as of April 3, 2012, the end of the Class Period.

## ZOU'S RESPONSE TO PLAINTIFF'S STATEMENT
## OF ALLEGED "DISPUTED" FACTS

1.      *Hayden Zou ("Zou") incorporated China Tibetan Pharmaceuticals Limited ("China Tibetan"), a Hong Kong Corporation, and is the sole director of China Tibetan. Transcript of Deposition of Hayden Zou ("Zou Deposition"), attached as Ex. 1 to the Declaration of Laurence M. Rosen in Support of Plaintiffs' Opposition to Defendant Hayden Zou's Motion for Summary Judgment ("Rosen Decl."), 21:11-15.*

**Zou's Response to Plaintiffs' Statement 1:** Undisputed that Zou testified that he

incorporated China Tibetan Pharmaceuticals Limited and was a director of China Tibetan.

However, the testimony cited does state that Zou was China Tibetan's "*sole*" director.  In any

event, this fact is irrelevant to Zou's Motion for Summary Judgment as the Court has already

ruled that Zou's role in connection with China Tibetan, a completely separate and legally distinct

subsidiary, does not lead to the conclusion that Zou is a director of Tibet.  *See* Docket # 132

[2/20/15 Opinion & Order] at 11 ("The Court is not persuaded by Plaintiffs' argument that a

director of a subsidiary corporation is analogously functioning as a director of the parent").

Moreover, the undisputed testimony establishes that after China Tibetan was incorporated (for

the *sole* purpose of facilitating the IPO) Zou's name was to be removed as having any role in

connection with the entity.  *See* September 30, 2016 Cargill Decl. Exhibit 5 [Zou Depo. Tr.] at

74-75.  However, as a result of an administrative error Zou's name was never removed.  *Id.*

2.      *Zou introduced the potential Tibet Pharmaceuticals, Inc. ("Tibet") Initial Public Offering ("IPO") to Anderson & Strudwick Incorporated ("A&S"). Transcript of Deposition of L. McCarthy Downs, III ("Downs Deposition"), 75:12-18; 118:19-23.*

**Zou's Response to Plaintiffs' Statement 2:** Undisputed that this statement accurately

represents Downs' testimony.  However, this fact is not material to Zou's Motion for Summary

Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of

disputed *material* facts").

3.      *Zou was engaged in the whole process of assisting Tibet to go public and arranging the IPO. Downs Deposition, 51:19-22.*

      **Zou's Response to Plaintiffs' Statement 3:** Zou objects to the statement that Zou was "*engaged in the whole process*" of the IPO as vague, ambiguous, and conclusory.  However, the asserted fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

4.      *Zou assisted in the preparation of Tibet's IPO prospectus. Downs Deposition, 118:19-119:16.*

      **Zou's Response to Plaintiffs' Statement 4:** Zou objects to the statement that Zou was "*assisted in the preparation of Tibet's IPO prospectus*" as vague, ambiguous, and conclusory. However, the evidence cited is irrelevant to Zou's Motion for Summary Judgment as the well-established Section 11 case law makes clear that even high-level company officials who have a direct role in preparing the registration statements are not to be held liable if they are not company directors or signatories to the registration statement.  *See, e.g., Employees' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.,* 804 F. Supp. 2d 141, 157 (S.D.N.Y. 2011) (fact that defendants "participated in drafting and disseminating the Offering Documents . . . sponsored the . . . offerings . . . and [that one defendant] is the parent company [of primary violator] . . . are statutorily irrelevant" under Section 11); *Armstrong v. Am. Pallet Leasing Inc.,* 678 F. Supp. 2d 827, 865 (N.D. Iowa 2009) (dismissing Section 11 claims against individual defendants where there were no allegations that any of the defendants "signed any registration statement, was a person who was a director of . . . the issuer at the time of the filing . . . a person who, with his consent, is named in the registration statement as being or about to become a director, or was an underwriter") (internal quotations omitted); *In re Williams Sec. Litig.,* 339 F. Supp. 2d 1242, 1269 (N.D. Okla. 2003) (dismissing Section 11 claim against

individual defendant where "he did not sign, nor is alleged to have signed, any registration statement containing any allegedly false or misleading statement"); *In re Elscint, Ltd. Sec. Litig.,* 674 F. Supp. 374, 385 (D. Mass. 1987) ("allegation that [individual defendant] was a high ranking officer in [plaintiff company] is not sufficient to state a Section 11 claim . . . an officer is not liable unless he was also a director, was named in the registration as about to become a director, or signed the registration statement"); *Somerville v. Major Expl., Inc.,* 102 F.R.D. 500, 502 (S.D.N.Y. 1984) (dismissing Section 11 claim against "Vice President for investor relations" that "had shared responsibilities for certain omissions or misstatements in the annual reports" and was actually involved in circulating a press release which provided "much of the substance for plaintiff's fraud claims" where individual "did not sign, nor is alleged to have signed, any registration statement containing any allegedly false or misleading statement"); *McFarland v. Memorex Corp.,* 493 F. Supp. 631, 642 (N.D. Cal. 1980) (while directors and registration statement signatories bear potential liability under Section 11 "the same does not hold true for officers . . .nonsigning officers cannot be held liable under Section 11.").  Moreover, Plaintiffs have taken the exact opposite when it is convenient for their arguments.  Plaintiffs cannot have it both ways.  *See* Statement of Disputed Fact 51 below (asserting "Zou did not review the Tibet IPO prospectus prior to its filing").

5.      *Zou was L. McCarthy Downs, III's ("Downs") and A&S' first point of contact at Tibet concerning the Tibet IPO and Tibet as a company. Downs Deposition, 36:24 37:1.*

        **Zou's Response to Plaintiffs' Statement 5:** Undisputed that this statement accurately reflects Down's testimony.  However, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

6.      *A&S received information and documents concerning Tibet directly from Zou in late 2009, including company generated financial statements and other business descriptive materials. After Zou sent these documents to A&S, A&S told Zou to have Tibet's auditor begin their efforts to prepare the financial statements mandated by the SEC in connection with the potential Tibet IPO. Downs Deposition, 36:2-6; 119:19-120:6; L. McCarthy Downs III's Answers to Plaintiffs' First Set of Interrogatories ("Downs Answers") attached as Ex. 5 to the Rosen Decl., Answer No. 14.*

     **Zou's Response to Plaintiffs' Statement 6:** Undisputed that this statement accurately

reflects Downs' Interrogatory Answer No. 14. However, it is incomplete because Downs stated

specifically that he could not "recall exactly what the materials consisted of" that were provided

by Zou. Further, this fact is not material to Zou's Motion for Summary Judgment. *See* New

Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material*

facts").

7.      *On May 13, 2010, Zou sent an email about the calculation of Tibet's shares in connection with Tibet's IPO, and Zou's email is listed as a "workgroup member" for the Tibet IPO along with the email addresses of the Chief Executive Officer of Tibet, Taylor Z. Guo ("Guo"), Downs, and Kaufman and Canoles, P.C ("K&C") attorneys. Zou Deposition, 51:17-54:12; Rosen Decl., Ex. 11.*

     **Zou's Response to Plaintiffs' Statement 7:** Undisputed that Zou sent the email

attached as Exhibit 11 to the Rosen Declaration.  However, Zou objects to Plaintiffs'

characterization of the referenced document, as Exhibit 11 is a written document that speaks for

itself.  Zou also objects to Plaintiffs' reference to "workgroup member" as vague and ambiguous.

Zou's undisputed testimony was that he doesn't believe he was part of any working group for the

Tibet IPO. *See* September 30, 2016 Cargill Decl. Exhibit at 54.  Further, this fact is not material

to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may

furnish "a supplemental statement of disputed *material* facts").

8.      *Zou corresponded with K&C attorneys with regards to Tibet's answers to the SEC's comments in connection with Tibet's SEC filings. Rosen Decl., Ex. 19.*

**Zou's Response to Plaintiffs' Statement 8:** Undisputed that Zou sent the email attached as Exhibit 19 to the Rosen Declaration.  However, Zou objects to Plaintiffs' characterization of the referenced document, as it is a written document that speaks for itself.  Zou also objects to Plaintiffs' reference to the term "workgroup member" as vague and ambiguous.  Further, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

9.      *On January 12, 2011, Zou received an email from Downs confirming the offering terms of the Tibet IPO for 3,000,000 shares at $5.50 per share. Rosen Decl., Ex. 14.*

**Zou' Response to Plaintiffs' Statement 9:** Undisputed that Zou was a carbon copy recipient of the email addressed to Tibet's CEO, Taylor Guo, attached as Exhibit 14 to the Rosen Declaration.  However, Zou objects to Plaintiffs' characterization of the referenced document, as Exhibit 14 is a written document that speaks for itself.  Further, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

10.     *On January 19, 2011, Zou received an email from Downs which outlined the wire transfer instructions for the escrow account holding the Tibet IPO proceeds. Zou Deposition, 47:25-49:25; Rosen Decl., Ex. 9.*

**Zou's Response to Plaintiffs' Statement 10:** Undisputed that Zou was a recipient of the email attached as Exhibit 9 to the Rosen Declaration which attached documents requiring "Taylor's signature."  However, Zou objects to Plaintiffs' characterization of the referenced document, as Exhibit 9 is a written document that speaks for itself.  Further, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

11.     *On January 19, 2011, Zou received an email from Downs which contained the delivery instructions for the Transfer Agent for the closing of the Tibet IPO, a copy of the Final Prospectus, and an instruction to "call [Downs] if you have any questions." Zou Deposition, 50:4-51:6; Rosen Decl., Ex. 10.*

Undisputed that Zou was a carbon copy recipient of the email addressed to "Nadia" of Computershare attached as Exhibit 10 to the Rosen Declaration.  However, Zou objects to Plaintiffs' characterization of the referenced document, as Exhibit 10 is a written document that speaks for itself.  Further, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

12.     *On January 19, 2011, Zou received an email from Downs stating that Downs will forward to Zou the wire instructions for the transfer of the Tibet IPO proceeds for Guo's signature, and that Downs will forward to Zou the expense breakdown setting forth the various expenses of the Tibet IPO. Rosen Decl., Ex. 16.*

**Zou's Response to Plaintiffs' Statement 12:** Undisputed that Zou was a recipient of the email attached as Exhibit 16 to the Rosen Declaration which referenced forthcoming documents that "need[ed] to be signed" by Taylor Guo and Downs.  However, Zou objects to Plaintiffs' characterization of the referenced document, as Exhibit 16 is a written document that speaks for itself.  Further, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

13.     *Zou received an email from a lawyer at K&C which requested that Zou provide Guo's signature for the escrow agreement for the transfer of the Tibet IPO proceeds. Rosen Decl., Ex. 17.*

**Zou's Response to Plaintiffs' Statement 13:**  Undisputed that Zou was a recipient of the email attached as Exhibit 17 to the Rosen Declaration.  However, Zou objects to Plaintiffs' characterization of the referenced document, as Exhibit 17 is a written document that speaks for

itself.  Further, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey

Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

14.     *Zou provided Downs with wire transfer instructions for the Tibet IPO proceeds.  Downs Deposition, 102:10-24.*

        **Zou's Response to Plaintiffs' Statement 14:** This statement incorrectly characterizes

Downs' testimony.  In the cited testimony Downs states that "the wiring instructions . . . *were*

*provided to us by Taylor Guo* through Hayden."  Further, this fact is not material to Zou's

Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a

supplemental statement of disputed *material* facts").

15.     *On January 20, 2011, Zou received an email from Downs which contained the amended escrow instructions for the transfer of the Tibet IPO proceeds. Rosen Decl., Ex. 12.*

        **Zou's Response to Plaintiffs' Statement 15:** Undisputed that Zou was a recipient of the

email attached as Exhibit 12 to the Rosen Declaration which requested that "Taylor . . .  sign" a

certain expense report and escrow agent instructions.  However, Zou objects to Plaintiffs'

characterization of the referenced document, as Exhibit 12 is a written document that speaks for

itself.  Further, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey

Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

16.     *On January 20, 2011, Zou received an email from Darren Minton, President of Trilogy Capital Partners requesting feedback and approval on the drafted press release announcing the pricing for Tibet's IPO. Rosen Decl., Ex. 13.*

        **Zou's Response to Plaintiffs' Statement 16:** Undisputed that Zou was a carbon copy

recipient of the email addressed to Taylor Guo, Mac Downs and Brad Haneberg attached as

Exhibit 13 to the Rosen Declaration. However, Zou objects to Plaintiffs' characterization of the

referenced document, as Exhibit 10 is a written document that speaks for itself.  Further, this fact

is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1

(opponent may furnish "a supplemental statement of disputed *material* facts").

17.     *Zou was copied on a letter, dated January 20, 2011, prepared by A&S setting forth the wiring instructions and bank accounts that were to receive the Tibet IPO proceeds. Rosen Decl., Ex. 20.*

      **Zou's Response to Plaintiffs' Statement 17:** Undisputed that Zou was a carbon copy

recipient of the letter addressed to Matt Ward of Suntrust Bank and signed by Taylor Guo

attached as Exhibit 20 to the Rosen Declaration.  However, Zou objects to Plaintiffs'

characterization of the referenced document, as Exhibit 20 is a written document that speaks for

itself.  Further, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey

Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

18.     *On January 21, 2011, Zou received an email from Downs which stated the time and date for a conference call for the closing of the Tibet IPO, and Downs stated "Thanks for the hard work from all in getting us to this point." Rosen Decl., Ex. 18.*

      **Zou's Response to Plaintiffs' Statement 18:** Undisputed that Zou was a carbon copy

recipient of the email addressed to Taylor Guo attached as Exhibit 18 to the Rosen Declaration.

However, Zou objects to Plaintiffs' characterization of the referenced document, as Exhibit 18 is

a written document that speaks for itself.  Further, this fact is not material to Zou's Motion for

Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental

statement of disputed *material* facts").

19.     *On January 24, 2011, Zou received an email from Sun Trust Bank confirming that the all wires scheduled to be released in connection with the transfer of the Tibet IPO proceeds were released. Rosen Decl., Ex. 18.*

      **Zou's Response to Plaintiffs' Statement 19:** Undisputed that Zou was a carbon copy

recipient of the email addressed to Downs attached as Exhibit 18 to the Rosen Declaration.

However, Zou objects to Plaintiffs' characterization of the referenced document, as Exhibit 18 is

a written document that speaks for itself.  Further, this fact is not material to Zou's Motion for

Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental

statement of disputed *material* facts").

20.     *On January 25, 2011, Zou received an email from Downs announcing that trading in Tibet stock would commence that day. Rosen Decl., Ex. 15.*

**Zou's Response to Plaintiffs' Statement 20:** Undisputed that Zou was a carbon copy

recipient of the email addressed to Taylor Guo attached as Exhibit 15 to the Rosen Declaration.

However, Zou objects to Plaintiffs' characterization of the referenced document, as Exhibit 15 is

a written document that speaks for itself.  Further, this fact is not material to Zou's Motion for

Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental

statement of disputed *material* facts").

21.     *In early January 2011, as a final step before the closing of Tibet's IPO, Downs called Zou to make certain that nothing had come to Zou's attention that A&S should know about in connection with the closing of the Tibet IPO, and Zou assured Downs that all was in order and that Tibet was ready to proceed with the IPO. Downs Answers, Answer No. 14; Declaration of L. McCarthy Downs III in Support of Motion for Summary Judgment ("Downs Declaration") attached as Ex. 6 to the Rosen Decl., ¶ 44.*

**Zou's Response to Plaintiffs' Statement 21:** Zou objects on the grounds that this statement of

fact constitutes inadmissible hearsay.  *See* Fed. R. Evid. 802.  In any event, this fact is not

material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent

may furnish "a supplemental statement of disputed *material* facts").

22.     *Zou's name is listed on the China Tibetan HSBC Hong Kong bank account. Zou personally opened the account.  Zou Deposition, 73:23-74:18; 75:7-14; 76:18-20.*

**Zou's Response to Plaintiffs' Statement 22:** Undisputed that Zou testified that he

opened the China Tibetan HSBC bank account.  However, this fact is not material to Zou's

Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a

supplemental statement of disputed *material* facts").

23.  *Zou was able to obtain the China Tibetan bank account records directly from HSBC. Zou Deposition, 76:18-77:3.*

**Zou's Response to Plaintiffs' Statement 23:** Undisputed.  However, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

24.  *On January 26, 2011, two days after the IPO proceeds were transferred to Tibet's HSBC Hong Kong bank account, $4,185,000.00 was deposited into China Tibetan's HSBC Hong Kong account. Zou Deposition, 77:14- 17; Rosen Decl., Ex. 7.*

**Zou's Response to Plaintiffs' Statement 24:** Undisputed.  However, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

25.  *Between February 21, 2011, through February 23, 2011, $3,840,012.86 was withdrawn from China Tibetan's HSBC Hong Kong account. Rosen Decl., Ex. 7.*

**Zou's Response to Plaintiffs' Statement 25:** Undisputed.  However, this fact is irrelevant.  Plaintiffs provide no evidence to establish the nature of these transactions. *See Hodges v. Mankey,* No. 15-3988, 2016 WL 3090326, at *1 (3d Cir. June 2, 2016) (to dispute a material fact "non-moving party ***must point to specific factual evidence*** to show a genuine dispute over a material fact") (emphasis added).  Moreover, the unrefuted documentary evidence establishes that months after these transactions occurred, in 10-Q financial filings signed by Tibet's CEO and Chairman, Tibet represented that the IPO proceeds were "net cash" on Tibet's balance sheets and that Tibet had control of the IPO funds.  *See* Pl's Response to Zou's 56.1(a) Statement at n.5.  Indeed, both the June and September 2011, 10-Q statements affirmatively state that Tibet had not yet applied the IPO proceeds "to any use" and that Tibet "is holding the [IPO] proceeds in a bank account pending their use." *See id.*  Zou did not sign these filings nor is he mentioned in them.  *See id.*  Further, Plaintiffs' claims concern purported misrepresentations in

30

Tibet's Offering documents, Plaintiffs do not allege, nor is there any evidence to support, common law conversion claims.

26.     *Tibet does not conduct any substantive business operations of its own, but conducts its primary business through Yunnan Shangri-La Tibetan Pharmaceutical Group Limited ("YSTP"). Rosen Decl., Ex. 3.*

      **Zou's Response to Plaintiffs' Statement 26**: Undisputed.  However, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

27.     *Through a corporate structure and numerous contractual arrangements, Tibet received control of YSTP without transferring legal ownership in the variable interest entity in which YSTP was consolidated. Id.*

      **Zou's Response to Plaintiffs' Statement 27**: Undisputed.  However, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

28.     *Tibet owns 100% of its subsidiary China Tibetan. Id.*

      **Zou's Response to Plaintiffs' Statement 28**: Undisputed.  However, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

29.     *In turn, China Tibetan owns 100% of Tibet's operating subsidiary, Yibo Information Consulting (Shenzhen) Company Ltd. ("Yibo"). Id.*

      **Zou's Response to Plaintiffs' Statement 29**: Undisputed.  However, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

30.     *Yibo conducts its business through YSTP via a series of contractual arrangements rather than through an equity ownership relationship. Id.*

**Zou's Response to Plaintiffs' Statement 30:** Undisputed.  However, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

31.     *By virtue of China Tibetan's 100% ownership of Yibo, China Tibetan (through Zou's sole control) and Tibet control YSTP, the entity which Tibet uses to conduct its primary business. Id.*

**Zou's Response to Plaintiffs' Statement 31:** The cited evidence does not support the facts asserted. Tibet's Prospectus expressly provides Tibet wholly owns China Tibetan and exercises complete control over China Tibetan, and through China Tibetan exclusively controls YSTP.  Plaintiffs' cited evidence fails to establish anything to the contrary.  *See* June 30, 2016 Cargill Decl. Exhibit 1 [Prospectus] at PDF004, PDF011 (noting "We conduct business through our operational entity, YSTP, located in Yunnan Province, China. *We control* YSTP'S operations through a series of contractual arrangements"; "***we control YSTP by virtue of our ownership of all of the equity of [China Tibetan]***"; and "[a]s a result of these Control Agreements . . . ***we are considered the primary beneficiary of YSTP***.") (emphasis added).

32.     *As a result, Tibet and China Tibetan (through Zou's sole control) retained the ability to effectively control YSTP and realize substantially all of the economic benefits of the variable interest entity in which YSTP was consolidated. Id.*

**Zou' Response to Plaintiffs' Statement 32:** The cited evidence does not support the facts asserted. Tibet's Prospectus expressly provides Tibet wholly owns China Tibetan and exercises complete control over China Tibetan, and through China Tibetan exclusively controls YSTP.  Plaintiffs' cited evidence fails to establish anything to the contrary.  *See* June 30, 2016 Cargill Decl. Exhibit 1 [Prospectus] at PDF004, PDF011 (noting "We conduct business through our operational entity, YSTP, located in Yunnan Province, China. *We control* YSTP'S operations through a series of contractual arrangements"; "***we control YSTP by virtue of our***

*ownership of all of the equity of [China Tibetan]*"; and "[a]s a result of these Control

Agreements . . . *we are considered the primary beneficiary of YSTP*.") (emphasis added).

33. *Tibet's IPO Prospectus stated that as of the 2009 year end, Tibet had $17.9 million in assets and $4 million in cash, and that as of September 30, 2010, Tibet's assets had grown to $27 million and that its cash more than doubled to $8.3 million. Id. at F-2.*

    **Zou's Response to Plaintiffs' Statement 33:** Undisputed.  However, this fact is not

material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent

may furnish "a supplemental statement of disputed *material* facts").

34. *Tibet's IPO Prospectus stated that Tibet owed $3.58 million on "longterm loan" as of 12/31/2009, increasing to $3.65 million as of 9/30/2010. Id.*

    **Zou's Response to Plaintiffs' Statement 34:** Undisputed.  However, this fact is not

material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent

may furnish "a supplemental statement of disputed *material* facts").

35. *Tibet's IPO Prospectus stated that "long-term loans consisted of two [unnamed] bank loans", both not due until November 2011. Id. at F-12.*

    **Zou's Response to Plaintiffs' Statement 35:** Undisputed.  However, this fact is not

material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent

may furnish "a supplemental statement of disputed *material* facts").

36. *On September 10, 2010, the People's Intermediate Court in China's Yunnan Province entered a judgment against Yunnan Shangri-La Tibetan Pharmaceutical Group Limited ("YSTP"). The judgment stated that YSTP was served and summoned by the court to appear for trial on July 20, 2010, but YSTP failed to appear and did not contest the suit filed by the Agricultural Bank of China against YSTP for defaulting on three loans, all of which were secured by the assets of YSTP. This September 10, 2010 court judgment ordered YSTP to repay its $4.54 million debt to the Agricultural Bank of China within 60 days. Rosen Decl., Ex. 21 at Ex. 3.*

    **Zou's Response to Plaintiffs' Statement 36:** Zou objects to Plaintiffs' characterization

of the "summary translation" attached as Exhibit 21 to the Rosen Declaration.  Exhibit 21 is a

written document that speaks for itself.  Further, this fact is not material to Zou's Motion for

Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

37.    *On January 10, 2011, the People's Intermediate Court in China's Yunnan Province entered an enforcement order freezing all of YSTP's assets. Rosen Decl., Ex. 21 at Ex. 4.*

      <u>**Zou's Response to Plaintiffs' Statement 37:**</u> Zou objects to Plaintiffs' characterization of the "summary translation" attached as Exhibit 21 to the Rosen Declaration.  Exhibit 21 is a written document that speaks for itself.  Further, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

38.    *On February 17, 2012, with the loans still not repaid, the Agricultural Bank of China proceeded to auction off the operating assets of YSTP. The public auction of YSTP's assets was announced on a website operated by the Kunming Pan Asia Assets and Equity Exchange Center. Id. at Ex. 22.*

      <u>**Zou's Response to Plaintiffs' Statement 38:**</u> Zou objects on the grounds that the uncertified website print-out cited in support of the asserted fact is inadmissible hearsay and violates the best evidence rule. It is therefore not competent evidence to establish the truth of any matter asserted.  *See* Fed. R. Evid. 802, 1002.  In any event, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

39.    *Zou consented to being named in Tibet's Registration Statement and Prospectus as a Board Observer. Zou Deposition, 35:5-14.*

      <u>**Zou's Response to Plaintiffs' Statement 39:**</u> The asserted fact incorrectly characterizes Zou's testimony.  In the cited passage Zou states that he does not recall consenting to being designated as a board observer.

40.    *Tibet's Form S-1 Registration Statement filed by Tibet with the SEC on May 14, 2010, and signed by Guo stated that: As of the date of this prospectus, [] Mr. Hayden Zou [is] serving as our Placement Agent's observer[] to our Board of Directors. Rosen Decl., Ex. 8.*

**Zou's Response to Plaintiffs' Statement 40:** Undisputed that the asserted fact quotes an isolated portion of the Tibet Prospectus.  However, the quoted language is incomplete and out of context.  The Prospectus is a written document that speaks for itself and must be read in context.  Elsewhere, the Prospectus specifically identifies by name Tibet's six Directors and recites that Tibet's "***Board of Directors makes all relevant Company decisions***."  June 30, 2016 Cargill Decl. **Exhibit 1** [Prospectus] at PDF088, PDF091 (emphasis added).

41.     *Zou was appointed as a Board Observer on Tibet's Board in connection with Tibet's IPO. Rosen Decl., Ex. 3 (the Prospectus); Id., Ex. 8 (Form S-1 Registration Statement),*

**Zou's Response to Plaintiffs' Statement 41:** Undisputed that the Prospectus states that Zou is serving as one of Anderson & Strudwick's observers to Tibet's Board of Directors.  However, this fact is not material to Zou's Motion for Summary Judgment.  *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

42.     *A&S appointed persons as Board Observers rather than Board members of companies that A&S underwrote issuances for specifically to <u>attempt to avoid exposure</u> to liability. Downs Deposition, 75:4-7.*

**Zou's Response to Plaintiffs' Statement 42:**

Undisputed that Downs testified as followed:

Q:      Why did Anderson designate two observers to the Board of Directors?

A.      Anderson & Strudwick over the years found that when small companies go

        public, sometimes they forget that the -- that -- found that a lot of times small

        companies want to continue to participate as small companies and be able to make

        decisions in a vacuum without regard to the interest or the desires of other

        people.  And once they became public, the burdens on the management and the

        Board of Directors of these particular companies in our mind shifted to a need to

make sure that all of the investors of the firm were best served by the Board, and

not just let the company continue to be run in the ways that it had been run

leading up to that point in time.  And Anderson & Strudwick felt like by

appointing one or two individuals to a Board following the completion of the IPO

for a defined period of time was in the interest of the people that were investing in

the public offering

Exhibit A [Downs Deposition Excerpts] to Declaration of Neil Hartzell dated June 30, 2016

(Docket ## 208-4) at 72.

Zou objects to Plaintiffs' characterization of Zou's testimony as it fails to acknowledge

the distinction Anderson & Strudwick made between an observer and a Board member was one

of substance, not mere title, as *inter alia,* observers "had no voting rights or ability to call a

meeting."  However, this fact is not material to Zou's Motion for Summary Judgment.  *See* New

Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material*

facts").

43.     *The IPO Prospectus declared that despite the lack of voting power, Board Observers*
*"may nevertheless significantly influence the outcome of matters submitted to the Board of*
*Directors for approval." Rosen Decl., Ex. 3 (emphasis added).*

        **Zou's Response to Plaintiffs' Statement 43:** Undisputed that the asserted fact quotes an

isolated portion of the Tibet Prospectus.  However, the quoted language is incomplete and out of

context.  The Prospectus is a written document that speaks for itself and must be read in context.

Elsewhere, the Prospectus specifically identifies Tibet's six Directors by name and recites that

Tibet's "***Board of Directors makes all relevant Company decisions***."  June 30, 2016 Cargill

Decl. **Exhibit 1** [Prospectus] at PDF088, PDF091 (emphasis added).

44.     *Board Observers had the power and authority to significantly impact matters submitted*
*to the Board of Directors for approval. Rosen Decl., Ex. 3.*

**Zou's Response to Plaintiffs' Statement 44:**

Undisputed that the prospectus states Board Observers "***may*** . . . significantly influence the outcome of matters submitted to the Board of Directors for approval." The asserted fact quotes an isolated portion of the Tibet Prospectus. However, the quoted language is incomplete and out of context. The Prospectus is a written document that speaks for itself and must be read in context. Elsewhere, the Prospectus specifically identifies by name Tibet's six Directors and recites that Tibet's "***Board of Directors makes all relevant Company decisions***." June 30, 2016 Cargill Decl. **Exhibit 1** [Prospectus] at PDF088, PDF091 (emphasis added).

45.     *Downs, the other Board Observer on Tibet's Board, reached out to the Tibet Board of Directors and Guo in early April of 2011 and recommended to them that they adopt a stock repurchase plan consisting of a two-pronged approach that consisted of an extension of the lockups of the insiders of Tibet, and a stock repurchase plan that was to be funded by the net income of Tibet on a quarterly basis. Downs Deposition, 82:3-83:16. In response to Downs' suggestion, Tibet and Guo agreed to, and ultimately did implement the repurchase plan. Id.*

**Zou's Response to Plaintiffs' Statement 45:** The asserted facts are immaterial as to Zou. *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

46.     *Downs also communicated and corresponded with Tibet during his time as a Board Observer and advanced potential ways that Tibet might be able to better present itself to the U.S. markets and to the investing public. Downs Deposition, 81:11-17.*

**Zou's Response to Plaintiffs' Statement 46:** The asserted facts are immaterial as to Zou. *See* New Jersey Local Rule 56.1 (opponent may furnish "a supplemental statement of disputed *material* facts").

47.     *Board Observers received the same amount of compensation from Tibet as the other Tibet independent directors. Rosen Decl., Ex. 3 ("We will also pay observers the same amount as our independent directors receive.")*

**Zou's Response to Plaintiffs' Statement 47:** The cited evidence does not support the facts asserted.  Plaintiffs' reference in a conclusory fashion to the language in the Prospectus stating Board observers *could be paid* in the same manner as a director does not establish that Zou "received" compensation from Tibet nor does it dispute the uncontroverted evidence in the record that Zou was never actually paid by Tibet.   *See* June 30, 2016 Cargill Decl. Exhibit 15 [Zou Depo. Tr.] at 41.

48.     *Board Observers received the same amount from Tibet for reimbursement for their expenses in attending Board meetings as the other Tibet independent directors. Rosen Decl., Ex. 3 ("We have agreed to reimburse the observers for their expenses for attending our Board meetings, subject to a maximum reimbursement of $6,000 per meeting and $12,000 annually, which amount is not more than the reimbursement payable to our directors.")*

**Zou's Response to Plaintiffs' Statement 48:** The cited evidence does not support the facts asserted. Plaintiffs' reference in a conclusory fashion to the language in the Prospectus Documents stating Board observers *could be reimbursed* in the same manner as a director does not establish that Zou "received" reimbursement from Tibet nor does it dispute the uncontroverted evidence in the record that Zou was never actually paid by Tibet. *See* June 30, 2016 Cargill Decl. Exhibit 15 [Zou Depo. Tr.] at 41.

49.     *Zou's duties, responsibilities, and rights as a Board Observer included attending Board meetings in person or on the telephone, being a participant in the general Board meetings, which included listening in, offering advice if solicited or warranted, and being heard.  Downs Deposition, 75:22-76:10.*

**Zou's Response to Plaintiffs' Statement 49:** The cited evidence does not establish Zou's "duties, responsibilities, and rights as a Board Observer."  At best, it concerns Downs' speculative opinion as to what he "envisioned [he] would do as an observer."  However, Downs vigorously objects to Plaintiffs' mischaracterization of his testimony, *see* Downs' responses to Plaintiffs' Supplemental Statement of Disputed Material Facts Response No. 43.

50.     *Zou admitted to not conducting any due diligence in connection with Tibet's prospective IPO. Zou Deposition, 31:4-6.*

**Zou's Response to Plaintiffs' Statement 50:**  The cited fact represents a legal conclusion not inappropriate for inclusion in a Rule 56.1 statement and thus, should be disregarded.  *See* New Jersey Local Rule 56.1 (each statement of material fact "shall not contain legal argument or conclusions of law").  Further, the undisputed evidence establishes that Zou visited Tibet's factories, spoke with its CEO on numerous occasions and relied on the accountants and auditors to perform the due diligence they were hired to conduct.  *See* June 30, 2016 Cargill Declaration **Exhibit 15** [Zou Depo. Tr.] at 23-25, 85; **Exhibit 21** [Diligence Opinion Letters]; Pl's Response to Zou's 56.1(a) Statement at No. 59, 62.

51.     *Zou did not review the Tibet IPO prospectus prior to its filing. Zou Deposition, 30:25-31:3; 35:25-36:4.*

**Zou's Response to Plaintiffs' Statement 51:** The cited evidence does not support the facts asserted.  Further, Plaintiffs have asserted evidence directly to the contrary to this stated fact when convenient for their arguments— Plaintiffs cannot have it both ways.  *See* Statement of Disputed Fact 4 above ("Zou assisted in the preparation of Tibet's IPO prospectus").

52.     *Zou is not aware if anybody checked the court websites in China to see if there were any actions pending against Tibet. Zou Deposition, 85:17-22.*

**Zou's Response to Plaintiffs' Statement 52:**  Undisputed. The undisputed evidence also establishes that Zou appropriately relied on the accountants and auditors to perform the due diligence they were hired to conduct.  *See* Cargill Declaration **Exhibit 15** [Zou Depo. Tr.] at 23-25, 85; **Exhibit 21** [Diligence Opinion Letters]; Pl's Response to Zou's 56.1(a) Statement at No. 62.

53.     *Zou only met with Guo less than five (5) times, and rarely spoke with him. Zou Deposition, 24:18-25:4.*

**<u>Zou's Response to Plaintiffs' Statement 53</u>:** Undisputed.  This fact supports Zou's

limited role in Tibet.

54.      *Zou never had any kind of relationship with Defendant Hong Yu ("Yu"), Tibet's*
*Chairman of the Board since April of 2011 and who served as Yunnan Tibetan's Chairman and*
*CEO from 2000 to 2009. Zou Deposition, 26:3-6.*
*26:3-6*

      **<u>Zou's Response to Plaintiffs' Statement 54:</u>** Undisputed that Zou testified he did not

have a relationship with Hong Yu.  This fact supports Zou's limited role in Tibet.

55.      *Zou never met, spoke to, or had any kind of relationship with Defendant Sabrina Ren*
*("Ren"), Tibet's Chief Financial Officer ("CFO") since 2010. Zou Deposition, 27:3-9.*

      **<u>Zou's Response to Plaintiffs' Statement 55</u>:** Undisputed that Zou testified he did not

have a relationship with Sabrina Ren.  This fact supports Zou's limited role in Tibet.

56.      *Zou never met, spoke to, corresponded via email, or had any kind of relationship with*
*Defendant Wenbo Chen ("W. Chen"), Tibet's Director since April 2010. Zou Deposition, 27:14-*
*23.*
      **<u>Zou's Response to Plaintiffs' Statement 56:</u>**  Undisputed that Zou testified he did not

have a relationship with Wenbo Chen.  This fact supports Zou's limited role in Tibet.

57.      *Zou met Defendant Youhang Peng ("Peng"), Tibet's director since April 2010, only once*
*prior to his involvement in Tibet. Zou Deposition, 28:3-24.*

      **<u>Zou's Response to Plaintiffs' Statement 57:</u>** Undisputed that Zou testified he met

Youhang Peng once at an "investor conference."  This fact supports Zou's limited role in Tibet.

58.      *Zou never had any kind of relationship with Peng, and once Zou became involved with*
*Tibet he never spoke with Peng or corresponded with Peng via email. Id. 28:3-5; 28:25-29:6.*

      **<u>Zou's Response to Plaintiffs' Statement 58:</u>**  Undisputed. This fact supports Zou's

limited role in Tibet.

59.      *Zou never met, spoke, corresponded via email, or had any kind of relationship with*
*Defendant Solomon Chen ("S. Chen"), Tibet's director since April of 2010. Zou Deposition,*
*29:12-21.*

**Zou's Response to Plaintiffs' Statement 59:** Undisputed. This fact supports Zou's limited role in Tibet.

60.    *Named plaintiff Sean Carithers purchased 6,000 shares of Tibet stock pursuant to Tibet's IPO at Tibet's IPO price of $5.50 on January 19, 2011. See PSLRA certification of named plaintiff Sean Carithers attached as Ex. 2 to the Rosen Decl.*

**Zou's Response to Plaintiffs' Statement 60:** Although Mr. Carithers' PSLRA certification reflects that he purchased 6,000 shares of Tibet stock on January 19, 2011, at a price of $5.50 per share, the evidence cited does not prove his purchases.  To date Plaintiffs have failed to produce brokerage records for Mr. Carithers to actually establish Mr. Carithers' alleged purchase and sale dates of Tibet stock and they cite to no documentary evidence other than Mr. Carithers' conclusory PSLRA certification . Accordingly, Plaintiffs have not met their burden to affirmatively establish Mr. Carithers' standing.


Dated:          September 30, 2016

SHER TREMONTE LLP

By:    /s/ Scott Cargill
        Scott Cargill
        Michael Tremonte
        (admitted *pro hac vice*)
        Justin J. Gunnell
        (admitted *pro hac vice*)

80 Broad Street, 13th Floor
New York, New York 10004
Tel: 212.202.2600
Email: scargill@shertremonte.com

*Attorneys for Defendant Hayden Zou*

41

## CERTIFICATE OF SERVICE

I hereby certify that this document was served via ECF on counsel of record on

September 30, 2016:

Laurence M. Rosen,
Esq. Sara Fuks, Esq.
THE ROSEN LAW FIRM,
PA 275 Madison Avenue,
34th Floor New York,
New York 10016
lrosen@rosenlegal.com
sfuks@rosenlegal.com

Nicole B. Liebman, Esq.
Peter J. Larkin, Esq. (pro hac vice)
William J. Kelly, Esq. (pro hac vice)
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
150 E. 42nd Street
New York, New York 10017
Nicole.liebman@wilsonelser.com
Peter.larkin@wilsonelser.com
William.Kelly@wilsonelser.com

Robert S. Brener, Esq.
LECLAIR RYAN
1037 Raymond Blvd. Newark,
New Jersey 07102
Email: Robert.Brener@leclairryan.com

A. Neil Hartzell, Esq. (admitted pro hac vice)
LECLAIRRYAN
One International Place, 11th Fl.
Boston, Massachusetts 02110
Email: neil.hartzell@leclairryan.com

Richard J. Davis, Esq.
Carl S. Burkhalter, Esq.
MAYNARD, COOPER & GALE, P.C.
1901 6th Avenue North, Suite 2400
Birmingham, Alabama 35203
Email: rdavis@maynardcooper.com