**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| ROBIN JOACHIM DARTELL, et al., individually and on behalf all others similarly situated,<br><br>　　　　　*Plaintiffs*,<br><br>　　v.<br><br>TIBET PHARMACEUTICALS, INC., et al.,<br><br>　　　　　*Defendants*. | Civil Action No. 14-3620<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This matter comes before the Court by way of the motions for summary judgment brought by Defendants L. McCarthy Downs III and Hayden Zou. D.E. 207, 210. Plaintiffs filed briefs in opposition to which Defendants replied. D.E. 227, 231, 240, 245. The Court reviewed the submissions in support and in opposition, and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, both motions for summary judgment are **GRANTED in part and DENIED in part**.

I. **FACTUAL AND PROCEDURAL BACKGROUND**

　　A. **Factual Background**[1]

---

[1] The factual background is taken from the following sources: (1) the first amended class action complaint (the "FAC"); (2) Downs' [Corrected] Statement of Material Facts and Plaintiffs' Response ("Downs SOMF"), D.E. 224; (3) Zou's Statement of Undisputed Material Facts and Plaintiffs' Response ("Zou SOMF"), D.E. 228; (4) Plaintiffs' Supplemental Statement of Material Facts and Downs' Response ("Plfs' Downs SOMF"), D.E. 241; (5) Plaintiffs' Supplemental Statement of Material Facts and Zou's Response ("Plfs' Zou SOMF"), D.E. 248; (6) the

This class action involves alleged misrepresentations in Defendant Tibet Pharmaceuticals, Inc.'s ("Tibet") Initial Public Offering ("IPO") registration documents. Plaintiffs brought suit under the Securities Act of 1933 against a number of individuals and entities who were involved in the IPO, including Tibet;[2] the Tibet Directors who signed the IPO registration statement;[3] the underwriter, Anderson & Strudwick ("A&S");[4] and the auditor for the IPO, Acquavella, Chiarelli, Shuster, Berkower & Co., LLP ("Acquavella").[5] *See generally* FAC ¶¶ 23-40, D.E. 50. Specifically, Plaintiffs allege that Tibet's IPO registration statement and prospectus "misrepresented Tibet as a financially sound and profitable company." *Id.* ¶ 2.

Tibet is a holding company that has "the ability to effectively control" Yunnan Shangri-La Tibetan Pharmaceutical Group Limited ("YSTP"). Downs SOMF ¶¶ 19-21. YSTP, a Chinese corporation, "is engaged in the manufacturing, marketing, sales, research, and development of modernized traditional Tibetan medicines in [China]." *Id.* ¶¶ 18-19. Non-party China Tibetan

---

Declaration of Laurence M Rosen ("Rosen Decl."), D.E. 226; and (7) the Declaration of Scott Cargill ("Cargill Decl."), D.E. 213.

[2] On July 28, 2016, the Clerk of the Court entered default against Tibet for failure to plead or otherwise defend pursuant to Federal Rule of Civil Procedure 55(a).

[3] The Registration Statement was signed by Defendants Hong Yu, Taylor Z. Guo, Sabrina Ren, Wenbo Chen, Youhang Peng, and Solomon Chen. *See* Cargill Decl. Ex 6. On March 31, 2017, the Court granted Peng's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(5) because Plaintiffs did not serve Peng until March 22, 2016, almost three years after filing the FAC. D.E. 260, 261. The Court is not aware of any information indicating that Plaintiffs ever served the other Director Defendants.

[4] Defendant Sterne Agee Group, Inc. ("Sterne Agee") acquired A&S and assumed all of its assets and liabilities in December 2011. FAC ¶ 33-34. Sterne Agee was dismissed as a Defendant through a court-approved settlement on July 13, 2016 (D.E. 217).

[5] Plaintiffs filed a motion seeking preliminary approval of a settlement with Acquavella on May 31, 2016. D.E. 206. This motion was granted on December 29, 2016, and the final settlement approval hearing is scheduled for June 6, 2017. D.E. 252, 253.

Pharmaceuticals Limited ("China Tibetan") is a wholly owned subsidiary of Tibet. China Tibetan "does not own any assets or conduct any operations." Zou SOMF ¶ 4. In fact, Tibet owns all outstanding capital stock of China Tibetan and "exercises complete control over the subsidiary." *Id.*

Defendant Zou incorporated China Tibetan, a Hong Kong corporation, and was named as the sole director of the company. Plfs' Zou SOMF ¶ 1. Zou also assisted with the Tibet IPO. Zou initially introduced Tibet executives to A&S regarding the potential IPO. *Id.* ¶ 5. After this introduction, Zou continued to serve as a liaison between Tibet and A&S until the IPO was completed. *Id.* ¶¶ 6, 9-12, 14, 21.

Defendant Downs was also involved in the Tibet and A&S introduction after learning about Tibet from Zou in late 2009. Plfs' Downs SOMF ¶¶ 6, 9; Rosen Decl. Ex 1, at T48:22-49:5. Downs was an employee at A&S and discussed the Tibet IPO with A&S's CEO at the time. Since 2005, Downs was a managing director of A&S's investment banking division and from 2009 until July 2010, he served on the A&S board. *Id.* at T14:6-12, 12-22. "Downs role [at A&S] was to identify prospective companies for issuances and bring the potential offerings to the A&S Commitment Committee (the "Committee") . . . for the Committee's approval." Downs SOMF ¶ 8. Downs was a member of the Committee when the Tibet IPO opportunity was initially presented. Plfs' Downs SOMF ¶ 4. The Committee reviewed internal Tibet documents that Zou provided to A&S and then instructed Downs to issue an engagement letter to Tibet. Rosen Decl. Ex. 1, at T36:12-17; 50:15-17. As a result, A&S served as the placement agent and underwriter for Tibet's IPO. Plfs' Downs SOMF ¶ 11. Downs, in addition to many other A&S employees, continued to work on the Tibet IPO for A&S. Downs SOMF ¶ 47.

On May 14, 2010, Tibet filed an S-1 registration statement with the SEC, "attaching a prospectus to be used in connection with the [IPO]." Zou SOMF ¶ 13. Through a Pre-Effective Amendment of the registration statement, Tibet filed its final registration statement on December 16, 2010, and on January 18, 2011, it filed the final prospectus. *Id.* ¶¶ 25, 32. Neither Downs nor Zou signed any version of the prospectus or registration statement. Downs SOMF ¶¶ 94-95; Zou SOMF ¶ 33.

The prospectus stated that at the end of 2009, Tibet had $17.9 million in assets and $4 million in cash. In addition, as of September 30, 2010, Tibet had $27 million in assets and $8.3 million in cash. Plfs' Downs SOMF ¶ 59. The prospectus also stated that as of December 31, 2009, Tibet owed $3.58 million on a "long-term loan" and that this amount increased to $3.65 million as of September 30, 2010. *Id.* ¶ 60. The prospectus, however, failed to mention that on September 10, 2010, the People's Intermediate Court in China's Yunnan Province entered default against YSTP because it failed to appear and did not contest a suit filed by the Agricultural Bank of China alleging that YSTP defaulted on three loans totaling $4.54 million. *Id.* ¶ 62. The judgment ordered YSTP to repay its debt to the Bank within sixty days. *Id.* On January 10, 2011, about two weeks before the IPO became effective, the Chinese court entered an order freezing all of YSTP's assets after Tibet failed to make payments on the defaulted loans. *Id.* ¶ 63.

Acquavella knew of the loan and that it was "secured by a pledge of certain of Tibet's machinery equipment and buildings." Downs SOMF ¶ 66. Acquavella, however, determined that Tibet had repaid the debt by November 30, 2010, failing to discover the Chinese Court judgment. *Id.* ¶ 67. Acquavella knew that the Agricultural Bank of China was "examining the possibility of an error in the interest calculation," but believed that Tibet was going to negotiate directly with the Bank to resolve the potential issue. *Id.* ¶ 68. A&S relied on Acquavella to "properly investigate

Tibet['s] [] bank debt." *Id.* ¶¶ 72-73. Moreover, Downs spoke with representatives from Acquavella "before the IPO closing in January of 2011," and they assured him that Tibet had paid the bank debt in November 2010. *Id.* ¶¶ 83, 85. A&S also relied on opinion letters from three law firms, dated January 20, 2011 and January 24, 2011, who also undertook due diligence of Tibet. The three law firms did not discover the alleged default or judgment freezing Tibet's assets. *Id.* ¶ 74-78.

The prospectus also stated that A&S appointed Downs and Zou to serve as "Board Observers" of the Tibet Board after the IPO closed. Cargill Decl. Ex. 1, at 35. Specifically, the prospectus states that "[Tibet] will have an ongoing relationship with our Placement Agent[, A&S,] that may impact our shareholders' ability to impact decisions related to our operations." *Id.* The prospectus indicated that although Downs and Zou could not vote as Board Observers, "they may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval." *Id.* In addition, Downs and Zou were to receive the same reimbursement as board members for attending meetings and were to be paid the same amount as independent directors. *Id.* There is no evidence suggesting that the Board ever actually met after the IPO, and Downs and Zou received no compensation for the Board Observer role. Zou SOMF ¶ 54. There is also no evidence suggesting that Downs or Zou actually influenced any board decision. Rosen Decl. Ex. 1, at T82:3-83:16.

The Tibet IPO closed on January 24, 2011, resulting in 3 million shares of Tibet stock being issued and offered to the public at $5.50 per share. Downs SOMF ¶ 144. Prior to the IPO, however, Tibet reported that 11,812,500 shares were currently outstanding. *Id.* ¶ 143. Thus, when combined, the total potential outstanding shares of Tibet following the IPO was 14,812,500. Zou owned some of these pre-IPO shares; as an early investor in Tibet, Zou invested his own money

into the company and acquired shares. Zou ¶ 60. On February 24, 2012, Zou sold over 83,400 of his pre-IPO shares and on March 6, 2012, he sold more than 26,700 pre-IPO shares. *Id.* ¶¶ 67-68. Lead plaintiffs Shao, Wu, Helton, Obasi, Dartell, and Yang did not purchase any shares before Zou began to sell his pre-IPO shares. Downs SOMF ¶ 152. Shao purchased 64,500 shares, Wu purchased 102,345 shares, Helton purchased 77,000 shares, Obasi purchased 334,000 shares, Dartell purchashed 156,590 shares, and Yang purchased 42,600 shares. Cargill Decl. Ex. 17. Lead Plaintiff Carithers, however, allegedly purchased 6,000 shares directly from the IPO. Rosen Decl. Ex. 2. Carithers purchased an additional 1,000 shares in September 2011, before Zou sold any shares, and 25,0000 more shares on April 27, 2012. *Id.*

On February 17, 2012, the Agricultural Bank of China auctioned the operating assets of YSTP off because the loans remained unpaid. Plfs' Downs SOMF ¶ 64. The auction was announced in news media outlets the same day. Downs SOMF ¶ 150. On February 27, 2012, Tibet issued a press release in which Tibet's CEO offered to buy all outstanding shares of Tibet stock and take the company private. The press release also stated the Tibet would "commence an investigation into the reports about the auction of its assets." *Id.* ¶ 151. On April 3, 2012, Plaintiffs allege that the NASDAQ halted trading on Tibet stock and ultimately delisted the stock on April 27, 2012. FAC ¶¶ 68-69. "As a result, . . . Tibet stock fell from $1.29/share to $.35/share, losing 72% of its value." *Id.* ¶ 70. As of February 1, 2013, Tibet stock was trading at $.01/share. *Id.* ¶ 71.

### B. Procedural History

Plaintiffs initially filed suit on August 31, 2012, in the United States District Court for the District of the Virgin Islands, and on May 1, 2013, filed the Amended Complaint (the "FAC") in that court. D.E. 1, 50. The FAC asserts the following claims: (1) violation of Section 11 of the

Securities Act of 1933 against all Defendants (Count One); (2) violation of Section 12(a)(2) of the Securities Act of 1933 against Tibet, A&S, and Sterne Agee (Count Two); and (3) violations of Section 15 of the Securities Act of 1933 against the Individual Defendants. D.E. 50. After considering multiple motions to dismiss for improper venue, the case was transferred to the District of New Jersey on May 1, 2014. D.E. 72. Zou, Acquavella, Sterne Agee, and Downs then filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). D.E. 96, 101, 102, 104. Judge Hochberg denied the four motions on February 20, 2015. D.E. 132.

In their motions to dismiss, Downs and Zou both moved to dismiss the claims asserted against them arguing that they were not proper Defendants under Sections 11 or 15.[6] Judge Hochberg determined that at the pleading stage, Plaintiffs pled enough facts to suggest that Downs had a position of control at A&S, in addition to a position of "influence, if not control, at Tibet." D.E. 132 at 10. As a result, Judge Hochberg concluded that Plaintiffs sufficiently pled that Downs was an underwriter, a permissible defendant under Section 11. As for Zou, Judge Hochberg concluded that Plaintiffs' allegations that China Tibetan, which was under the sole control of Zou, possessed all the proceeds from the IPO and had played a key role in the initial offering. These allegations, coupled with the statement in the prospectus naming Zou as a Board Observer, was sufficient to conclude at the motion to dismiss stage that Zou was a person performing similar functions as a director under Section 11. As a result, Judge Hochberg concluded that Plaintiffs' Section 11 claims against Downs and Zou could proceed. *Id.* at 10-11. Judge Hochberg also denied Zou and Downs' motion as to the Section 15 claims, concluding that the FAC "sufficiently

---

[6] Because Sterne Agee and Acquavella have settled, or are in the process of settling, the Court will not address the aspects of Judge Hochberg's opinion that pertain to these Defendants.

alleges facts to plausibly state Section 15 claims against Downs and Zou given each's authority within A&S and Tibet, respectively." *Id.* at 11-12 n.11.

On February 22, 2016, Judge Arleo granted Plaintiffs' motion to certify a class. D.E. 183, 184. Acquavella, Downs and Zou opposed Plaintiffs' motion, in part, on the grounds of typicality, arguing that the proposed class representatives did not have typical claims because they could not "trace," or connect their shares to the IPO. Judge Arleo determined that the evidence demonstrated that the only shares available on the public market when the proposed lead Plaintiffs purchased their shares were issued through the IPO. Class Opinion at 9, D.E. 183. Consequently, the proposed Lead Plaintiffs' claims were typical of the class as a whole. Judge Arleo expressly stated, however, that "[t]o the extent additional information on this [tracing] issue becomes available, the parties may revisit this issue on summary judgment." *Id.* n.2 (citation omitted).

Downs and Zou filed these motions for summary judgment on June 30, 2016.[7] D.E. 207, 210. While the parties' specific arguments will be addressed below, Downs and Zou both generally argue that they are not proper Defendants under Section 11 and that they are not a "control person" under Section 15. Consequently, they seek summary judgment as to Counts One and Three. Both Defendants also seek to revisit Judge Arleo's determination in the class certification opinion regarding tracing due to new facts that were discovered in summary

---

[7] Downs' memorandum of law in support of his Motion for Summary Judgment (Corrected) is referred to as "Downs Br.," D.E. 214 and Zou's memorandum of law in support of his motion for summary judgment is referred to as "Zou Br.," D.E. 211. Plaintiffs' memorandum of law in support of their opposition to Downs' motion is referred to as "Plfs' Downs Opp.," D.E. 227, and their opposition to Zou's motion is referred to as "Plfs' Zou Opp.," D.E. 231. Finally, Downs' reply memorandum of law is referred to as "Downs Reply," D.E. 240, and Zou's reply memorandum of law is referred to as "Zou Reply," D.E. 245.

In addition to filing their opposition briefs, Plaintiffs filed an objection to certain evidence that Downs submitted in support of his motion for summary judgment. D.E. 232. The Court will not address Plaintiffs' argument because it did not rely on the evidence for which Plaintiffs have objections.

judgment. Zou argues that the lead Plaintiffs lack standing to pursue their Section 11 claims because they cannot "trace" the purchase of their shares to the IPO. Downs takes an even more limited view, maintaining that the Third Circuit has rejected the concept of tracing such that Section 11 only applies to shares purchased directly from an IPO. Plaintiffs opposed the motions but failed to raise any facts or arguments concerning Count 3, the Section 15 claim.

## II.     SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits,

or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## III. ANALYSIS

### A. Standing

Defendants maintain that some of the lead Plaintiffs lack standing to maintain their claims, seeking to revisit Judge Arleo's decision in her class certification opinion regarding traceability. Zou argues that some lead Plaintiffs lack standing to pursue their claims because they cannot "trace" their purchase of Tibet shares to the IPO. Zou Br. at 21-24. Downs takes an even more limited view, asserting that the Third Circuit has rejected the concept of tracing such that Section 11 only applies to shares purchased directly from an IPO. Downs Br. at 3. Plaintiffs argue that this is a redundant argument that was already addressed by Judge Arleo in her class certification opinion. Plfs' Downs Opp. at 8; Plfs' Zou Opp. at 7.

In the class certification opinion, Judge Arleo determined that when the lead Plaintiffs purchased their shares, the public market consisted solely of shares issued through the IPO.

Consequently, Judge Arleo determined that Plaintiffs had standing to pursue the Section 11 claims. ClassOpinion at 9. Judge Arleo expressly stated, however, that "[t]o the extent additional information on this issue becomes available, the parties may revisit this issue on summary judgment." *Id.* n.2 (citation omitted). Defendants do present new information to the Court that was not provided to Judge Arleo at the class certification stage. Specifically, on February 24, 2012, Zou sold more than 83,400 of his pre-IPO shares, and on March 6, 2012, he sold an additional 26,700 pre-IPO shares. Plaintiffs do not dispute this new evidence. Zou SOMF ¶¶ 67-68. Consequently, when Shao, Wu, Wang, Helton, Obasi, and Dartell began purchasing their Tibet shares, there were at least some pre-IPO shares trading on the open market.[8] Due to this new information, the Court revisits the traceability argument.

Under Section 11, "any person acquiring a security *issued pursuant to* a false or misleading registration statement may recover damages."[9] *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 286 (3d Cir. 1992) (emphasis added) (citing 15 U.S.C. § 77k). Plaintiffs bear the burden of proof to establish that their shares were issued from the IPO. *See id.* Many circuits permit a plaintiff to bring suit if the plaintiff sufficiently alleges that his or her shares, even if purchased on the secondary market rather than directly from an IPO, can be "traced" to the registration statement at issue. *See, e.g., In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 31 n.1 (2d Cir. 2006). Tracing occurs when a plaintiff shows that "his or her shares were issued under/registered to the allegedly defective registration statement—regardless of whether the shares were acquired directly

---

[8] Shao, Wu, Yang and Helton began purchasing shares on February 28, 2012, and Obasi and Dartell began purchasing shares on March 12, 2012. Downs SOMF ¶ 152.

[9] There is an exception if at the time of the acquisition the plaintiff knew that the registration statement contained an untrue statement or omission of material fact. 15 U.S.C. § 77k(a). This exception is not at issue here.

from the issuer or in the aftermarket." *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 61 (S.D.N.Y. 2013). Thus, "[t]racing may be established either through proof of a direct chain of title from the original offering to the plaintiff . . . or through proof that the plaintiff bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement." *In re Initial Public Offerings Sec. Litig.*, 471 F.3d at 31 n.1 (brackets in original omitted).

Due to the new uncontroverted evidence, Zou's shares that were sold, Judge Arleo's determination that lead Plaintiffs shares could be traced to the IPO no longer holds true. Plaintiffs do not dispute that Zou sold 100,100 pre-IPO shares in 2012. *See* Zou SOMF ¶¶ 67-68. Except for Carithers' initial purchase of 7,000 total shares before Zou sold any of his shares, Plaintiffs do not dispute that when they bought their Tibet shares, Zou's pre-IPO shares were trading on the open market. Thus, using Judge Arleo's explanation of tracing (Class Opinion at 8-9), Plaintiffs fail to provide any facts by which the Court can determine whether certain of their shares were in fact issued through the IPO or if the shares stemmed from Zou's pre-IPO shares.

Nevertheless, certain Plaintiffs still have standing because they purchased more shares than Zou sold: Wu (102,345), Obasi (334,000), and Dartell (156,590). In other words, even if any of these individual Plaintiffs bought every share sold by Zou, each would still have additional shares that could not have been Zou's shares. Also, as noted, Carithers 7,000 shares were purchased before Zou sold his shares, so Carithers also has standing. The more difficult question concerns the remaining three Plaintiffs. Shao, Helton, and Yang each purchased a number of shares lower than the total amount sold by Zou: 64,500; 77,000; and 42,600, respectively. However, when adding the shares of any two of the remaining three Plaintiffs, the amount exceeds the number of shares sold by Zou. This means that at least two of the remaining Plaintiffs would have standing

by virtue of the fact that their shares (or a portion thereof) could not have been Zou's shares. It also possible that all three have standing because they may not have bought all (or any) of Zou's shares. But Plaintiffs, who bear the burden of proof, offer no evidence for the Court to determine which of the remaining three Plaintiffs should remain in the case. Without such information, the Court is left to speculate, or devise a formula not based on the evidence, as to whom should remain. The Court will not do so and is aware of no authority permitting it to do so if it were so inclined. As a result, the Court finds that Plaintiffs have not met their burden of proof as to the standing of Shao, Helton, and Yang, and all three are dismissed from the case.

As to Downs' remaining argument that the Third Circuit does not employ the traceability test used by Judge Arleo, the Court will not disturb Judge Arleo's findings. The parties did not make a motion for reconsideration to Judge Arleo, and Downs' argument is merely an attempt to rehash an issue already decided by a judge in this District.[10]

---

[10] Downs argues although the Third Circuit used the term "traceability" in *Shapiro*, the court appears to have limited Section 11 plaintiffs to those who purchased shares directly from the IPO at issue. *See Shapiro*, 964 F.2d at 286. Specifically, the Third Circuit stated that "[i]f plaintiffs' shares were purchased in the secondary market, they would not be linked to a registration statement . . . and the [Section] 11 claim would fail." *Id.* Moreover, the *Shapiro* court continued that without the benefit of discovery, "it is impossible for plaintiffs to know whether their shares were newly issued or were purchased in the secondary market." *Id.* The secondary market involves the trading of shares outside of those issued through an IPO, or the aftermarket. *See Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 687-89 (3d Cir. 1991). Thus, the language used in *Shapiro* suggests that the Third Circuit was intentionally limiting Section 11 standing to the direct purchase of shares through an IPO, according to Downs. Consequently, Downs continues, the Third Circuit appears in *Shapiro* to have foreclosed a plaintiff's ability to trace shares purchased in the secondary market to the registration statement at issue. *See also Brosious v. Children's Place Retail Stores*, 189 F.R.D. 138, 144 (D.N.J. 1999) ("Thus, purchasers on the secondary market have no cause of action under section 11.").

The issue is somewhat complicated by a footnote *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 274 n.7 (3d Cir. 2006). There, the Third Circuit cited *Shapiro* approvingly while suggesting that a Section 11 plaintiff has standing if he can demonstrate that his shares are traceable to the allegedly false and misleading registration statement. *Id.* In support of its view, the Third Circuit cited three decisions recognizing that aftermarket purchasers who can trace their shares to registration statement have standing. *Id.* (citing *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir.

**B. Violation of Section 11 of the Securities Act of 1933 (Count One)**

In Count One, Plaintiffs allege that Downs and Zou are liable under Section 11, which allows purchasers of a registered security to sue "when false or misleading information is included in a registration statement." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). To establish a Section 11 violation, a plaintiff must demonstrate the existence of a material misrepresentation or omission. *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 273 (3d Cir. 2005). An omission is material if "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 641 (3d Cir. 1989) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "Materiality is a mixed question of law and fact" and is ordinarily left to the factfinder. *Shapiro*, 964 F.2d at 280 n.11.

Downs and Zou do not address the materiality issue,[11] instead arguing that Count One should be dismissed because they are not proper Section 11 Defendants. A Section 11 action is

---

2003); *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 976-77 (8th Cir. 2002); *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000)). Thus, the Third Circuit signaled in the footnote that it may approve of the traceability requirement as defined by the Second, Eighth, and Tenth Circuits.

The Court notes the foregoing to frame the issue. As noted, however, the Court will not revisit Judge Arleo's earlier decision in this case.

[11] In this instance, a reasonable jury could conclude that the registration statement omitted material information regarding the Agricultural Bank of China debt and the resulting Chinese Court judgment. To be precise, the prospectus failed to mention that on September 10, 2010, the People's Intermediate Court in China's Yunnan Province entered default against YSTP because it failed to appear and did not contest a suit filed by the Agricultural Bank of China alleging that YSTP defaulted on three loans totaling $4.54 million. Plfs' Downs SOMF ¶ 62. The judgment ordered YSTP to repay its debt to the Bank within sixty days. *Id.* On January 10, 2011, about two weeks before the IPO closed, the Chinese court entered an order freezing all of YSTP's assets after Tibet failed to make payments on the defaulted loans. *Id.* ¶ 63. A reasonable jury could conclude that this type of omission is material and should have been mentioned in the prospectus. *See, e.g., In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274-78 (3d Cir. 2004) (concluding that discount retailer's unauthorized possession of a limited amount of golf clubs, which was outside the

14

"limited in scope" and can "only be brought against certain parties." *Herman & MacLean*, 459

U.S. at 381-82. Specifically, Section 11 provides that a plaintiff may assert claims against:

> (1) every person who signed the registration statement;

> (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

> (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

> (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

> (5) every underwriter with respect to such security.

15 U.S.C. § 77k(a). Section 11 is a "virtually absolute liability provision[], which do[es] not

require plaintiffs to allege that defendants possessed any scienter." *In re Adams Golf, Inc. Sec.*

*Litig.*, 381 F.3d 267, 274 n.7 (3d Cir. 2004). As a result, the categories of potential defendants are

narrowly construed. *See, e.g.*, *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 184

(2d Cir. 2011); *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 640 (N.D. Cal. 1980) ("The

Supreme Court has made clear that the securities acts are not to be interpreted as a federal common

law of securities, and that traditional rules of strict construction apply."). Moreover, even if an

individual "play[ed] a part in preparing the registration statement" he cannot be reached by a

---

protected distribution network, could be material and the materiality issue should be decided by a jury); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 506-514 (S.D.N.Y. 2013) (concluding that Facebook failed to include material information regarding mobile usage trends and the potential impact on revenue in registration statement).

Section 11 action if he does not fall into one of the enumerated categories.[12] *Herman & MacLean*, 459 U.S. at 386 n.22. For example, officers of a corporation are not proper Section 11 defendants, assuming that they do not otherwise fall into one of the Section 11 categories. *See, e.g., In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 385 (D. Mass. 1987) ("The allegation that [Defendant] was a high ranking officer in Elscint is not sufficient to state a Section 11 claim against him; an officer is not liable unless he was also a director, was named in the registration as about to become a director, or signed the registration statement."); *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 642 (N.D. Cal. 1980) ("Direct liability under [S]ection 11 is limited to these two officers [who signed the registration statement] and to the directors. The nonsigning officers cannot be held liable under Section 11.").

### 1. Underwriter Liability

Plaintiffs argue that Downs is a proper defendant because he participated in the underwriting of Tibet's IPO. Plfs' Downs Opp. at 17-22. Downs counters that he was only an employee of A&S, the underwriter for the Tibet IPO, and not the underwriter himself. As a result, Downs maintains that he cannot be personally liable under Section 11. Downs Br. at 12-15.

The term "underwriter" is defined in the Securities Act as

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or *participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking;* but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term "issuer" shall include, in addition to an issuer,

---

[12] Downs and Zou did not sign the registration statement. Downs SOMF ¶¶ 94-95; Zou SOMF ¶ 33. Therefore, the Court will not address subsection (1) as it is clearly inapplicable. In addition, Plaintiffs do not assert that Downs or Zou are liable under subsection (4). Consequently, the Court will also not address this provision.

> any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

15 U.S.C. § 77b(a)(11) (emphasis added). Thus, the term is broadly defined. *Special Situations Fund, III, L.P. v. Cocchiola*, No. 02-3099, 2007 WL 2261557, at *4 (D.N.J. Aug. 3, 2007).

Despite this already broad definition, Plaintiffs seek to further expand the definition in asking that the Court, in essence, pierce the corporate veil and hold Downs personally liable as an underwriter. Plaintiffs rely on the definition language regarding direct or indirect participation, arguing that as an A&S employee, Downs "played a direct role in the distribution and facilitation of the securities." Plfs' Downs Opp. at 20-21. Notwithstanding Downs clear participation in the underwriting process as an employee of A&S (*see id.*), Plaintiffs fail to provide the Court with a single case in which a court determined that an *individual employee* of an underwriter was personally liable under Section 11, *in addition to the underwriter itself.* Nor has the Court's own research revealed such an expansive interpretation.

Downs counters that "[i]t would be incongruous for the federal securities laws to extend individual liability to all employees of firms participating in the underwriting process of public issuances." Downs Br. at 13. The Court agrees. Plaintiffs fail to provide the Court with any basis to support their broad reading of subsection (5). Plaintiffs here also brought suit against the underwriter, A&S, itself and have already entered into a settlement agreement regarding those claims. Plaintiffs are not seeking to assert claims against a different entity that was involved in the underwriting process, but instead are seeking to hold a second person liable for the same actions and conduct as A&S because Downs worked for A&S on the underwriting process. The Court will not extend the underwriter category of Section 11 defendants in such a manner. Accordingly,

summary judgment is granted to Downs as to Count One with regards to his liability as an underwriter.

### 2. Liability Persons Performing Similar Functions to Directors

An individual may also be liable under Section 11 if they are a "person performing similar functions" to a director of the issuer when the allegedly false or misleading registration statement was filed or if he "with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner." 15 U.S.C. § 77k(a)(2), (3). Downs and Zou both maintain that they were not a person performing similar functions under either subsection. Zou argues that there can only be liability for a director *or* a person performing similar functions, *but not both*. Zou Br. at 16-17. As a result, because Tibet had a board of directors when the registration statement was filed, Zou asserts that he cannot also be liable. *Id.* at 17. Zou also maintains that the Offering Documents do not list him as being or about to become a person performing similar functions. Zou Reply at 6-7. Downs similarly argues that he was not a board member at the time of the IPO, therefore, he cannot be liable under Section 77k(a)(2). Downs further maintains that he cannot be liable under subsection (3) because even after his role as a Board Observer became effective, the Board Observers did not actually direct any affairs of the Company. Downs Br. at 10-11. Plaintiffs' theory of liability focuses on the argument that based on the facts presented here, Board Observers constitute people performing similar functions as a director. Plfs' Downs Opp. at 12-17; Plfs' Zou Opp. at 12-23.

There is a dearth of authority as to the meaning of "person performing similar functions" as a director within the context of Section 11. The parties rely solely on *Mersay v. First Republic Corp. of Am.*, 43 F.R.D. 465 (S.D.N.Y. 1968) and *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353 (S.D. Fla. 2001). The Court, however, does not find either case persuasive. In dicta in

*Mersay*, the court stated that "*[m]ost probably*, this phrase is concerned with imposing liability upon the person who is actually directing the affairs of the corporation, but who, for the purpose of avoiding liability, shuns the formal title 'director.'" *Mersay*, 43 F.R.D. at 469 (emphasis added). The "most probably" language indicates that this was not intended to be a definitive interpretation of the phrase. In fact, the *Mersay* court performed no legal analysis in reaching this conclusion. Moreover, no subsequent court has relied on this interpretation and this Court also chooses not to do so. And the Court respectfully disagrees with the conclusion in *In re Unicapital*. There, the court determined that an individual defendant named in the prospectus as about to become the president and CEO of a division of the defendant company subjected that individual to Section 11 liability as a person performing similar functions as a director. 149 F. Supp. 2d at 1366 n.21. As in *Mersay*, the court's conclusion in *In re Unicapital* is not supported by any legal analysis. As a result, this Court will not conclude that an officer of a division performs similar functions of a director of a corporation. In fact, as noted, there are several cases in which an officer was found not be within the express confines of Section 11.

Due to the lack of authoritative case law interpreting this phrase, the Court turns to principles of statutory construction. First, "where Congress leaves a statutory term undefined, that term should be given its ordinary and common sense meaning." *Donovan v. Frezzo Bros., Inc.*, 678 F.2d 1166, 1170 (3d Cir. 1982); *see also Restrapo v. Attorney Gen. of U.S.*, 617 F.3d 787, 796 n.9 (3d Cir. 2010) ("The panel[]s recourse to *Black's Law Dictionary* comports with the accepted method of affording terms their common definition when they are left undefined by Congress."). The term "director" is not defined by the Securities Act. Accordingly, the Court will apply its ordinary meaning. *Black's Law Dictionary* defines "director" as "[s]omeone who manages, guides, or orders; . . . [or] [a] person appointed or elected to sit on a board that manages the affairs

of a corporation or other organization by electing and exercising control over its officers."[13] *Director*, BLACK'S LAW DICTIONARY (10th ed. 2014). The Court will also apply the ordinary meaning of "similar," which is defined as "having characteristics in common." *See Similar*, MIRRIAM-WEBSTER DICTIONARY (2016). The Court also notes that Congress chose to use the word "similar," rather than "identical" or the "same."

In addition, "[i]t is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). In this instance, Defendants' position that there can be no person performing similar function if a board exists would render the phrase "or person performing similar function" unnecessary in the vast majority of cases. *Cf. United States v. Siegel*, 477 F.3d 87, 91-92 (3d Cir. 2007) (interpreting Pennsylvania criminal statute that uses the word "or" as "contemplat[ing] no less than eight different—although not necessarily mutually exclusive—[criminal] scenarios"); *see also United States v. One 1973 Rolls Royce, V.I.N. SRH-16266 ex rel Goodman*, 43 F.3d 794, 815 (3d Cir. 1994) (stating that context should be taken into account when interpreting a phrase containing "or"). The Court does not believe that Congress

---

[13] Downs and Zou both argue that SEC guidance and case law interpreting the word "director" within the context of the Securities Exchange Act of 1934 (the "Exchange Act") is instructive. Downs Br. at 11; Zou Br. at 16-18. But the Court does not find these authorities to be helpful to Defendants' argument. In fact, the SEC Interpretive Release on Rules Applicable to Insider Reporting & Trading that is cited by Downs (and Plaintiffs) actually supports the Court's interpretation. There, the SEC stated that title is not determinative to the decision of whether a person is a director. In addition, the SEC concluded an honorary director is not a director for purposes of Section 16 of the Exchange Act if that person "does not take part in formulating and deciding policy issues, and does not have access to inside information." 60 Fed. Reg. 48,147, 48,149 (Sept. 24, 1981). While there are certainly key differences between the insider trading rules of the Exchange Act and the strict liability provision of Section 11 of the Securities Act, this guidance is still instructive.

intended such a rigid result. If Congress did intend such a result, then the statute could have easily been drafted in such a manner. For example, the phrase "with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner" could have been written as "with his consent, is named in the registration statement as being or about to become a director, person performing similar functions *when no directors are named*, or partner." In sum, the Court determines that a defendant may be held liable if he had the ability to exercise similar control and management as a director when the registration statement at issue was filed or was named as about to assume such a role in the registration statement, even if the corporation at issue also had a board of directors or persons about to be named directors.

In this instance, both Downs and Zou were named in the prospectus as about to become Board Observers; neither Defendant argues that this was done without their consent. A Board Observer, however, is not defined in the prospectus. Nor is it defined in *Black's Law Dictionary*. The Court has found opinions in which the position of board observer is mentioned. *See, e.g., Chesemore v. Alliance Holdings, Inc.*, 770 F. Supp. 2d 950, 957 (W.D. Wis. 2011) ("The shareholders also resolved to permit Fenkell and Wanko from Alliance to act as 'board observers,' with right to notice and participation but not vote."). However, the parties did not provide and the Court could not find a universally accepted definition of board observer. As a result, the Court concludes that simply being named a board observer did not open Downs or Zou up to Section 11 liability because the title does not indicate that such a position necessarily performs similar functions to a director.

Here, however, the language in the prospectus outlining Downs' and Zou's role as Board Observers expressly indicates the influence that each could exercise as observers. The prospectus stated that while Downs and Zou could not vote, "they may nevertheless significantly influence

the outcome of matters submitted to the Board of Directors for approval." Cargill Decl. Ex 1, at

35. Moreover, Tibet acknowledged that through the Board Observers, it was going to have "an

ongoing relationship with our Placement Agent[, A&S,] that may impact our shareholders' ability

to impact decisions related to our operations." *Id.* Finally, the two Board Observers were to

receive the same compensation for their role as independent directors. *Id.* Viewing the entire

description of the Board Observer role in context, there is, at a minimum, a genuine issue of

material fact as to whether Downs and Zou could be viewed as a people performing similar

functions to a director.

The prospectus does not define any of the words used to describe the Board Observers'

role. As a result, the Court turns to dictionary definitions. First, the statement indicates that Board

Observers would have the ability to influence the Tibet Board. "Influence" is defined as "the

power or capacity of causing an effect in indirect or intangible ways." *Influence*, MIRRIAM-

WEBSTER DICTIONARY (2016). Next, the description provides that this influence would be

significant. "Significant" means "of a noticeably or measurably large amount." *Significant*,

MIRRIAM-WEBSTER DICTIONARY (2016). Thus, the language "significantly influence" indicates

that the two Board Observers could play a critical role in board decisions.

The question then becomes what matters could Board Observers significantly influence?

Importantly, the prospectus does not place a limit on whom or what they may influence. According

to the description, Board Observers could influence the entire board. Thus, the Board Observers

arguably had more influence than any individual board member, who could only cast a single vote.

By comparison, the Board Observers had the potential ability to influence the action of the board

acting as a collective body. Moreover, there is no limit on which matters they may exert their

influence; the Board Observers could influence all matters that were brought to the Board for

approval. In this instance, the Tibet Board "makes all relevant Company decisions," which could include (1) appointing officers; (2) "exercising the borrowing powers of the company and mortgaging the property of the company;" (3) executing checks and other negotiable instruments on behalf of the company; and (4) playing a "key role in [Tibet's] risk oversite." *See* Cargill Decl. Ex. 1, at 84-85; *Cf. In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 555 (D.N.J. 2011) (discussing requirement of shareholder demand due to "the well-settled principle that directors, rather than shareholders, manage the affairs of the corporation").

Finally, the description contemplates that the Board Observers may be able to significantly influence the "outcome" of any matter submitted to the Board. As a result, Zou and Downs had the ability to have an important impact on the final results of all matters which needed board approval. The Court further recognizes that Board Observers were to receive the same compensation and reimbursement as independent board members. As a result, the Court cannot find that, as a matter of law, given the breadth and degree of influence as set forth in the prospectus, Downs and Zou were not going to be performing "similar" functions as a director in their capacities as Board Observers.

The Court's only hesitation with the foregoing conclusion is due to the use of the word "may," rather than "shall" or "will," recognizing that there is only a potential for Downs and Zou to expert any influence. In other words, according to the prospectus, it was not necessarily mandatory that the Board Observers exercise their "significant influence." However, in light of the heading of the section in the prospectus, the scope of the influence set forth, and the comparable compensation, the Court does not find in Defendants favor as a matter of law. Accordingly, Downs and Zou are not entitled to summary judgment as to liability under subsection (3).

Downs and Zou go to great lengths to explain that although they were named as Board Observers, they never actually influenced the Tibet Board or were even provided an opportunity to do so. *See, e.g.*, Zou Reply at 12-14. These facts, however, are irrelevant to the Court's analysis. The purpose of Section 11 is to "protect[] investors by ensuring that companies issuing securities . . . make a full and fair disclosure of information relevant to a public offering" and the "linchpin of the Act is its registration requirement." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015) (internal quotation and quotation marks omitted). Therefore, in the context of a Section 11(a)(3) analysis, the Court views the actual language used in the registration statement and prospectus as dispositive; what happened after the fact does not change the description in the prospectus that Board Observers may significantly influence the outcome of matters submitted to the Board of Directors for approval. *Cf. In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 932 F. Supp. 2d 1095, 1119 (C.D. Cal. 2013) (dismissing claims against individual defendants because false and misleading statements were added into final prospectus that was filed after they signed the registration statement). For the same reason, the Court also disregards Plaintiffs' assertions that Downs and Zou played integral roles at A&S and Tibet, respectively, leading up to the IPO.[14] In other words, in considering a potential Section 11 violation for defendant under 15 U.S.C. § 77k(a)(3), the Court focuses on what is actually stated in a registration statement and prospectus as opposed to what the person did before or after the filing of the documents.

Zou also argues that because Section 11 imposes strict liability, the enumerated categories of defendants should be narrowly construed. Zou continues that Plaintiffs are attempting to

---

[14] To be clear, the Court does not believe that, pursuant to subsection (2), Downs and Zou were persons performing similar functions to a director when the registration statement became effective. The Court is denying summary judgment solely on the basis of subsection (3).

"impermissibly stretch the scope of Section 11 to cover Zou." Zou Br. at 15. In denying summary

judgment on Plaintiffs' Section 11 claims, the Court is not expanding the scope of Section 11.

Rather, the Court is simply interpreting the plain language of statute and what is meant by a person

performing a function similar to that of a director.

Section 11, however, does provide a due diligence affirmative defense for all defendants

except for the issuer. 15 U.S.C. § 77k(b); *see also Herman & MacLean*, 459 U.S. at 382. Section

11 provides that

> as regards any part of the registration statement not purporting to be made on the
> authority of an expert, and not purporting to be a copy of or extract from a report
> or valuation of an expert, and not purporting to be made on the authority of a public
> official document or statement, he had, after reasonable investigation, reasonable
> ground to believe and did believe, at the time such part of the registration statement
> became effective, that the statements therein were true and that there was no
> omission to state a material fact required to be stated therein or necessary to make
> the statements therein not misleading

15 U.S.C. § 77k(b)(3). "[T]he standard of reasonableness shall be that required of a prudent man

in the management of his own property." *Id.* § 77k(c). Further, a defendant bears the burden of

demonstrating due diligence if liability is established. *Herman & MacLean*, 459 U.S. at 382. But,

"[t]he reasonableness of a defendant's due diligence investigation will, in most cases, be a question

for the jury." *Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, 68 F. Supp. 3d 439, 444

(S.D.N.Y. 2014); *see also In re Software Toolworks Inc.*, 50 F.3d 615, 622 (9th Cir. 1994) (stating

that courts may resolve the due diligence inquiry only "in those cases where no rational jury could

conclude that the defendant had not acted reasonably").

Downs argues that he reasonably relied on the financial statements and comfort letter

provided by Acquavella. Downs Br. at 16-17. He maintains that "there were no 'red flags' that

arose during the due diligence that would have otherwise put Downs on alert that the financial

statements prepared by Acquavella contained misrepresentations." *Id.* at 18. In addition, Downs

and A&S conducted their own due diligence by traveling to China to meet with Tibet (Downs SOMF ¶ 38), engaging an outside law firm to conduct parallel diligence (*see, e.g., id.* ¶¶ 37, 44, 55), and informing Tibet that it needed to engage an auditor (*id.* ¶¶ 34, 45-46). Downs contends that this is sufficient for the Court to conclude that he undertook reasonable due diligence. Zou does not independently address the due diligence defense but joins in Downs' argument. Zou Reply at 18-19. Plaintiffs counter that Downs does not provide affirmative evidence establishing that he independently performed any due diligence. Plfs' Downs Opp. at 33.

Downs only addresses his due diligence in the context of his role as an underwriter but the Court has determined that there is no liability for Downs personally as an underwriter. Downs does not address due diligence in the context of his being named a Board Observer. Zou also fails to provide any evidence concerning his due diligence. Consequently, the Court denies summary judgment as to Downs and Zou concerning the due diligence defense.

In sum, summary judgment is denied as to Count One for both Defendants because there are material issues of fact as to whether they were persons named in the registration statement as about to become people performing similar functions to a director and whether Defendants' are absolved of liability under the due diligence defense.

### C. Section 15 of the Securities Act of 1933 (Count Three)

Downs and Zou also seek summary judgment for Count Three, which asserts control person claims pursuant to Section 15. Zou Br. at 18-21; Downs Br. at 24-30. Plaintiffs did not address the Section 15 claims asserted against Zou or Downs in their opposition briefs.

A court may deem a claim abandoned when a party moves for summary judgment and the party opposing summary judgment fails to address the argument in any way. *See, e.g., Freeman v. Middle Twp. Bd. of Educ.*, No. 10-6024, 2012 WL 3715925, at *3 (D.N.J. Aug. 27, 2012)

(viewing claims not addressed in opposition brief as waived). As a result, the Court construes Plaintiffs' Section 15 claims as abandoned and summary judgment is therefore appropriate. Consequently, summary judgment is granted to Defendants for Count Three.

## IV. CONCLUSION

For the reasons set forth above, the motions for summary judgment filed by Defendant L. McCarthy Downs, III (D.E. 207) and Hayden Zou (D.E. 210) are **GRANTED in part and DENIED in part**. An appropriate Order accompanies this Opinion.

Dated: May 10, 2017

John Michael Vazquez, U.S.D.J.