## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBIN JOACHIM DARTELL, *et al*, individually and on behalf all others similarly situated, | |
| *Plaintiffs*, | Civil Action No. 14-3620 |
| v. | **OPINION** |
| TIBET PHARMACEUTICALS, INC., *et al*, | |
| *Defendants*. | |

**John Michael Vazquez, U.S.D.J.**

This matter comes before the Court by way of the motions for final approval of the proposed settlement and for attorney fees filed by Lead Plaintiffs Obasi Investment Limited, Jude Shao, Robin Dartell, Lixin Wu, Jason Helton, and Sean Carithers. D.E. 263, 265. The motions are unopposed, however, two potential class members submitted letters regarding the proposed settlement and award of attorneys' fees. D.E. 258, 259, 270. The Court reviewed the submissions in support of the motions and held a settlement hearing on June 6, 2017. For the reasons stated below, both motions are **GRANTED**.

## I.    FACTUAL BACKGROUND

This class action involves alleged misrepresentations in Defendant Tibet Pharmaceuticals, Inc.'s ("Tibet") Initial Public Offering ("IPO") registration documents. Specifically, Lead Plaintiffs allege that Tibet's IPO registration statement and prospectus "misrepresented Tibet as a financially sound and profitable company." *See generally* First Amended Complaint ("FAC"),

D.E. 50. Plaintiffs brought suit under the Securities Act of 1933 against a number of individuals and entities who were involved in the IPO, including Tibet;[1] the Tibet Directors who signed the IPO registration statement;[2] the underwriter, Anderson & Strudwick ("A&S");[3] and the auditor for the IPO, Acquavella, Chiarelli, Shuster, Berkower & Co., LLP ("ACSB"). *See generally* FAC ¶¶ 23-40. This proposed settlement only involves ACSB.[4]

Lead Plaintiffs allege that Tibet's prospectus stated that Tibet was financially sound when in reality the registration documents overstated Tibet's assets and misrepresented the Company's indebtedness. FAC ¶¶ 48-51. Specifically, Lead Plaintiffs allege that the registration statement failed to mention that on September 10, 2010, the People's Intermediate Court in China's Yunnan Province entered default against Yunnan Shangri-La Tibetan Pharmaceutical Group ("YSTP"), an entity that Tibet effectively controlled. YTSP failed to appear and did not contest a suit filed by the Agricultural Bank of China alleging that YSTP defaulted on three loans totaling $4.54 million. The judgment ordered YSTP to repay its debt to the Bank within sixty days. *Id.* ¶ 55. On January

---

[1] On July 28, 2016, the Clerk of the Court entered default against Tibet for failure to plead or otherwise defend pursuant to Federal Rule of Civil Procedure 55(a).

[2] The Registration Statement was signed by Defendants Hong Yu, Taylor Z. Guo, Sabrina Ren, Wenbo Chen, Youhang Peng, and Solomon Chen. On March 31, 2017, the Court granted Peng's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(5) because Lead Plaintiffs did not serve Peng until March 22, 2016, almost three years after filing the FAC. D.E. 260, 261. The Court is not aware of any information indicating that Lead Plaintiffs ever served the other Director Defendants.

[3] Defendant Sterne Agee Group, Inc. ("Sterne Agee") acquired A&S and assumed all of its assets and liabilities in December 2011. FAC ¶ 33-34. Sterne Agee was dismissed as a Defendant through a court-approved settlement on July 13, 2016 (D.E. 217).

[4] Lead Plaintiffs continue to litigate their claims against L. McCarthy Downs and Hayden Zou who, among other things, were named as "Board Observers" in the prospectus. The Court denied motions for summary judgment as to the Section 11 claims asserted against Downs and Zou and a motion for reconsideration is pending. D.E. 269, 271.

10, 2011, about two weeks before the IPO became effective, the Chinese court froze all of YSTP's assets after it failed to make the ordered payments. *Id.* ¶ 56.

In the registration statement, ACSB certified that it performed an audit and found that the financial statements in the registration statement accurately represented Tibet's financial position. *Id.* ¶ 94. Lead Plaintiffs allege that had ACSB conducted its audit in conformance with audit standards, it would have discovered the defaulted loans and Chinese lawsuit. *Id.* ¶¶ 100-03. Lead Plaintiffs further allege that a proper audit would have prevented the losses suffered by class members. *Id.* ¶ 108.

## II. PROCEDURAL HISTORY

Plaintiffs initially filed suit on August 31, 2012, in the United States District Court for the District of the Virgin Islands, and on May 1, 2013, filed the Amended Complaint (the "FAC"). D.E. 1, 50. After considering multiple motions to dismiss for improper venue, the case was transferred to the District of New Jersey on May 1, 2014. D.E. 72. Zou, ACSB, Sterne Agee, and Downs then filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). D.E. 96, 101, 102, 104. Judge Hochberg denied the four motions on February 20, 2015. D.E. 132.

The parties then began discovery. As to discovery for ACSB, Lead Plaintiffs engaged two accounting experts, reviewed documents produced by ACSB, and attempted to depose David Svoboda, a partner at ACSB. Svoboda did not show up for the deposition. Declaration of Laurence M. Rosen in Support of Plaintiffs' Motion for Final Approval of the Class Action Settlement and Motion for Attorneys' Fees ("Rosen Decl.") ¶ 40. In addition, Plaintiffs filed a motion for class certification, which was opposed by ACSB, Downs, and Zou. On February 22, 2016, Judge Arleo granted Lead Plaintiffs' motion, certifying a class of persons who purchased Tibet stock pursuant and/or traceable to Tibet's registration statement and prospectus. D.E. 183, 184. Judge Arleo also

appointed the Rosen Firm as Lead Counsel and Lead Plaintiffs to serve as representatives of the class. D.E. 184.

ACSB and Lead Plaintiffs engaged in arms' length settlement negotiations, which resulted in an agreement in principal to settle the claims against ACSB. Rosen Decl. ¶ 47. Lead Plaintiffs filed their motion for preliminary approval of the settlement agreement on May 31, 2016. D.E. 206. The settlement states that in exchange for ACSB's payment of $2.075 million, Lead Plaintiffs and the settlement class will release their claims against ACSB. *See* Settlement Stipulation, D.E. 205. ACSB's settlement payment utilizes almost half the funds remaining in its insurance policy.[5] *See* Rosen Decl. ¶¶ 6, 80.

After it preliminarily approved the settlement and class notice in December 2016, the Court scheduled a settlement hearing for June 6, 2017. D.E. 253. Lead Plaintiffs filed the pending motions in advance of the hearing. In their motion for final approval of the class action settlement, Lead Plaintiffs ask the Court to find that notice was provided in accordance with the Court's preliminary approval Order, and approve the settlement and plan of allocation. *See generally* Settlement Approval Br., D.E. 264. Concerning the motion for attorneys' fees, Lead Counsel seeks an award of attorneys' fees of one-third of the settlement fund, or $691,667; reimbursement of $62,140.25 in out-of-pocket expenses; and a $5,000 award for each Lead Plaintiff; all of which would be paid from the settlement fund. *See generally* Attorneys' Fees Br., D.E. 266.

---

[5] The other half of ACSB's policy is being used for settlement in *P. Van Hove BVBA, et al v. Universal Travel Group, Inc., et al*, Civ. No. 11-2164. The Court held a settlement hearing in *Universal Travel Group* immediately before the hearing in this case. The Court required Lead Counsel to adequately explain the reasons by which the parties determined the apportionment of ACSB's total amount between the two matters.

The Court and Lead Counsel received letters from two individuals regarding the proposed settlement and award of attorneys' fees. The Court does not construe either as an objection to the settlement or a request to be excluded as a class member.

### III.    ADEQUACY OF NOTICE

Through the Order preliminarily approving the settlement, the Court ruled that the class notice materials and the proposed method of dissemination satisfied Due Process requirements, Rule 23, and the PSLRA. D.E. 252. The Court reaffirms its early conclusions concerning the adequacy of notice.

Rule 23(e) provides that when a class action is settled, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e). "The Rule 23(e) notice is designed to summarize the litigation and the settlement and 'to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation.'" *In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 327 (3d Cir. 1998) (quoting 2 *Newberg on Class Actions* § 8.32 at 8-109). In addition, the PSLRA imposes notice requirements upon the settlement of a securities class action. *See* 15 U.S.C. § 77z-1. The PSLRA requires that class members receive notice regarding a settlement that includes the following:

> 1) a statement of recovery in the aggregate and on an average per share basis;
> 2) a statement of the potential outcome of the case, which includes an explanation on the average amount of damages per share;
> 3) a statement of attorneys' fees or costs sought;
> 4) the name and contact information for at least one representative of class counsel who can be available for questions; and
> 5) the reasons for settlement.

15 U.S.C. § 77z-1(a)(7). The Court-approved class notice here informed class members of (a) the nature, history and progress of the litigation; (b) the rights of class members, including how to

lodge objections and opt out of the class; (c) the proposed settlement; (d) how to file a proof of claim; (e) the fees and expenses sought by Lead Counsel; and (f) where to find and review relevant court documents for this matter. *See* Declaration of Josephine Bravata ("Bravata Decl.") Ex. A. As a result, the class notice here satisfies the requirements of Rule 23(e) and the PSLRA. Moreover, the notice plan was implemented as set forth in the Preliminary Approval Order. *See* Bravata Decl. ¶¶ 4-7. Accordingly, the notice plan was sufficient and the Court approves the plan of allocation as set forth in the class notice.

## IV.  **FINAL SETTLEMENT APPROVAL**

A class action cannot be settled under Rule 23(e) without a determination that the proposed settlement is "fair, reasonable and adequate." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004). In determining the reasonableness, fairness, and adequacy of a proposed settlement for the purposes of Rule 23(e), courts consider the following factors, known as the *Girsch* factors:

1) the complexity, expense and likely duration of the litigation;
2) the reaction of the class to the settlement;
3) the stage of the proceedings and the amount of discovery completed;
4) the risks of establishing liability;
5) the risks of establishing damages;
6) the risks of maintaining the class action through the trial;
7) the ability of the defendants to withstand a greater judgment;
8) the range of reasonableness of the settlement fund in light of the best possible recovery; and
9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 437 (3d Cir. 2016) (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)). The settling parties bear the burden of establishing that the *Girsh* factors weigh in favor of approval. But the ultimate decision of whether

to approve a proposed settlement "is left to the sound discretion of the district court." *Girsh*, 521 F.2d at 157.

The Third Circuit also requires courts to consider whether the settlement satisfies several additional factors, as set forth in *In re Prudential Insurance Company America Sales Practice Litigation Agent Actions*. *See, e.g., Yedlowski v. Roka Bioscience, Inc.*, No. 14-8020, 2016 WL 6661336, at *12 (D.N.J. Nov. 10, 2016) (quoting *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010)). The *Prudential* factors include:

> [1] [T]he maturity of the underlying substantive issues . . . .; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved – or likely to be achieved –for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Id.* In this instance, the proposed settlement satisfies the *Girsh* factors, as well as the relevant *Prudential* factors.

## 1. Complexity, Expense, and Likely Duration of Litigation

The first factor considers "the probable costs, in both time and money, of continued litigation." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 812 (3d Cir. 1995) (quoting *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir. 1974)). "Settlement is favored under this factor if litigation is expected to be complex, expensive and time consuming." *Yedlowski*, 2016 WL 6661336, at *12 (quoting *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-374, 2008 WL 9447623, at *17 (D.N.J. Dec. 9, 2008)).

"Federal securities class actions by definition involve complicated issues of fact and law." *In re Royal Dutch*, 2008 WL 9447623, at *17. This observation applies here. Lead Plaintiffs face

significant burdens to survive motions for summary judgment, and ultimately, to succeed at trial. To succeed, Lead Plaintiffs would need to retain experts to testify as to multiple issues including auditing standards, class action damages, and loss causation. Settlement Approval Br. at 11. Such experts are expensive and could quickly drive up the cost of continued litigation. Therefore, this factor favors settlement.

### 2. Reaction to Settlement

The second *Girsh* factor "gauge[s] whether members of the class support the settlement." *In re Prudential*, 148 F.3d at 318. As such, courts look at the "number and vociferousness of the objectors. . . . [and] generally assume[] that silence constitutes tacit consent to the agreement." *In re Gen. Motors*, 55 F.3d at 812 (quoting *Bell Alt. Corp.*, 2 F.3d at 1313 n.15).

Here, Strategic Claims Services ("SCS"), the claims administrator, sent notice and claim forms to 4,941 potential class members or their nominees. Bravata Decl. ¶ 6. To date, not a single class member objected to any portion of the settlement or opted out of the settlement. Two potential class members did submit letters.

First, Mr. Louis Yelich sent one letter addressed to the Court and another letter addressed to Lead Counsel, Lawrence Rosen of the Rosen Law Firm. D.E. 259, 270. In his letter to Mr. Rosen, Mr. Yelich largely sought clarification regarding the number of outstanding shares of Tibet stock and the inability of the Defendants to participate in the settlement. D.E. 259. The Rosen Law Firm responded to Mr. Yelich's questions. Rosen Decl., Ex. 3. In his letter to the Court, Mr. Yelich asked several questions, including why he was not a Lead Plaintiff in this matter. D.E. 270. Based on the information provided by Mr. Yelich, it appears that he purchased his shares (or at least a large portion of his shares) outside of the class period. D.E. 270. Consequently, Mr. Yelich does not appear to be a member of the class.

Second, Mr. Fred W. Riesen's letter questions why Lead Counsel accepted such a small settlement. Mr. Riesen, however, specifically states that he is not objecting to the settlement. D.E. 258.

Accordingly, the lack of objectors weighs in favor of approving the settlement.[6]

### 3. Stage of Proceedings

The purpose of this factor is to determine "the degree of case development that class counsel have accomplished prior to settlement." *In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001). "[C]ourts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Id.* (citing *In re Gen. Motors*, 55 F.3d at 813).

In this instance, ACSB and Lead Plaintiffs have litigated this case for nearly five years. The parties have fully briefed motions to dismiss, a motion for class certification, and have engaged in discovery. Moreover, Lead Plaintiffs engaged two experts regarding accounting and auditing practices in China and regarding GAAP. Rosen Decl. ¶ 40. Accordingly, Lead Plaintiffs are well aware of the relative strengths and weaknesses of their case as to ACSB. *See, e.g., In re Genta Sec. Litig.*, No. 04-2123, 2008 WL 2229843, at *6 (D.N.J. May 28, 2008).

Importantly, the settlement proceeds here come from a wasting insurance policy. *See* Settlement Br. at 19. This means that the policy limit was reduced by payment of defense costs while the matter was being litigated. As litigation continues, less money is available to the class.

---

[6] The Court notes that some courts have suggested that the lack of objectors essentially *requires* a finding that the settlement is fair and reasonable. *See, e.g., In re Linerboard Antitrust Litig*, 296 F. Supp. 2d 568, 578 (E.D. Pa. 2003) ("'[T]his unanimous approval of the proposed settlement[ ] by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlement.'" (quoting *Fisher Bros v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 451 (E.D. Pa. 1985))). The Court does not agree with this conclusion but recognizes that the lack of objectors provides a strong indication that the settlement is fair and reasonable.

If the parties did not settle and instead continued with discovery and motions for summary judgment, the insurance funds available for any potential settlement would be quickly diminished and perhaps exhausted. Accordingly, this factor weighs in favor of the fairness of the settlement.

### 4. The Risks of Establishing Liability and Damages

The purpose of these factors is to "balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential*, 148 F.3d at 319. "By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *In re Gen. Motors*, 55 F.3d at 814. Where there is a prospect of long, contentious, and uncertain litigation along with a lack of evidence required to support claims in such protracted litigation, these factors weigh in favor of approval. *See In re Cendant Corp. Litig.*, 264 F.3d at 238.

#### a. Liability

Lead Plaintiffs face multiple obstacles in moving this case forward if it does not settle. Further discovery will be difficult and time consuming because evidence is located in China. Settlement Approval Br. at 16. Gathering evidence in China for litigation that is occurring in the United States is a difficult and expensive process. *See, e.g.*, Elizabeth Fahey & Zhirong Tao, The Pretrial Discovery Process in Civil Cases: A Comparison of Evidence Discovery Between China & the United States, 37 B.C. Int'l & Comp. L. Rev. 281, 283-86 (2014). And as discussed, this case involves difficult and complicated issue of law and fact that may not be successful in a motion for summary judgment or at trial. Settlement Br. at 15-16. The Court notes, however, that Lead Plaintiffs asserted claims against ACSB under Section 11 of the Securities Act. Thus, Lead Plaintiffs only need to establish that the registration statement contained material misstatements or

omissions, and that ACSB is within the class of individuals and entities that can be liable under Section 11. *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 364 (D.N.J. 1999). These requirements are less onerous to prove than scienter-based securities claims, such as a 10b-5[7] claim, where a plaintiff must prove "knowledge by the defendant, an intent to defraud, misrepresentation or failure to disclose, materiality of the information and, injurious reliance by the plaintiff." *Id.* at 368.

### b. Damages

Assuming that Lead Plaintiffs could prove liability, proving damages is also difficult. Yet, unlike 10b-5 claims, plaintiffs asserting a Section 11 claim do not have the burden to prove causation. Defendants, however, may assert an affirmative defense "that a lower share value did not result from any nondisclosure or false statement." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004). As it did in its motion to dismiss, ACSB would likely assert this affirmative defense. ACSB would likely argue that the class members' losses are not attributable to the alleged misrepresentations in Tibet's registration statement and prospectus. This issue typically requires expert testimony. "Thus in the end, loss causation would be reduced to a 'battle of experts.' The reaction of a jury to such competing expert testimony is impossible to predict." Settlement Approval Br. at 17. Moreover, this expert testimony would likely be expensive and, therefore, deplete the money available from the insurance policies for defense experts. As a result, this factor also weighs in favor of concluding that the settlement is fair and reasonable.

### 5. Risk of Retaining Class Certification throughout Trial

The risk of obtaining and maintaining class certification through trial also supports approval of the settlement. "There will always be a 'risk' or possibility of decertification, and

---

[7] The SEC's Rule 10b-5 is found at 17 C.F.R. § 240.10b-5, and was promulgated pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*

consequently the court can always claim this factor weighs in favor of settlement." *In re Prudential*, 148 F.3d at 321. Here, in their motions for summary judgment Downs and Zou sought to revisit the class certification decision, arguing that certain Lead Plaintiffs lacked standing to maintain their claims. The Court granted their motions in part. Summary Judgment Opinion at 12. Although this does not impact the settlement here, it illustrates the fact that there is a risk of retaining class certification. Consequently, this factor also weighs in favor of approving the settlement.

### 6. Defendant's Ability to Withstand Greater Judgment

This factor "is concerned with whether defendants could withstand a judgment for an amount *significantly* greater than the [s]ettlement." *In re Cendant Corp. Litig.*, 264 F.3d at 240 (emphasis added). ACSB was dissolved during the pendency of this litigation and its sole remaining asset is the insurance policy. Almost half of the remaining $4.4 million in the policy will be contributed to the common fund here.[8] Settlement Approval Br. at 19. Thus, this factor weighs in favor of approving the settlement.

### 7. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risk of Litigation

These factors aim to "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warfarin*, 391 F.3d at 538. "In conducting this evaluation, it is recognized that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding to[o] large a settlement based on the court's view of the merits of the litigation." *See In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 484-85 (D.N.J. 2012) (internal

---

[8] As discussed in note 5, *supra,* the other half ACSB's policy is being used to settle another class action, *P. Van Hove BVBA, et al v. Universal Travel Group, Inc., et al,* Civ. No. 11-2164.

quotations omitted). These factors consider "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Pro v. Hertz Equip. Rental Corp.*, No. 06-3830, 2013 WL 3167736, at *5 (D.N.J. June 20, 2013) (quoting *In re Prudential*, 148 F.3d at 322). As discussed, this settlement provides a good recovery to the class in light of the risks of litigation. Moreover, because the settlement fund consists of money from a wasting insurance policy, any further litigation will decrease the amount of money available to the class. Consequently, these factors also weigh in favor of settlement.

### 8. The Relevant Prudential Factors

In this instance, the relevant *Prudential* factors are whether class members may opt out of the settlement and whether the procedure for processing individual claims is fair and reasonable.[9] *In re Prudential*, 148 F.3d at 323-24.

Class members may opt out of the class here and the claims procedure is fair and reasonable. As was made clear in the class notice, class members may elect to opt out of the class and were informed of the procedures to do so. *See* Bravata Decl. Ex. A, at 8. Potential class members are required to submit claims to SCS, who assesses whether the potential member is a valid member of the class. The claims process is standardized and Lead Counsel represented at the Settlement Hearing that SCS provides claimants with the ability to resolve problems with their claims if SCS determines that the initial submission is lacking. In addition, SCS will continue to accept late claims if practicable, up until the time that the settlement funds are actually distributed. Thus, the claims procedure appears to be fair and reasonable.

---

[9] The reasonableness of plaintiffs' request for attorneys' fees is another *Prudential* factor. Because Lead Plaintiffs here filed a motion for attorneys' fees along with their motion for final settlement approval this factor will be addressed at length below. As will be discussed, the Court finds that the requested fees and costs are reasonable. Thus this factor weighs in favor of settlement.

Having considered each of the *Girsch* and *Prudential* factors, the Court approves the settlement as fair and reasonable.

## V.     MOTION FOR ATTORNEYS' FEES AND EXPENSES

Lead Plaintiffs also make a claim for attorneys' fees of one-third of the settlement amount, or $691,667; reimbursement of litigation expenses; and a nominal award for the six Lead Plaintiffs. The fees and expenses would be paid from the settlement fund. *See generally* Attorneys' Fees Br. In common fund cases such as this one, attorneys' fees are typically awarded through the percentage-of-recovery method. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005). The percentage-of-recovery method provides for attorneys' fees by awarding a reasonable percentage of the common fund. *Id.* The percentage-of-recovery method is preferred in common fund cases because it "rewards counsel for success and penalizes it for failure." *Id.* (quoting *In re Prudential*, 148 F.3d at 333).

The Third Circuit suggests that when district courts use the percentage-of-recovery method, they also employ the lodestar method to cross-check the fee and ensure that it is reasonable. *Id.* at 305. "The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Id.* The cross-check occurs by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier. If "the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." *Id.* at 306.

### A.  The Percentage-of-Recovery Method

As discussed, Lead Counsel seeks a fee award of one-third of the settlement fund. When analyzing a fee award under the percentage-of-recovery method, courts consider several factors, including:

> 1) the size of the fund created and the number of persons benefitted;
> 2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;
> 3) the skill and efficiency of the attorneys involved;
> 4) the complexity and duration of the litigation;
> 5) the risk of nonpayment;
> 6) the amount of time devoted to the case by plaintiffs' counsel; and
> 7) the awards in similar cases.

*Id.* at 301 (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)). The list is not exhaustive. *Yedlowski*, 2016 WL 6661336, at *19. As such, in *In re Prudential*, the Third Circuit enumerated three additional factors that may be relevant. *Id.* The additional factors are:

> 1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations;
> 2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and
> (3) any "innovative" terms of settlement.

*Id.* (quoting *In re Prudential*, 148 F.3d at 338-40). A court, however, need not apply these factors "in a formulaic way because each case is different." *Id.* (quoting *In re Rite Aid*, 396 F.3d at 301).

Here, because the *Gunter* factors substantially overlap with the *Girsch* factors, the Court will refer to its earlier findings when reviewing the fee application. An analysis of these factors supports the requested one-third fee award.

### 1. The Size of the Fund and the Benefit to Class Members

For this factor, courts "consider the fee request in comparison to the size of the fund created and the number of class members to be benefitted." *Id.* at *20 (quoting *Rowe v. E.I. DuPont de*

*Nemours & Co.*, Nos. 06-1810, 06-3080, 2011 WL 3837106, at *18 (D.N.J. Aug. 26, 2011)). A smaller fund does not necessarily equate to a smaller percentage award. In fact, "because of fixed costs and economies of scale, attorneys' fees and costs do not increase dollar-for-dollar with the size of the case. Thus, it takes a greater percentage of the settlement to support litigation in a smaller case." *Id.*

This is a relatively small securities class action. In addition, the average percentage of estimated damages that were recovered through securities class action settlements in 2016 was nine percent. *See* Securities Class Action Settlements 2016 Review & Analysis, at 1, http://securities.stanford.edu/research-reports/1996-2016/Settlements-Through-12-2016-Review.pdf (last visited June 26, 2017); *see also In re Par Pharm. Sec. Litig.*, No. 06-3226, 2013 WL 3930091, at *2 (D.N.J. July 29, 2013) (approving settlement with total sum of $8.1 million, which amounted to approximately 7% of class-wide damages). Here, total maximum damages are optimistically valued at approximately $16.5 million. The settlement fund is $2.075 million. Attorneys' Fees Br. at 7. In addition, at the Settlement Hearing, Lead Counsel represented that SCS has only received 847 valid claims. Consequently, the relatively low amount of actual claims ensures that each class member will receive a proportionally larger payment.[10] Thus, this factor supports the fee request.

### 2. Objections to the Fee Request

In this instance, class notice informed potential class members that Lead Counsel was seeking an award of up to one-third of the settlement fund. The notice also advised class members that they could object to the settlement and explained the procedure to do so. Bravata Decl., Ex.

---

[10] Lead Plaintiffs also recovered $1.45 million through the A&S settlement, which will also be distributed to class members. Thus, class members may recover up to 37% of their recognized losses. Attorneys' Fees Br. at 7.

A. To date, no class member has objected to the requested fees. *Id.* ¶ 12. Accordingly, the reaction from the class supports the fee request.

### 3. The skill and efficiency of the attorneys involved

"Lead Counsel's skill and efficiency is 'measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel.'" *Yedlowski*, 2016 WL 6661336, at *20 (quoting *Hall v. AT&T Mobility LLC*, No. 07-5325, 2010 WL 4053547, at *19 (D.N.J. Oct. 13, 2010)). In addition, "[t]he quality and vigor of opposing counsel" is relevant when evaluating the quality of services rendered by Lead Counsel. *Id.* at *21.

Here, the Rosen Firm is experienced in the complex field of securities fraud class action litigation. *See* Rosen Fee Decl. Ex. 2-A. Courts have recognized that the Rosen Firm "has extensive experience navigating the particular complexities of litigation with Chinese companies." *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 540 (S.D.N.Y. 2015). The performance and quality of defense counsel is also high. Thus, the competence of opposing counsel favors a finding that Lead Counsel prosecuted this case with skill and efficiency. Therefore, this factor supports the fee request.

### 4. The complexity and duration of the litigation

The fourth factor captures "the probable costs, in both time and money of continued litigation." *In re Gen. Motors*, 55 F.3d at 812 (quoting *Bryan*, 494 F.2d at 801). As discussed, the settlement fund is financed through a wasting insurance policy. Any continued litigation would decrease the amount of money available for settlement and attorneys' fees. Moreover, due to the complexity and nature of securities litigation, any further litigation would likely be time

consuming as well as expensive due to the need for experts. In light of the potential length of continued litigation, the likely additional costs of this securities class action, and the fact that ACSB has a wasting insurance policies, a one-third fee is reasonable.

### 5. The risk of nonpayment

"Courts across the country have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees." *Yedlowski*, 2016 WL 6661336, at *21. This risk of no recovery "is especially high in securities class actions, as they are 'notably difficult and notoriously uncertain.'" *Id.* (quoting *Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277, 281 (S.D.N.Y. 1993)). In this instance, Lead Counsel undertook this action on a contingency basis with no guarantee that it would be compensated for its time or expenses. Attorneys' Fee Br. at 11. In light of the difficulty of its undertaking, Lead Counsel should be reimbursed for its time and expenses.

### 6. The amount of time devoted to the case by plaintiffs' counsel

The sixth factor considers the time that counsel devoted to this litigation. *Gunter*, 223 F.3d at 199. While this factor will be addressed in the Court's discussion of the lodestar cross-check, the hours that Lead Counsel devoted to this case appear reasonable.

### 7. The awards in similar cases

The one-third fee is within the range of fees typically awarded within the Third Circuit through the percentage-of-recovery method; the Circuit has observed that fee awards generally range from 19% to 45% of the settlement fund. *See In re Gen. Motors*, 55 F.3d at 822. "For smaller securities fraud class actions, 'courts within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses.'" *Yedlowski*, 2016 WL 6661336, at *22

(quoting *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005)). Thus, the requested fee in this matter is within the normal range.

### 8. The Recovery is Solely Attributable to the Efforts of Class Counsel

When Lead Counsel initiated this action no government action against ACSB was announced. Although, a Public Company Accounting Oversight Board ("PCAOB") action against ACSB and Svoboda was announced in November 2013, it failed to make any reference to Tibet.[11] Therefore, the PCAOB action cannot be attributed to Lead Counsel's success here. "The fact that Lead Counsel received no help from any government investigation is a 'significant factor' supporting the fee award." *Yedlowski*, 2016 WL 6661336, at *22.

### 9. The Percentage Fee is Consistent with Contingent Fee Arrangements in Privately Negotiated Non-Class Litigation

A one-third fee is consistent with fee awards in non-class cases. *See id.* at *23. In individual cases, "the customary contingent fee would likely range between 30 and 40 percent of the recovery." *Id.* Consequently, this factor also supports Lead Counsel's fee request.

### B. LODESTAR CROSS-CHECK

The lodestar cross-check "ensures that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a 'windfall' to lead counsel." *In re Cendant Corp. Litig.*, 264 F.3d at 285. Again, to perform the cross-check, a court divides the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier. *In re AT&T*, 455 F.3d at 164.

---

[11] While ACSB and Svoboda did not admit liability, the PCAOB imposed a $10,000 civil penalty on ACSB and barred Svoboda from associating with a registered firm for at least three years. *See* PCOAB Press Release, https://pcaobus.org/News/Releases/Pages/11212013_Enforcement.aspx (Nov. 22, 2013).

Excluding the work it performed exclusively for the A&S bankruptcy proceeding, had the Rosen Firm been paid an hourly rate, it would hypothetically receive $1,313,540 for 2,028.7 hours, with a blended hourly rate of $670.[12] *See* Rosen Fee Decl. ¶ 6. While the blended hourly rate here is on the higher end of the spectrum, the Court recognizes that it is based upon a reasonable hourly rate for such services given the geographical area, the nature of the services provided, and the experience of each attorney. Among other things, the Rosen Firm researched and investigated the facts and claims in this case, prepared the Complaint and the FAC, drafted opposition briefs for multiple motions, reviewed documents produced during discovery, and took and defended multiple depositions. *Id.* ¶ 5. In this instance, the lodestar cross-check results in a multiplier of .53. Attorneys' Fees Br. at 20. "[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Yedlowski*, 2016 WL 6661336, at *19. A negative multiplier, as is the case here, means that Lead Counsel will only be compensated for approximately 50% of its work. However, the multiplier does not appear to be quite as low as indicated because Lead Counsel included hours it spent on matters that do not pertain to ACSB, such as opposing Peng's motion to dismiss for lack of service, and Downs and Zou's motions for summary judgment. However, even excluding these hours, the cross-check still results in a low multiplier. As a result, the Court finds that the lodestar cross-check demonstrates that the requested fee award here is reasonable.

## C. LEAD COUNSEL'S REQUEST FOR REIMBURSEMENT OF FEES

"Counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case."

---

[12] Lead Counsel anticipates receiving an award of attorneys' fees for the A&S bankruptcy proceeding so the Court will not include these hours in its lodestar cross-check. Attorneys' Fees Br. at 19.

*In re Cendant Corp.*, 232 F. Supp. 2d 327, 343 (D.N.J. 2002). Class notice here stated that Lead Counsel may seek reimbursement for expenses not to exceed $150,000. Bravata Decl. Ex. A at 2. Nobody opposed the proposed request for expenses. *Id.* ¶ 12.

Through their motion, Lead Counsel now seeks to be reimbursed for $62,140.25 of litigation expenses that it incurred. Lead Counsel's request is supported with adequate documentation; approximately $52,000 of the expenses are associated with expert fees; $3,373 is associated with service of process fees, much of which is in connection to Lead Plaintiffs' letters rogatory to determine the whereabouts of the IPO proceeds, and the remaining expenses were incurred for online legal research and other miscellaneous fees. Rosen Fee Decl. ¶ 13. These fees are all properly charged to the class. *Yedlowski*, 2016 WL 6661336, at *23. The Court finds that these expenses are reasonable and will award the requested amount of $62,140.25 to Lead Counsel.

### D. LEAD PLAINTIFF AWARD

Finally, Lead Counsel requests an award of $5,000 for each Lead Plaintiff, or a total of $30,000, to compensate them for the time devoted to this case over the last six years. Attorneys' Fees Br. at 19. The PSLRA does not specifically provide for incentive awards to lead plaintiffs but does acknowledge that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). In addition, "the Third Circuit favors encouraging class representatives, by appropriate means, to create common funds and to enforce laws—even approving 'incentive awards' to class representatives." *In re Schering-Plough Corp.*, 2013 WL 5505744, at *56.

Lead Counsel argues that the Lead Plaintiffs should each receive a $5,000 award because collectively, they spent more than 6,000 hours reviewing pleadings, discussing the case with Lead

Counsel, independently following developments regarding Tibet, and preparing for and traveling to their depositions. Rosen Decl. Exs. 4-9. In addition, Class Notice informed potential class members that Lead Plaintiffs were seeking this award and, to date, no objections have been received. Bravata Decl. ¶ 12, Ex. A. Lead Counsel contends that this request is reasonable and that others courts have approved similar awards for Lead Plaintiffs' efforts. *See, e.g.*, *Yedlowski*, 2016 WL 6661336, at *24.

Although Lead Plaintiffs engaged in the type of activities that warrant reimbursement, the Court is concerned by the disparity between the hours spent on this case amongst the individual Lead Plaintiffs. Specifically, Lead Plaintiffs' efforts range from approximately 27 to 3000 hours. Rosen Decl. Ex. 4-9. The Court takes this disparity into account in calculating the awards. As a result, Edmund Obasi is awarded $6,500, Jude Shao is awarded $4,500, Robin Dartell is awarded $4,500, Lixin Wu is awarded $3,000, Jason Helton is awarded $3,000, and Sean Carithers is awarded $1,500.

## VI. CONCLUSION

In sum, Lead Plaintiffs' motion for final approval of the settlement [D.E. 263] is **GRANTED**. Subject to modifications to the Lead Plaintiffs' award, the motion for attorneys' fees [D.E. 265] is also **GRANTED**. An appropriate form of Order accompanies this Opinion.

Dated: June 29, 2017

John Michael Vazquez, U.S.D.J.